**In The United States District Court**
**For The Middle District Of North Carolina**
**Greensboro Division**

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; CENTER FOR FOOD SAFETY; ANIMAL LEGAL DEFENSE FUND; FARM SANCTUARY; FOOD & WATER WATCH; GOVERNMENT ACCOUNTABILITY PROJECT; FARM FORWARD; and AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS | Case No.: 16-cv-25 |
| *Plaintiffs*, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CONCERNING THE CONSTITUTIONALITY OF A STATE STATUTE** |
| v. | |
| ROY COOPER, in his official capacity as Attorney General of North Carolina, and CAROL FOLT, in her official capacity as Chancellor of the University of North Carolina-Chapel Hill, | |
| *Defendants*. | |

## I.     <u>INTRODUCTION</u>

1.     Overriding the Governor's veto, the North Carolina legislature enacted

Session Law 2015-50 (codified at N.C. Gen. Stat. § 99A-2), an "Anti-Sunshine Law"

designed to deter whistleblowing regarding workplace activities by individuals who

seek to inform the public about matters of public concern.  The law attacks the core

values embodied by the federal and state constitutional protections of speech and the

press; it obstructs the federal and state right to petition; it violates the federal and state

constitutional guarantees of equal protection and due process of the laws; and it is

unconstitutionally vague. The law should be declared unconstitutional under the First and Fourteenth Amendments of the United States Constitution, and under Article I, Sections 12, 14, and 19 of the North Carolina Constitution, and Defendants should be enjoined from enforcing its provisions.

2. The text of the Anti-Sunshine Law makes clear that the statute's central targets are whistleblowers, such as investigative journalists and activists engaged in undercover investigations, who seek to share information with the public. Unlike a generally applicable statute that would create liability for all employees, the Anti-Sunshine Law only regulates five enumerated acts, which primarily involve the intentional collection of information that employers and property owners wish to keep from public view. The Anti-Sunshine Law is also focused on those who seek to share that information with the public. The law exempts from liability individuals who collect information and provide it to their superiors or government officials under certain state statutes, rather than releasing it to the public. As a result, the Anti-Sunshine Law is directed at those who set out to investigate employers' and property owners' conduct because they believe there is value in exposing employers' and property owners' unethical or illegal behavior to the disinfecting sunlight of public scrutiny.

3. The Anti-Sunshine Law's legislative history confirms that the statute's aim is to keep whistleblowers from exposing employers' and property owners' hidden conduct to the public. In the words of one of the bill's supporters, the law's goal is to

2

allow employers and property owners to engage in activities of public concern without fear of an "exposé."

4.    Because the Anti-Sunshine Law targets the gathering of information in order to inform the public, it attacks "the core value" embodied by the federal and state constitutional protections of speech and the press, "[t]he public interest in having free and unhindered debate on matters of public importance." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 573 (1968). It is a content-based regulation of speech, which also discriminates based on the viewpoint of the speaker, a particularly "egregious form of content discrimination." *Rosenberger v. Rectors & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). It also targets and disproportionally burdens the press. Such infringements on speech or the press are presumptively unconstitutional, requiring the state to carry a significant burden in order to preserve the statute, which it cannot do here. *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983). Further, the Anti-Sunshine Law is unconstitutionally overbroad. While Plaintiffs contend that the law cannot ever be constitutionally applied, even if it had some constitutional applications—and even if the law could be constitutionally applied to Plaintiffs—the Anti-Sunshine Law's unconstitutional applications substantially outweigh its constitutional ones and, as a result, the law must be struck down.

5.    Further, the Anti-Sunshine Law also interferes with citizens' ability "to express their ideas . . . and concerns to their government" and thus violates the right to petition afforded by the First Amendment of the United States Constitution, and

3

Article I, Section 12 of the North Carolina Constitution. *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2495 (2011). In fact, because the statute only carves out an exception for reporting employers' or property owners' activities under certain state laws, it prohibits citizens reporting to their government through other, statutorily prescribed channels. As a result, the law can only stand in the "most extreme circumstances," a showing the state cannot make here. *McDonald v. Smith*, 472 U.S. 479, 486 (1985) (Brennan, J. concurring).

6. The Anti-Sunshine Law also violates the guarantees of equal protection and due process of laws provided for in the Fourteenth Amendment of the United States Constitution, and Article I, Section 19 of the North Carolina Constitution. The statute's legislative history reveals that the law was motivated by animus towards, and targeted at a particular class of individuals and interferes with their fundamental right of free speech. Therefore, at the least, the law is subject to strict scrutiny, placing the burden on the state to demonstrate the law's constitutionality, which it cannot do. *See Massachusetts Bd. of Ret. v. Murgia,* 427 U.S. 307, 312 & n.3 (1976). Thus, the Anti-Sunshine Law cannot stand.

7. Finally, the Anti-Sunshine Law is unconstitutionally vague under the First and Fourteenth Amendments of the United States Constitution, and Article I, Sections 14 and 19 of the North Carolina Constitution. The Anti-Sunshine Law is a quasi-criminal statute that interferes with speech, yet it fails to define a variety of key terms in § 99A-2(b)(1) and § 99A-2(b)(2). In this manner, the Anti-Sunshine Law fails to

4

provide due process and suppresses a substantial amount of constitutionally protected speech.  Accordingly, §§ 99A-2(b)(1)-(b)(2) are unconstitutional.

8.      Therefore, Plaintiffs ask the Court to declare the Anti-Sunshine Law unconstitutional under the First and Fourteenth Amendments to the United States Constitution, and Article I, Sections 12, 14, and 19 of the North Carolina Constitution, and to enjoin Defendants from enforcing the statute so that Plaintiffs can continue to engage in their constitutionally protected activities.

## II.     **JURISDICTION AND VENUE**

9.      This action arises under the United States Constitution and the laws of the United States, including 42 U.S.C. §§ 1983 and 1988.  Therefore, this Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

10.     North Carolina law provides a cause of action against state officials for violations of the state constitution.  *State v. Petersilie*, 432 S.E.2d 832, 841 (N.C. 1993).

11.     Pursuant to 28 U.S.C. § 1367 the Court may exercise supplemental jurisdiction over the claims arising under the North Carolina state constitution.

12.     This action also arises under the Court's inherent equitable jurisdiction.

13.     This Court has authority to grant the declaratory and injunctive relief requested pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure, as well as the Court's inherent equitable powers.

14.     Venue is proper in the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(1) and (2).

### III. PARTIES

#### A. Plaintiffs

15.     Plaintiff PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC. ("PETA") is a Virginia non-stock corporation and animal protection charity exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code. PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, undercover investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals.

16.     As explained in further detail below, PETA has conducted undercover investigations in North Carolina and wishes to continue to conduct such investigations in the future, but it has been deterred from doing so for fear of being sued for damages under the Anti-Sunshine Law.

17.     PETA's first undercover investigation—the 1981 investigation of Dr. Edward Taub's monkey testing laboratory in Silver Spring, Maryland—resulted in the nation's first arrest and criminal conviction of an animal experimenter for cruelty to animals.  PETA's experience establishes that confronting the public with evidence of animal cruelty is its most effective form of advocacy, because it can build support to ensure existing laws are enforced, advance additional legal protections, and encourage entities to adopt more humane practices.  Among other tools that it employs to expose and educate the public about animal cruelty, PETA publishes a magazine, *Animal Times*, produces a blog with approximately a half-dozen posts per day, publishes

6

videos that receive hundreds of thousands of views, and drafts op-eds, letters to the editor, and articles for publication. PETA employs dozens of people to engage in this work and it draws substantially from the information gathered through its undercover investigations of private and governmental operations. Without access to information from undercover investigations, PETA is unable to engage in its desired form of speech to further its mission.

18.     Moreover, because of the Anti-Sunshine Law, in order to engage in its undercover investigations, to advance its mission, PETA would have to accept the risk of liability. Typically, PETA's investigators, at PETA's behest, seek out jobs at facilities PETA believes are engaged in acts of animal cruelty. Those investigators use their real names to obtain at-will positions in the facilities, merely omitting from their applications their current employment. While employed at the facilities, investigators perform all of the functions they are assigned or instructed to engage in to the best of their abilities. The investigators also seek to gather information from non-public areas regarding the facilities' treatment of animals. Once they have collected sufficient information, the investigators leave their at-will positions in good standing. PETA presents evidence of illegal conduct to the proper federal, state, and local authorities. PETA's mission and advocacy also involves releasing evidence of the unethical or illegal treatment of animals to the public through news articles, blog posts, videos, and/or press releases.

19.     Through publically exposing the unethical or illegal conduct that employers have kept from public view, PETA's undercover investigations, including

7

investigations in North Carolina, have resulted in significant policy changes and enforcement actions that have protected animals and changed the way the public thinks about animal rights. For instance, one PETA investigator obtained employment in the kennels of Professional Laboratory and Research Services, near Raleigh, North Carolina. There, in the private areas, where the animals were kept, tested on, and "treated" by staff, the investigator documented the kennel testing insecticides and other chemicals on the dogs and cats at the behest of Bayer, Eli Lilly, Novartis, Schering-Plough (now Merck), Sergeant's, Wellmark, and Merial. Through his access to the non-public areas, the investigator was also able to record staff abusing the animals. PETA filed a complaint with USDA and released this information to the public. The public pressure this campaign brought to bear resulted in the facility surrendering 200 dogs and 50 cats and the first-ever felony cruelty charges against laboratory workers for their abuse and neglect.[1]

20.    Another PETA investigator obtained employment at a North Carolina hog farm that supplies Smithfield Foods and, while working in non-public areas, recorded workers dragging the pigs by their ears and snouts, and supervisors describing how they beat the animals. PETA released this video to the public and, as a direct result of

_____

[1] *See Professional Laboratory and Research Services Undercover Investigation*, http://www.peta.org/features/professional-laboratory-research-services/.

8

the attention generated by that video, one of the workers was charged with six counts of animal cruelty.[2]

21.    PETA has similarly conducted undercover investigations of state-run facilities in North Carolina, which, if they were conducted today, would force PETA to accept the risk of liability under the Anti-Sunshine Law.  From 2001-2003 PETA conducted investigations of animal laboratories at the University of North Carolina-Chapel Hill ("UNC-Chapel Hill").  Two PETA investigators secured at-will jobs as animal care technicians in the UNC-Chapel Hill animal testing laboratories, performing all of the functions of animal care technicians.  In the non-public areas of the facilities, PETA's investigators gathered information, including making recordings, showing that the workers disregarded animal care protocols and government orders, for instance, cutting off the heads of rat pups while the pups were still conscious and in violation of protocol.  PETA's investigators tried to report these violations to university personnel, but other employees in the lab discarded and hid evidence, and a supervisor instructed PETA's investigators not to tell him about the violations.  PETA publicized its findings and filed a report with the National Institutes of Health, which confirmed PETA's allegations.[3]

22.    On information and belief, the unethical and illegal treatment of animals continues at these UNC-Chapel Hill laboratories.  As part of its mission, PETA would

_____

[2] *See Charges Filed After Investigation Reveals Torture of Pigs*, http://www.peta.org/action/action-alerts/charges-filed-investigation-reveals-torture-pigs/.
[3] *See PETA Investigations Reveal Taxpayer-Funded Torture at UNC Laboratory*, http://www.peta.org/features/unc/.

9

conduct another undercover investigation of these facilities, instructing one of its investigators to secure employment at the facilities in order to record activities and collect data so that PETA could then release that information to the public, expose the behavior, and build public pressure for change. However, PETA fears liability under the Anti-Sunshine Law. Therefore, because of the chill created by the Anti-Sunshine Law, PETA has chosen not to undertake this investigation of the UNC-Chapel Hill laboratories and has been prevented from engaging in its chosen form of speech and advocacy.

23.     Plaintiff CENTER FOR FOOD SAFETY ("CFS") is a 501(c)(3) non-profit public interest and environmental advocacy organization dedicated to ensuring the public's right to know how their food is produced and protecting human health and the environment by curbing the use of harmful food production technologies, including industrial animal agriculture, and by promoting organic and other forms of sustainable agriculture. Accordingly, CFS utilizes regulatory actions, citizen engagement, legislation, and, when necessary, litigation, to promote transparency and accountability in industrial agriculture. CFS is a membership organization with over 700,000 members nationwide, including 14,663 members in North Carolina.

24.     To accomplish its mission, CFS disseminates to government agencies, legislatures, and the general public a wide array of informational materials addressing the harmful effects of industrial agriculture. These materials—which are distributed in North Carolina and elsewhere—include news articles, scientific and policy reports, books, legal briefs, press releases, action alerts, and fact sheets. In the course of the

10

Anti-Sunshine Law's passage, veto, and subsequent re-passage, CFS created three webpages and sent six "action alerts" to its North Carolina members urging them to contact their state legislators and the Governor to take actions against the bill. Because the Anti-Sunshine Law was originally passed, was vetoed, and then the veto was overridden, CFS expended more of its highly limited resources to stop the bill's ultimate passage than it typically does on pending legislation. CFS' expenditures on the Anti-Sunshine Law harmed CFS' ability to carry out its core mission. CFS had to divert resources away from its core activities to work against the legislation, as the Anti-Sunshine Law will prevent the creation and dissemination of information on which CFS relies to inform the public about how its food is produced and to prevent harmful food production technologies.

25.     Indeed, CFS relies on and uses information obtained by whistleblowers, such as undercover investigations of industrial agriculture operations, like those conducted by Plaintiffs, for the informational, legal, and advocacy materials it develops and distributes. For example, in 2014 CFS utilized information from numerous undercover investigations at egg-production facilities that employ battery cages to formulate and substantiate its arguments in an amicus brief in support of California's ban on the sale of eggs from such facilities.[4] The brief demonstrated the association between foodborne illness and the use of battery cages, as revealed by undercover investigations that documented unsanitary and inhumane conditions in

_____

[4] *See* Amici Curiae Br. in Support of Defs.' and Def.-Intervenors' Mots. to Dismiss, *Missouri v. Harris*, 58 F. Supp. 3d 1059 (E.D. Cal. 2014) (No. 2:14-cv-00341-KJM), 2014 WL 3726702.

11

battery cage facilities. CFS cited to the same investigations in letters to members of the Massachusetts state senate urging them to support legislation to prevent farm animal cruelty.[5] In 2015, CFS utilized information from undercover investigations of veal calf facilities in formulating administrative comments to the United States Department of Agriculture ("USDA"), Food Safety & Inspection Service ("FSIS"), urging the agency to amend requirements for the disposition of non-ambulatory disabled veal calves under the Humane Methods of Slaughter Act ("HMSA").[6] Most recently, CFS has used information from undercover investigations at the Hallmark/Westland slaughter plant in a letter to FSIS in support of a petition to improve enforcement of the HMSA. At the time of the cited investigation, Hallmark was the second-largest supplier of beef to the USDA Agricultural Marketing Service, which purchases beef for distribution to the public under various social services programs. Based on the information revealed by the investigations, FSIS amended its HMSA regulations.

26.   Because of the chilling effect of the Anti-Sunshine Law, CFS will be hindered in carrying out its mission by being denied access to information uncovered by whistleblowers that it would use to inform its members, the public, and the government about food safety and animal welfare issues, including violations of federal law. Likewise, CFS's members will be harmed by being denied access to such information through CFS. CFS would like to continue to rely on information from

---

[5] *See* Letter from Rebecca Spector, West Coast Director, Ctr. for Food Safety, to Members of the Joint Comm. On the Judiciary (June 2014) (on file with author).
[6] *See* Comments, Aug 12 2015, Docket No. FSIS-2014-0020.

undercover investigations in its advocacy. By discouraging whistleblowing, and particularly the public distribution of the information gathered by such sources, on which CFS relies to carry out its mission, the Anti-Sunshine Law has prevented and will prevent CFS from engaging in its desired form of speech. Moreover, CFS is concerned that its future use of materials derived from undercover investigations could subject it to liability under the Anti-Sunshine Law.

27. Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a national 501(c)(3) non-profit animal protection organization founded in 1979 that uses education, public outreach, investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those animals who are raised for food, used in biomedical research, exhibited to the public, or bred as pets. ALDF's work is supported by more than 110,000 members across the country, many of which live in North Carolina. Among the materials that ALDF produces to advance its work are a quarterly publication, *The Animals' Advocate*, articles, press releases, reports, and a blog.

28. As explained in further detail below, ALDF and its agents have conducted undercover investigations at animal facilities around the country, including at least a dozen in North Carolina. ALDF wishes to continue to conduct such investigations in North Carolina, but it has been deterred from doing so for fear of being sued for damages under the Anti-Sunshine Law.

29. Among the tactics ALDF employs in its undercover investigations are for an ALDF-employee to obtain employment with an organization that ALDF believes is

13

engaged in the unethical or illegal treatment of animals. In non-public areas of an organization, the investigator then collects information and/or makes recordings regarding the organization's conduct. ALDF investigators may also be instructed to leave recording devices unattended to capture images and sound over a longer duration, such as to document the severity of repetitive pathological stereotypies in captive wild animals, or the length of time for which a sick or injured animal goes without veterinary care. In order to advance its mission, ALDF releases the evidence uncovered during its investigations to the public.

30.     ALDF would like to conduct undercover investigations in North Carolina and has an investigative team capable of doing so. ALDF's Manager of Investigations has personally conducted undercover employment-based investigations in North Carolina of the kind prohibited by the Anti-Sunshine Law. ALDF has recruited specific investigators who are ready, willing, and able to conduct undercover investigations at animal facilities in North Carolina. ALDF has spent several thousand dollars to run radio advertisements in North Carolina in an effort to recruit further investigators. ALDF has also created a comprehensive list of animal facilities including farms, research facilities, puppy mills, and animal hoarders in North Carolina, which are locations for potential investigations. This list includes a number of governmental facilities. ALDF has even collected employment applications at some of these facilities. In short, ALDF has done everything *but* violate the Anti-Sunshine Law. It has refrained from taking the final step to actualize an investigation,

14

for fear of liability it cannot afford.  In other words, the Anti-Sunshine Law has chilled ALDF's ability to engage in constitutionally protected advocacy.

31.     Moreover, ALDF's core mission of improving the lives of animals is fundamentally impaired by the Anti-Sunshine Law.  ALDF uses investigations to support its litigation and outreach, and the Anti-Sunshine Law directly impedes these efforts by diminishing the supply of such investigations.  To take an example, ALDF participated in the legal effort to shut down All Creatures Great and Small, an animal hoarder masquerading as a rescue shelter in Hendersonville, North Carolina.  A PETA undercover investigation at All Creatures Great and Small provided indisputable evidence that hundreds of dogs and cats were suffering in filthy, deplorable conditions, many with untreated wounds and diseases.  Ultimately the facility was shut down and hundreds of animals were rescued, a result that would not have occurred if not for photo and video evidence collected by PETA's undercover investigator who spent several months employed at the facility.  That very same investigator now leads ALDF's investigations program.  Because the Anti-Sunshine Law impedes ALDF's access to evidence of animal cruelty, it frustrates ALDF's mission of using the legal system to advance the interests of animals.

32.     Further still, ALDF relies on the information gathered through its own and other organizations' undercover investigations, like those conducted by Plaintiff PETA, for the materials that it produces.  Indeed, ALDF has specific and definite plans to produce additional materials building on and citing to the information generated through undercover investigations.  However, because of the Anti-Sunshine

15

Law's chilling effect on investigations by whistleblowers, and the public distribution of information gathered by such individuals, on which ADLF relies to carry out its mission, the Anti-Sunshine Law has prevented and will prevent ADLF from engaging in its desired form of speech. Moreover, ALDF fears that simply its use of information from such whistleblowers could subject it to liability under the Anti-Sunshine Law.

33. To combat these frustrations of its mission, ALDF has diverted significant resources to prevent the spread of unconstitutional laws like and including the one enacted in North Carolina. ALDF was extremely active in the legislative campaign to prevent the passage of the Anti-Sunshine Law, then in the campaign to convince Governor McCrory to veto the bill, and finally in the campaign against the veto override. ALDF used social media and action alerts to urge its members and supporters in North Carolina to contact their legislators to oppose the Anti-Sunshine Law. These expenditures to counteract the unconstitutional violations of various persons' civil rights constitute a harmful diversion of ALDF's very limited resources and a loss to the organization, because those resources would otherwise be better spent furthering ALDF's core mission of directly protecting the lives and advancing the interests of animals through the legal system. ALDF, however, is obligated to divert its resources in order to prevent the harm that "Ag-Gag" laws, like and including the one enacted in North Carolina, pose to ALDF's core mission.

34. Plaintiff FARM SANCTUARY is a non-profit 501(c)(3) animal-advocacy organization with over 250,000 constituents nationwide, including constituents in

North Carolina. Farm Sanctuary focuses its efforts exclusively on farm animals and is the largest farm animal rescue and protection organization in the United States. Core to its mission is protecting farm animals from cruelty and encouraging a new public awareness about farm animals through education and media outreach. Its education efforts and media outreach include public appearances, maintaining a blog, producing literature and videos, issuing press statements, and serving as a source for journalists and media.

35.     To further its mission, Farm Sanctuary has conducted farm animal investigations, in which its investigators have either entered onto properties or obtained employment in order to access non-public areas and gather evidence, and/or record images of animal cruelty. After obtaining this information, Farm Sanctuary turned over evidence of illegal activities to proper authorities, and released the information to the public. Its investigation helped form the foundation for federal intervention to stop the inhumane and unsanitary slaughter of animals. And showing the public images of the mistreatment of farm animals furthers Farm Sanctuary's mission to raise awareness.

36.     Moreover, Farm Sanctuary's education efforts and media outreach rely on the information gathered by its own and other organizations' undercover investigations, like those conducted by Plaintiffs PETA and ALDF. Farm Sanctuary has relied on the information gathered through undercover investigations in its campaigns—targeting the public and legislatures—to stop the inhumane confinement of animals, the inhumane transportation and marketing of downed animals, and the

17

inhumane treatment of ducks in the production of foie gras. Farm Sanctuary would like to continue to rely on information from undercover investigations in its advocacy. However, because of the Anti-Sunshine Law's chilling effect on investigations by whistleblowers, and the public distribution of information gathered by such individuals, on which Farm Sanctuary relies to carry out its mission, the Anti-Sunshine Law has prevented and will prevent Farm Sanctuary from engaging in its desired form of speech. Moreover, Farm Sanctuary fears that its use of information from such whistleblowers could subject it to liability under the Anti-Sunshine Law.

37.     Plaintiff FOOD & WATER WATCH ("FWW") is a is a 501(c)(3) non-profit organization that advocates for common-sense policies that will result in healthy, safe food, and access to safe and affordable drinking water. FWW is a membership organization with close to 70,000 members nationwide, including 2,000 members in North Carolina. FWW also maintains a presence in North Carolina with organizing staff, legal and communications support staff, and a supporter email list of approximately 22,000 people. FWW's objective is to ensure that Americans consume safe, accessible, and sustainably produced food, fish, and water and to enable people to take charge of where their food comes from. Accordingly, FWW advocates extensively on issues surrounding industrial agricultural systems, and fracking, and to ensure clean, accessible, and safe water resources. FWW fears that the Anti-Sunshine Law will inhibit and interfere with FWW's ability to carry out its mission and serve its members' and supporters' needs.

18

38.     In particular, FWW accomplishes its ends through engagement with the public and the government, regulatory actions, and litigation.  In order to educate the public and the government about the risks presented by current food production methods and water contamination, FWW maintains a blog, produces news articles, press releases, and reports, and issues fact sheets and action alerts.  It releases and places these materials in North Carolina and elsewhere.  Among the material these publications rely on is information gathered by public whistleblowers concerning factory farms, food processing plants, and polluting facilities.  Because of the Anti-Sunshine Law's chilling effect on investigations by whistleblowers, and the public distribution of information gathered by such individuals, on which FWW relies to carry out its mission, the Anti-Sunshine Law has prevented and will prevent FWW from engaging in its desired form of speech.

39.     For instance, at present, FWW is the lead plaintiff in ongoing litigation concerning the new poultry processing inspection rules issued by USDA.  *Food & Water Watch, et al. v. Tom Vilsack, et al.,* No. 14-01547 (D.D.C.).  During the development of that legal action, FWW attorneys worked closely with whistleblowers from the USDA's FSIS, including some federal poultry inspectors, who were deeply concerned about how the new inspection regime was being implemented in poultry processing plants across the country.  FWW relied on this information to both inform its membership and the general public about the dangers of the new inspection system, as well as develop the lawsuit to protect the public's right to safe food.  The Anti-Sunshine Law will interfere with FWW's ability to engage in such protected

19

activities.  Moreover, FWW fears that its use of information from such whistleblowers could subject it to liability under the Anti-Sunshine Law.

40.    Plaintiff GOVERNMENT ACCOUNTABILITY PROJECT ("GAP") is an independent, non-partisan, and non-profit organization that promotes corporate and government accountability by protecting whistleblowers and advancing occupational free speech.  GAP defines a "whistleblower" as any private or public-sector employee who discloses information that he reasonably believes is evidence of illegality, gross waste or fraud, mismanagement, abuse of power, general wrongdoing, or a substantial and specific danger to public health and safety.  Typically, whistleblowers speak out to parties that can influence and rectify the situation.  These parties include the media, organizational managers, hotlines, or legislative and Congressional members or staff. GAP defends whistleblowers and offers legal assistance where disclosures in any of these forms affect the public interest.

41.    For over 38 years, GAP has represented major whistleblowers who have exposed gross injustices under every presidential administration since the group's inception.  Since 2012, GAP has been approached by more than 30 whistleblowers in North Carolina from a wide-range of industries, including academia, agriculture, and pharmaceutical companies.  GAP has advocated on behalf of or is advocating for North Carolinian chicken farmers who blew the whistle on Perdue Farms' poor animal welfare and labeling practices, which resulted in an OSHA complaint; a Wyeth Pharmaceutical employee who exposed training deficiencies at the Wyeth facility in Stanford, North Carolina, which resulted in litigation under the Sarbanes-

20

Oxley Act; and a UNC-Chapel Hill employee, whose disclosures revealed the largest academic fraud in NCAA history. Accordingly, GAP is also at the forefront of advocating for whistleblower rights and protections, including in North Carolina, having seen retaliation against such individuals, ranging from professional demotions to criminal prosecutions.

42. Among the ways that GAP advances its advocacy are maintaining a blog, producing news articles, press releases, and reports, and issuing fact sheets and action alerts. It releases and places these materials in North Carolina and elsewhere, including placing an op-ed in the Charlotte Observer and serving as a source for North Carolina newspapers. These advocacy materials rely on and relay the important evidence that whistleblowers have provided about both public and private employers' unethical or illegal activities. Beyond publicizing the stories of whistleblowers, GAP also relies on and utilizes the information obtained by undercover investigations conducted by activist groups, like those conducted by Plaintiffs PETA, ALDF and Farm Sanctuary, to corroborate whistleblowers' stories. As a result, because of the Anti-Sunshine Law's chilling effect on investigations by whistleblowers, and particularly the public distribution of information gathered by such individuals, on which GAP relies to carry out its mission, the Anti-Sunshine Law has prevented and will prevent GAP from engaging in its desired form of speech. Moreover, GAP fears liability under the statute. GAP fears that its mission to defend whistleblowers and its use of information derived from whistleblowers in its materials could subject it to liability under the Anti-Sunshine Law.

21

43.     Plaintiff FARM FORWARD is a 501(c)(3) non-profit organization that seeks to implement innovative strategies to promote conscientious food choices, reduce farm animal suffering, and advance sustainable agriculture.  Farm Forward works to eliminate the worst practices in factory farming; advocates an acute reduction in the consumption of factory-farmed meat, fish, eggs, and dairy by encouraging conscientious consumer decision-making; supports interdisciplinary research and undergraduate teaching about the cultural significance of animals and animal agriculture; and stimulates the production of essays, books, films, and religious activities that raise awareness about the problems in animal agriculture and the deeper cultural issues behind them.  For instance, Farm Forward routinely publishes features on factory farming via its website, and consulted on the writing of the 2008 book *The Veganist*.  Farm Forward also consulted heavily on the research, writing, and tone of the book *Eating Animals*, and has helped develop content for the forthcoming documentary film version of that book.  Farm Forward has over 40,000 newsletter subscribers and over 30,000 social media users, many of whom reside in North Carolina.

44.     To accomplish its mission, Farm Forward relies extensively on investigative reporting of factory farms to inform consumers about their cruelty, including reporting stemming from investigations like those of Plaintiffs PETA, ALDF and Farm Sanctuary.  For instance, the book *Eating Animals*, written by best-selling novelist and Farm Forward Board Member Jonathan Safran Foer, used information obtained via many undercover investigations, including investigations of

22

Agriprocessors, to show readers the welfare problems common to industrialized animal agriculture. In fact, the author himself participated in one such investigation. In addition, Farm Forward's BuyingMayo campaign, which helped lead Unilever— the world's third largest consumer goods company—to commit to developing an egg supply chain that would not kill male chicks, used footage obtained from an undercover investigation. Further, Farm Forward used information obtained during an undercover investigation of the Hallmark/Westland slaughter facility in its special report entitled "Exposing Ag-Gag." Farm Forward would like to continue to rely on information from undercover investigations in its advocacy. In fact, Farm Forward maintains a separate petition website (ag-gag.org) that allows users to oppose laws like the Anti-Sunshine Law.

45. North Carolina's Anti-Sunshine Law substantially impairs Farm Forward's ability to inform consumers about the worst practices in factory farming because it has chilled and will chill the public distribution of the information on which Farm Forward relies to carry out its mission. Therefore, the Anti-Sunshine Law has prevented and will prevent Farm Forward from engaging in its desired form of speech. Moreover, Farm Forward will have to devote additional resources to explain the factory farm system because the system is being hidden from public view. For example, Farm Forward produces a humane buying guide for consumers called BuyingPoultry. The chilling effect created by North Carolina's Anti-Sunshine Law will require Farm Forward to expend additional staff time to explain to consumers why they should utilize guides like BuyingPoultry and purchase higher welfare

23

products, because it will be more difficult to demonstrate the problems of industrial agriculture without reference to information gathered by whistleblowers, which would be available to Farm Forward except for the Anti-Sunshine Law.  Finally, Farm Forward fears that it could incur liability under the Anti-Sunshine Law by directly or indirectly inducing an individual or organization to violate the law's provisions.

46.     Plaintiff the AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS ("ASPCA") was incorporated in 1866 by a special act of the New York State legislature, and is a not-for-profit corporation whose mission is to provide an effective means for the prevention of cruelty to animals throughout the United States.  The ASPCA is the nation's oldest humane organization and, today, is also one of the largest, with roughly 2.5 million supporters nationwide, including over 75,000 in North Carolina.

47.     The ASPCA is nationally known for its advocacy for and assistance with investigative work on behalf of animals, much of which relies on members of the public to report animal cruelty and abuse at facilities and businesses that breed, raise, sell, transport or house animals.  The ASPCA fears that its encouragement of members of the public to take such action and its use of information obtained as a result will subject it to liability under the Anti-Sunshine Law.

48.     For example, farm animal welfare is a key area of focus for the ASPCA. Many Americans are unaware of how animals are raised and treated on large-scale, industrial farms, the source of 99% of animals used for food products in this country. The ASPCA is currently waging a multifaceted campaign to raise consumer

24

awareness about the inhumane conditions at these facilities, inform consumers about the difference between conventionally raised and higher welfare animal products, and encourage consumers to demand more humane standards so that companies will eliminate some of the worst farming practices. The ASPCA advocates for greater transparency on large-scale, industrial farms, believing that consumers must know the conditions under which their food is produced in order to make informed purchasing decisions.

49.     Because the practices and operations of large-scale industrial farms are largely concealed from public view, information, photographs, and video from employee whistleblower investigations at these facilities are critical to the ASPCA's advocacy work. The ASPCA also relies on information from undercover investigations conducted by animal welfare organizations like Plaintiffs.

50.     The ASPCA publishes information from undercover investigations, including photographs and videos, in magazines sent by mail to its supporters, in reports, and on its websites—including the sites Truth About Chicken, and Change Your Chicken Challenge. The ASPCA frequently updates these materials with additional news articles, ASPCA press releases and studies, and other information highlighting inhumane practices by agricultural producers. *See*, *e.g.*, *New Investigation: Live Chickens on Factory Farm Buried with the Dead; Living in Filth* (Truth About Chicken web article based on revelations by a whistleblower employed at a North Carolina factory chicken facility); *A Growing Problem -- Selective*

*Breeding in the Chicken Industry:  The Case for Slower Growth* (ASPCA report containing photos obtained through undercover operations).

51.     The ASPCA has relied on, and wishes to continue to rely on, information uncovered by whistleblowers working at large-scale industrial farms to inform its members, the public, and the government about the inhumane treatment of farm animals and thereby advocate for positive change in the conditions under which billions of animals are kept.  The ASPCA also depends on whistleblowers to expose and change inhumane practices and conditions at large-scale substandard commercial dog and cat breeding facilities, whose operations are likewise largely hidden from public view.  The chilling effect of the Anti-Sunshine Law has had an adverse effect and will have a substantial impact on the ASPCA's ability to carry out this work.  The Anti-Sunshine Law has and will prevent the ASPCA from engaging in its desired form of speech, and the ASPCA fears that its use of such information will expose it to liability under the Anti-Sunshine Law.

52.     In addition, the ASPCA regularly assists law enforcement with investigations of animal neglect and cruelty across the country, as well as the prosecutors that pursue those cases.  The ASPCA's primary goals in assisting these investigations, which include several ongoing investigations in North Carolina, are rescuing the animal victims from abusive and inhumane situations and ensuring the effective prosecution of the perpetrators.  These investigations are sometimes initiated because of, or rely heavily upon, information and evidence of unlawful practices exposed by employee whistleblowers working at commercial dog breeders, pet stores,

26

boarding facilities, or animal sanctuaries and rescues. The Anti-Sunshine Law will deter potential whistleblowers from publicly exposing such abuses and potentially subject the ASPCA to substantial civil liability for using information from whistleblowers who come forward to provide the ASPCA with evidence of neglect or cruelty.

## B. Defendants

53.      Defendant North Carolina Attorney General ROY COOPER, sued in his official capacity, is the chief law enforcement officer of North Carolina with both statutory authority and "those powers of the Attorney General that existed at the common law." N.C. Gen. Stat. § 114-1.1. The Attorney General has the "duty . . . to appear for the State in any [] court or tribunal in any cause or matter, civil or criminal, in which the State may be a party or interested." N.C. Gen. Stat. § 114-2(1). The North Carolina Attorney General also has the "duty . . . [t]o represent all State departments, agencies, institutions, commissions, bureaus or other organized activities of the State which receive support in whole or in part from the State." N.C. Gen. Stat. § 114-2(2).

54.      Defendant Chancellor CAROL FOLT, sued in her official capacity, is the Chancellor of UNC-Chapel Hill. The Chancellor of UNC-Chapel Hill is the "administrative and executive head of [that] institution" and exercises "complete executive authority therein." N.C. Gen. Stat. § 116-34(a).

27

## IV. **FACTS**

### A. **The Anti-Sunshine Law**

55.     Over the Governor's veto, the Anti-Sunshine Law was passed into law on
June 3, 2015.

56.     The Anti-Sunshine Law represents the legislature's third attempt to enact
such legislation.  The legislature twice previously failed to pass a version of the law
focused on insulating agricultural operations from scrutiny.[7]  Such a bill would have
directly aligned North Carolina with other states that have passed "Ag-Gag" laws
targeted at whistleblowing in the agriculture industry.  Because such laws are content-
based restrictions on speech, prompted by animus against the speakers, they have
been struck down as unconstitutional.  *Animal Legal Defense Fund v. Otter*, __ F.
Supp.3d ___, No.14-00104, 2015 WL 4623943 (D. Idaho Aug. 3, 2015) (striking
down Idaho's Ag-Gag law on First Amendment and equal protection grounds; appeal
pending); *accord Animal Legal Defense Fund v. Herbert,* No. 13-00679 (D. Utah
Aug. 8, 2014) (Dk. No. 53) (denying the state's motion to dismiss First Amendment
and equal protection claims in challenge to Utah's Ag-Gag law); *Western Watersheds
Project v. Michael*, __ F. Supp.3d ___, No. 15-0169 (D.Wyo. Dec. 28, 2015) (Dk. No.
40) (denying the state's motion to dismiss suit against Wyoming's law prohibiting
investigations of and reporting on the environmental impact of grazing because the
court has "grave concerns" about its constitutionality).

---

[7] Craig Jarvis, *Protests Mount on NC Workplace Bill*, The News & Observer, May
27, 2015, *available at* http://www.newsobserver.com/news/politics-
government/state-politics/article22444584.html.

28

57.     The North Carolina legislature's response was to broaden the law to apply to "legitimate whistleblowers" from any and all industries. [8]  As a result, after its initial passage, a broad coalition of advocacy groups campaigned to stop the governor from signing the Anti-Sunshine Law.  For example, AARP explained that the bill would discourage nursing home workers from documenting elder abuse.  When vetoing the law, the Governor cited these concerns, also explaining that he could not support the legislation because it "contradict[ed]" Burt's Law, a statute requiring workers to report abuse of mentally ill and intellectually disabled patients.[9]

58.     Despite the Governor's concerns, the legislature overrode his veto, and the Anti-Sunshine Law, codified at N.C. Gen. Stat. § 99A-2, took effect on January 1, 2016.

59.     N.C. Gen. Stat. § 99A-2(a) provides a cause of action against "[a]ny person who intentionally gains access to the nonpublic areas of another's premises and engages in an act that exceeds the person's authority to enter those areas . . . for any damages sustained" by the "owner or operators of the premises."

60.     However, the statute defines certain of its terms to make clear that the statute is not applicable to all employees who act outside the scope of their employment, but targets a specific class of individuals:  those who seek to gather and publicly disclose information on matters of public concern.

---

[8] Craig Jarvis, *McCrory Vetoes Workplace Bill*, Charlotte Observer, May 29, 2015, *available at* http://www.charlotteobserver.com/news/politics-government/article22610133.html.
[9] *Id.*

61.    "'[N]onpublic areas'" are defined to "mean those areas not accessible to or not intended to be accessed by the general public."  N.C. Gen. Stat. § 99A-2(a).

62.    "[A]n act that exceeds a person's authority to enter the nonpublic areas of another's premises" is defined to mean one of five enumerated acts.  N.C. Gen. Stat. § 99A-2(b).  They are:

      a. An individual who has been hired as an employee "enter[ing] the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization captur[ing] or remov[ing] the employer's data, paper, records, or any other documents and us[ing] the information to breach the person's duty of loyalty to the employer."  N.C. Gen. Stat. § 99A-2(b)(1).

      b. An individual who has been hired as an employee "intentionally enter[ing] the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization record[ing] images or sound occurring within an employer's premises and us[ing] the recording to breach the person's duty of loyalty to the employer."  N.C. Gen. Stat. § 99A-2(b)(2).

      c. Any person "[k]nowingly or intentionally placing on the employer's premises an unattended camera or electronic surveillance device and

30

using that device to record images or data."  N.C. Gen. Stat. § 99A-2(b)(3).

    d. Any person "[c]onspiring in organized retail theft, as defined in Article 16A of Chapter 14 of the General Statutes."  N.C. Gen. Stat. § 99A-2(b)(4).

    e. Any person engaging in an "act that substantially interferes with the ownership or possession of real property."  N.C. Gen. Stat. § 99A-2(b)(5).

63.    In this manner, through N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(3) and N.C. Gen. Stat. § 99A-2(b)(5), the Anti-Sunshine Law expressly targets the speech of whistleblowers whose objective is to bring to light employers' and property owners' unethical or illegal activities.[10]

64.    These provisions only apply to individuals who "*intentionally*" access employers' or property owners' "nonpublic areas," defined to mean those areas that contain information "not intended to be accessed by the general public."  N.C. Gen. Stat. § 99A-2(a) (emphasis added).  Three of the four types of covered conduct concern an individual *purposefully* setting out to collect information from those nonpublic areas.  N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(3) (covering an individual intentionally entering nonpublic areas to collect documents or recordings, or leaving a

---

[10] Plaintiffs do not contend that, standing alone, N.C. Gen. Stat. § 99A-2(b)(4)—which concerns individuals engaging in retail theft as defined in Article 16A of Chapter 14 of the General Statutes, the only other type of conduct actionable under the Anti-Sunshine Law—would be unconstitutional.

31

recording device unattended). The fourth type of covered conduct appears to encompass the collateral consequences of purposefully collecting information from nonpublic areas. N.C. Gen. Stat. § 99A-2(b)(5) (concerning acts that interfere with property rights). Further, N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(2) only apply if the individual "uses," *i.e.*, communicates, the information.

65.     In sum, the operation of these provisions of the Anti-Sunshine Law is to limit the statute's reach to those who are seeking to blow the whistle on employers and property owners. Indeed, organizations and individuals whose objective is to inform the public of unethical or illegal activities are some of the only people who would engage in the statute's prohibited acts of purposefully collecting information regarding employers' and property owners' hidden conduct in order to communicate that information.

66.     The Anti-Sunshine Law also carves out exceptions to the enumerated acts constituting "act[s] that exceed[] a person's authority to enter the nonpublic areas," further confirming that the law is intended to target those who seek out information to publically disclose matters of public concern.

67.     N.C. Gen. Stat. § 99A-2(e) excludes from the covered conduct any individual collecting information to provide it to his or her supervisor or a government official, as provided for under certain North Carolina laws.

68.     N.C. Gen. Stat. § 99A-2(f) excludes from the covered conduct any efforts to gather information in the course of an official investigation.

69.     The Anti-Sunshine Law specifically exempts anyone who shares information with his or her employer or a government official if they utilize pre-approved channels as provided for under certain state laws, rather than releasing the information to the public.  These exemptions confirm that the law's true goal is to thwart the efforts of those who seek to educate the public about wrongdoing that goes on behind closed doors.

70.     For each violation of the covered conduct, in addition to equitable relief, and compensatory damages to the extent they are provided for under other causes of actions, the Anti-Sunshine Law provides that "a court may award" "[e]xemplary damages . . . in the amount of five thousand dollars ($5,000) for each day, or portion thereof, that a defendant has" violated the statute, and "[c]osts and fees, including reasonable attorneys' fees."  N.C. Gen. Stat. § 99A-2(d).

71.     Moreover, the Anti-Sunshine Law provides that a complainant can both recover from the person who violates the statute and also that "[a]ny person who intentionally directs, assists, compensates, or induces another person to violate this section shall be jointly liable."  N.C. Gen. Stat. § 99A-2(c).  This too underscores the statute's targeting of public whistleblowers such as investigative journalists and activists that conduct undercover investigations.  Concerted action is inherent to the work of such whistleblowers.

**B. Legislative History**

72.     In debating the Anti-Sunshine Law, both before and after the Governor's veto, the North Carolina legislature confirmed that a central objective of the Anti-

33

Sunshine Law is to prevent whistleblowers from collecting information and distributing it to the public.[11]  In fact, the leading proponents of the bill emphasized that the "crux" of the law is that it differentiates between individuals who seek to report illicit activities to their superiors or the authorities, and those who wish to disseminate that information to the public, only punishing the latter.

73.    In the debates of the House Judiciary Committee, Representative Glazier—the author of the final amendment that created the text of the statute passed into law—explained that the Anti-Sunshine Law is designed to target those who seek to uncover and publically release information, not typical employees.  He explained that if the information is collected by an employee, who in the course of his regular activities happens upon "something illegal," that individual would not "come under [the statute]."  Instead, the Anti-Sunshine Law only reaches information collected by people where the "reason they're there" is to gather such information.  As Representative Glazier summed it up, "the one person who is covered" is the person who is "not a government agent" or the person is seeking to report information through approved channels, but the person who collects "images or whatever" as part of "undercover operation[s]."

74.    After the North Carolina House passed the bill for the Governor's signature, Representative Jordan, one of the sponsors of the Anti-Sunshine Law, testified before the North Carolina Senate Commerce Committee in support of the

---

[11] No transcripts are available of the North Carolina legislature's debates on the Anti-Sunshine Law, but the debates were recorded.  The statements reproduced in this Complaint come from counsel transcribing the statements.

34

legislation. Senator Sanderson asked Representative Jordan to what extent the Anti-Sunshine Law would prohibit someone from "sharing" information. Representative Jordan responded that this was the "crux" of the statute and it "depend[s] on who you share it with and what your intentions are in sharing it." If a person shares the information with "appropriate authorities," that would not be prohibited by the statute. Instead, the statute is aimed at those who uncover information and go "running out to a news outlet" with that information.

75. After the Governor's veto, Representative Szoka, another sponsor of the bill, took to the House floor to advocate for an override, insisting that the statute's objectives are laudable because "I think we can all agree that proper authorities [to report information to] are law enforcement and state and federal regulatory agencies such as the United States Department of Agriculture, and not the media, and not private special-interest organizations."[12]

76. Representative Speciale took to the floor to offer a similar rationale for overriding the veto—and indeed why he was switching his vote, having previously opposed the bill: "If I get a job somewhere, and in the course of doing business I see that my employer is a crook, I can turn him in and I'm good to go. But if I take the

---

[12] As Plaintiffs explain, Representative Szoka misstated the scope of the Anti-Sunshine Law's exemptions. The law only exempts those who report information as provided for under the listed state laws, which fail to properly provide for reporting under federal law. *See* N.C. Gen. Stat. § 99A-2(e). Indeed, in the final statement on the floor before the House voted to override the veto, Representative Szoka acknowledged that the Anti-Sunshine Law fails to protect whistleblowers who report information under a variety of laws, but he insisted this was not a "major flaw[]" and thus the bill should be passed as written.

35

job because I want to do an exposé for ABC News?  Well, that's a whole different story.  I'm [de]frauding the employer.  That's what this is about."

77.     Likewise, Representative McElraft endorsed an override on the House floor because those who wish to expose the unethical or illegal conduct of employers and property owners "should get law enforcement involved and not cameras involved, because cameras can lie."

### C. The Anti-Sunshine Law Violates the Protections of Speech and the Press Provided by the First Amendment of the United States Constitution, and Article I, Section 14 of the North Carolina Constitution

78.     The First Amendment to the United States Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides "Congress shall make no law . . . abridging the freedom of speech, or of the press."

79.     North Carolina Constitution Article I, Section 14 is equivalent, providing, "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse."

80.     The Anti-Sunshine Law violates the federal and state constitutional protections of speech and the press.  The law is a content-based statute regulating speech that also discriminates based on the viewpoint of the speaker, in that it aims to prevent the public release of information concerning employers' and property owners' unethical or illegal conduct.  The law seeks to censor press activities and unduly burdens the publication of information.  And it is unconstitutionally overbroad, as the

36

activities it unconstitutionally regulates substantially outweigh the activities that it could constitutionally regulate.

      a. ***The Anti-Sunshine Law Is a Content-Based Statute that Also Discriminates Based on Viewpoint Violating the Federal and State Protections of Free Speech***

81.    A particularly "egregious form of content discrimination" occurs when a law not only regulates speech based on its subject matter, but engages in "[v]iewpoint discrimination," *e.g.*, the "specific motivating ideology or opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

82.    By the plain operation of its definitions and exceptions, the Anti-Sunshine Law both (i) "'restrict[s] expression because of its message, its ideas,'" *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)), and (ii) "restrain[s] certain speech by certain speakers" because of their perspective, *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2670 (2011). The Anti-Sunshine Law both restrains speech based on the nature of the message— only regulating speech that works against employers' and property owners' interests—and based on the motivation of the speaker—targeting individuals and groups whose advocacy involves informing and engaging the public about that information.  Put another way, whether conduct is actionable under the Anti-Sunshine Law is not determined by whether an individual was acting consistent with the scope of his or her authority, but by (i) the substance of the expression—whether it is speech that employers and property owners want to occur or speech that they wish to

37

suppress; and (ii) the objective of the speaker—whether the information is disclosed through approved channels to supervisors and government officials, which will keep the information from the public at large, or through a disapproved medium that could inform the public, such as in press releases or news reports. These facts, both individually and collectively, render the law both content-based and viewpoint discriminatory.

83. Through N.C. Gen. Stat. §§ 99A-2(b)(1), (b)(2), (b)(3) and (b)(5), the Anti-Sunshine Law concerns the process of engaging in speech. N.C. Gen. Stat. §§ 99A-2(b)(1)-(2) cover employees setting out to collect "data, paper, records, or any other documents" or make a recording, and "us[ing]," *i.e.*, communicating, that information in "breach [of] the person's duty of loyalty to the employer." N.C. Gen. Stat. § 99A-2(b)(3) covers people purposefully seeking to record activities at a business, plainly in order to communicate what they uncover. And N.C. Gen. Stat. § 99A-2(b)(5) covers "substantially interfer[ing] with the ownership or possession of real property," seeming to address the harm to property that could be caused from an individual gathering information in order to release it.

84. Yet, the Anti-Sunshine Law only prohibits the collection and distribution of information if it relates to the type of information—such as evidence of unethical or illegal conduct—which employers and property owners wish to keep from public view. The statute only regulates the collection of information from "nonpublic areas," which are defined to mean areas containing information that employers and property owners wish to keep from the public. N.C. Gen. Stat. § 99A-2(a). Damages under the

38

statute are to be awarded based on the harm "sustained" by employers or property owners from the collection or release of the information. N.C. Gen. Stat. § 99A-2(a). And two of the five enumerated unlawful acts, N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(2), expressly require that the information collected be released in a manner that breaches the "duty of loyalty." The Anti-Sunshine Law favors speech that employers and property owners want to occur and be heard, only seeking to regulate speech that employers and property owners believe harms their interests by presenting an undesirable image of their actions.

85. Moreover, the Anti-Sunshine Law purposefully targets those who seek out this information in order to disclose it to the public. The Anti-Sunshine Law excludes from its reach those who commit any of the enumerated acts and quietly report the information they gather to their superiors or government officials as provided for under the listed state laws. N.C. Gen. Stat. § 99A-2(e). Thus, one of the only types of disclosures for which an individual can be liable under the statute is if he discloses the information directly to the public. Further, the statute is focused on those who purposefully gather the information, not those who happen upon it in the course of their other activities. To fall within any of the enumerated acts, the statute requires that a person have "*intentionally* gain[ed] access to the nonpublic area[]," the area where information not meant for public consumption is kept. N.C. Gen. Stat. § 99A-2(a) (emphasis added). In addition, to have committed the conduct described in N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(3) the defendant seemingly must have entered the nonpublic area with the express purpose of gathering information regarding

39

employers' and property owners' hidden conduct. Public-minded whistleblowers, such as investigative journalists and activists who engage in undercover investigations, whose objective is to inform and engage the public, are some of the only individuals who would invest the resources to gain access for the purpose of gathering evidence of employers' and property owners' improper conduct to disclose that information in a non-approved manner. Indeed, recognizing that the covered conduct is most likely to be committed by those working on behalf of such organizations, the Anti-Sunshine Law extends liability to any person who "intentionally directs, assists, compensates, or induces another person to violate this section." N.C. Gen. Stat. § 99A-2(c).

86. Even if a court concludes that the law is "facially content neutral," the Anti-Sunshine Law should nonetheless be treated as a content-based statute because the legislature explained that it "adopted" the Anti-Sunshine Law "'because of disagreement with the message the speech conveys.'" *Reed*, 135 S. Ct. at 2227 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (brackets omitted). The North Carolina legislature made clear that the law's goal was to throttle investigations meant to alert the public to information regarding employers' and property owners' illicit conduct. Labeling whistleblowers who release information to the public "crook[s]" and "fraud[s]," the representatives explained that they wanted to dissuade such whistleblowers from and punish them for "running out to a news outlet." Further, the representatives explained that the statute was motivated by a desire to suppress the work of the "media" and "private special-interest organizations"

as these groups generate the "exposé[s]" the legislature is seeking to prevent. The objective of the Anti-Sunshine Law is to give employers and property owners comfort that their unethical or illegal activities will not be brought out in a way where there are "cameras involved," because the legislature believes that those who choose to use "cameras" are "li[ars]."

87.     In short, the Anti-Sunshine Law regulates speech and is both content-based and viewpoint discriminatory. As a "[c]ontent-based" law it is "presumptively unconstitutional and may be jusfied only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118 (1991)). The state cannot possibly carry this burden here, when its objective is to enable employers and property owners to hide their unethical or illegal conduct, and, in order to fall within the Anti-Sunshine Law's grasp one must be engaged in politically and socially important expressions.

### b. *The Anti-Sunshine Law Violates the Federal and State Constitutional Protections of a Free Press*

88.     The Anti-Sunshine Law also violates the separate federal and state constitutional protections for freedom of the press, as the Anti-Sunshine Law subjects press activities to "differential treatment." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 583 (1983). Through N.C. Gen. Stat. §§ 99A-2(b)(1), (b)(2), (b)(3), (b)(5), and (e), the Anti-Sunshine Law seeks to impose

41

damages for investigating and publically reporting on particular activities, a penalty that could act "as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government." *Minneapolis Star & Tribune Co.*, 460 U.S. at 585. As described above, the law expressly targets undercover investigations of employers or property owners, particularly if they are undertaken to report the information to the public. Moreover, the statute extends liability to individuals who "direct[], assist[], compensate[], or induce[]" a person to violate the statute. N.C. Gen. Stat. § 99A-2(c). In this manner, the Anti-Sunshine Law seeks to discourage the collective action that is required to implement and publish the results of investigations undertaken by media organizations and advocates.

89.     By imposing exemplary, punitive damages and enabling the complainant to recover attorneys' fees and costs—on top of equitable relief and any compensatory damages otherwise available under the law—the objective of the Anti-Sunshine Law is to burden organizations and individuals so they will be reluctant to initiate such investigations and/or publish their results. *See* N.C. Gen. Stat. § 99A-2(d). In fact, the legislature expressly described the Anti-Sunshine Law's objectives, as "about" ensuring people do not "take [a] job" with an employer or property owner "because [they] want to do an exposé for ABC News[.]"

90.     Such laws are "presumptively unconstitutional" and can only be sustained if the state establishes "a counterbalancing interest of compelling importance that it

42

cannot achieve" in another manner, a burden the state cannot carry here. *Minneapolis Star & Tribune Co.*, 460 U.S. at 585.

### c. The Anti-Sunshine Law is Unconstitutionally Overbroad

91. Even if there is a constitutional construction of the Anti-Sunshine Law, and even if the Anti-Sunshine Law could be constitutionally applied to Plaintiffs, through N.C. Gen. Stat. §§ 99A-2(b)(1), (b)(2), (b)(3), (b)(5), and (e), the speech the Anti-Sunshine Law seeks to unconstitutionally regulate substantially outweighs the law's constitutional reach. Thus, the Anti-Sunshine Law must be struck down as overbroad.

92. For instance, the Anti-Sunshine Law prohibits a wide variety of statutorily prescribed communications with the federal government. An employee with a government contractor that documents the company's fraudulent dealings with the federal government is not only entitled, but encouraged to report that information to federal officials under the False Claims Act. 31 U.S.C. § 3729 *et seq.* Yet, that individual would run afoul of the Anti-Sunshine Law because such whistleblowing to the federal government is not allowed under the Anti-Sunshine Law's approved reporting mechanisms. Likewise, the National Environmental Policy Act, 40 C.F.R. § 1506.6(d), and the Endangered Species Act, 16 U.S.C. § 1533(b)(3)(A), both provide for citizens to submit information to inform federal rulemaking. But, under the Anti-Sunshine Law, an individual who gathered that information for the federal government could be subjected to damages under the Anti-Sunshine Law.

93. The Anti-Sunshine Law also subjects citizens to liability for communicating with their state government. For instance, as the Governor explained

43

in his veto statement, the Anti-Sunshine Law directly conflicts with Burt's Law, a statute requiring individuals to report abuse of the mentally ill and developmentally disabled. N.C. Gen. Stat. § 122C-66(b1). Because the Anti-Sunshine Law's exception for reporting information to supervisors and officials does not encompass reporting under Burt's Law, an individual that attempted to document such abuse to substantiate his claims and aid law enforcement could be prosecuted under the Anti-Sunshine Law by the abusing employer. In addition, the Clean Water Act demands that the "State shall assemble and evaluate all existing and readily available water-quality data and information" including any information about "[w]aters for which water quality problems have been reported by . . . members of the public." 40 C.F.R. § 130.7(b)(5). However, because such communications are not specifically exempted under the Anti-Sunshine Law, if an employee sets out to gather and submit water sampling data from property owned by his employer, that employee could be subject to the Anti-Sunshine Law's penalties.

94. The Anti-Sunshine Law also prohibits public disclosures of information of public concern, including threats to human health and safety, as well as evidence of unethical or illegal conduct. For example, the Humane Society of the United States engaged in an undercover investigation to document failed meat inspections, which enabled companies to sell beef from calves so sick they could barely stand. This investigation not only placed the public on notice of the risk to their safety, but also resulted in congressional and USDA investigations into the federal meat inspection

44

program, making meat safer for all future consumers.[13]  Nonetheless, under the Anti-Sunshine law, that investigation and reporting, leading to national reforms, would be prohibited.  The Anti-Sunshine Law may even punish groups' distribution of such information, even if they were not involved with the investigation.  *See* N.C. Gen. Stat. § 99A-2(c).

95.    Similarly, the statute outlaws efforts by elder or child-care workers to gather documents or make recordings that put the public and the individuals' families on notice of abuse.  This could be the case even if the worker did not set out to document abuse, but merely encountered the evidence in a non-public area and decided it was important to collect and share that information.  *See* N.C. Gen. Stat. § 99A-2(b)(5).

96.    Speech on issues of public importance, which the Anti-Sunshine Law prohibits, "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."  *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 102 S. Ct. 3409, 3426 (1982); *Carey v. Brown*, 447 U.S. 455, 467 (1980)).  In this manner, the Anti-Sunshine Law's unconstitutional applications substantially outweigh any purported constitutional ones, and the law must be invalidated.  *See*, *e.g.*, *City of Houston v. Hill*, 482 U.S. 451, 467 (1987).

---

[13] *Hearing Before the House Comm. on Oversight and Gov't Reform, Subcomm. on Domestic Policy*, 111th Cong. (Mar. 4, 2010) (statement of Wayne Pacelle), *available at* http://www.humanesociety.org/assets/pdfs/farm/pacelle_slaughter_030410.pdf.

45

**D. The Anti-Sunshine Law Violates the Right to Petition Provided by the First Amendment of the United States Constitution, and Article I, Section 12 of the North Carolina Constitution**

97.     The First Amendment to the United States Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."

98.     North Carolina Constitution Article I, Section 12 is equivalent, providing, "The people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances; but secret political societies are dangerous to the liberties of a free people and shall not be tolerated."

99.     Because, through N.C. Gen. Stat. §§ 99A-2(b)(1), (b)(2), (b)(3), (b)(5), and (e), the Anti-Sunshine Law restricts the manners in which an individual can report conduct, and the type of information individuals can present to their government, it is an unconstitutional violation of the right to petition.  Central to the right to petition is that the state cannot construct laws that prohibit the "use [of] the channels and procedures of state and federal agencies and courts to advocate their causes and points of view." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972).  Yet, this is precisely how the Anti-Sunshine Law operates.  In order to avoid liability, an individual must be entitled to provide his evidence under the state law mechanisms specified in the Anti-Sunshine law.  N.C. Gen. Stat. § 99A-2(e).  An individual who collects and reports information outside those approved mechanisms,

46

whether it be directly to the government or through other means meant to influence the government, can be liable.

100.    This is true even if the Anti-Sunshine Law provides no means to bring the evidence to the government's attention, and the individual is operating under another statute that specifically provides for the individual to report the information to the government.  For instance, as explained above, an employee of a contractor who collected and provided the federal government evidence of fraud under the False Claims Act, 31 U.S.C. § 3729 *et seq*., could be liable under the Anti-Sunshine Law.  Likewise, an employee who sets out to document water quality problems on his employer's property is entitled to provide that information to the state government under the Clean Water Act, but in doing so would have to risk liability under the Anti-Sunshine Law because the law does not allow for this type of disclosure.  *See* 40 C.F.R. § 130.7(b)(5).

101.    The Anti-Sunshine Law interferes with citizens' ability to communicate with their government and thus limits the types of viewpoints and causes the government will consider.  Such curtailments of the right to petition cannot occur "except in the most extreme circumstances," plainly not present here.  *McDonald v. Smith*, 472 U.S. 479, 486 (1985) (Brennan, J., concurring).  Accordingly, the Anti-Sunshine Law is unconstitutional.

47

### E. The Anti-Sunshine Law Violates the Guarantees of Equal Protection and Due Process of the Laws Provided by the Fourteenth Amendment of the United States Constitution, and Article I, Section 19 of the North Carolina Constitution

102. The Fourteenth Amendment's requirements for equal protection and due process of the laws prohibits statutes that have "the purpose and effect of disapproval of [a] class" of people. *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013). Moreover, when a statute makes a "legislative classification" that "interferes with the exercise of a fundamental right," such as the freedom of speech, it is subject to strict scrutiny. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 & n.3 (1976). Article I, Section 19 of the North Carolina State Constitution provides equivalent rights to those provided under the federal Equal Protection and Due Process Clauses.

103. Through N.C. Gen. Stat. §§ 99A-2(b)(1), (b)(2), (b)(3), (b)(5), and (e) the Anti-Sunshine Law penalizes or prohibits the speech of public whistleblowers seeking to expose employers' or property owners' unethical or illegal conduct. The Anti-Sunshine Law allows speech that employers or property owners wish to occur. *See* N.C. Gen. Stat. §§ 99A-2(a), (b)(1)-(b)(2), (b)(5). Moreover, the Anti-Sunshine Law allows the collection of information regarding an employer's or property owner's unethical or illegal conduct so long as one either keeps that information to oneself, N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(2), or chooses to only share the information as provided for under the approved state law channels, N.C. Gen. Stat. § 99A-2(e). Thus, the Anti-Sunshine Law targets those whose speech is perceived as working against employers' and property owners' interests and those who communicate that

48

information publically.  The effect of these provisions is to demonstrate the state's disapproval for the speech of a class of individuals.

104.    Further, it was the legislature's animus towards that class of individuals that motivated the Anti-Sunshine Law.  North Carolina's legislators explained their objective in passing the Anti-Sunshine Law was to chill and punish public whistleblowers because the legislature believed them to be "crook[s]," "fraud[s]," and "li[ars]."  Indeed, in the debates on the statute, the legislature ridiculed these individuals' expressions as part of "running out to [] news outlet[s]" and being conducted on behalf of "private special-interest organizations."  The Anti-Sunshine Law was passed because the legislature disliked the form and content of public whistleblowers' speech and public whistleblowers themselves.

105.    In this manner, the Anti-Sunshine Law has both the purpose and effect of expressing the state's disapproval of a class of individuals by restricting their fundamental right of free speech.  At the very least, the Anti-Sunshine Law is subject to strict scrutiny, placing the burden on the state to demonstrate its constitutionality, a burden the state cannot carry.  Therefore, the Anti-Sunshine Law is unconstitutional.

### F.  Sections 99A-2(b)(1) & 99A-2(b)(2) of the Anti-Sunshine Law Are Unconstitutionally Vague Under the Federal and State Constitutions

106.    The Fourteenth Amendment to the United States Constitution assures that the states will provide due process of law, and the First Amendment, made applicable to the states through the Fourteenth Amendment, protects free speech.  Article I,

49

Sections 14 and 19 of the North Carolina Constitution provide equivalent protections to ensure due process and free speech.

107.    Due process and the protections of free speech demand that the Anti-Sunshine Law provide people of ordinary intelligence a reasonable opportunity to understand the conduct the law prohibits, and establish standards for the law's enforcement so that the statute's prohibitions will not be arbitrarily or discriminatorily applied. *See Hill v. Colorado,* 530 U.S. 703, 732 (2000). In fact, because the Anti-Sunshine Law imposes significant penalties, including exemplary, punitive damages, it is a quasi-criminal statute requiring heightened scrutiny to ensure that it clearly advises citizens how to avoid its prohibitions. Similarly, because the Anti-Sunshine Law regulates constitutionally protected speech it is required to have greater specificity regarding the nature of its restrictions so that speakers will not be chilled. *Parker v. Levy*, 417 U.S. 733, 752 (1974).

108.    Yet, § 99A-2(b)(1) and § 99A-2(b)(2) of the Anti-Sunshine Law rely on concepts that are foreign to North Carolina law, and the statute does not provide relevant definitions, failing to provide an ordinary person a reasonable opportunity to understand what is regulated. Accordingly, the Anti-Sunshine Law enables, and indeed encourages, arbitrary enforcement, and chills a substantial amount of protected speech.

109.    To fall within N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(2) a person must "use[]" the information he collects "to breach the person's duty of loyalty" to the person's employer. However, the nature of the "duty of loyalty" is not explained in the statute

50

and one cannot look to North Carolina law to understand the obligation, as the North Carolina Supreme Court recently explained that no such affirmative duty exists. *Dalton v. Camp*, 548 S.E.2d 704, 709 (N.C. 2001). Instead, North Carolina only recognizes an affirmative "fiduciary duty" which is inapplicable to most employment situations. *Id*. What is more, underscoring that a reasonable person would be incapable of deciphering the meaning of the "duty of loyalty," the *Dalton* court stated that the concept of a "duty of loyalty" had been discussed in some decisions, but it refused to endorse those opinions, merely concluding that there is no claim for breach of a duty of loyalty, and leaving for another day whether and how the concept could be applied as a defense to suit. *Id*. Accordingly, the "breach [of] the person's duty of loyalty" required by N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(2) could mean, for example, that a person acted inconsistent with his contractual terms or, alternatively, violated some yet unannounced background rule. There is no way that a person seeking to conform his conduct to the statute could know whether he is in compliance.

110.    Similarly, N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(2) state that to be liable under these provisions an employee must both "intentionally gain access to the nonpublic areas of another's premises and engage in an act that exceeds the person's authority to enter" and do so without a "bona fide intent of seeking or holding employment or doing business." These distinct phrases must have different implications for the requisite mental state, but a "bona fide intent of seeking or holding employment or doing business" is not defined either in the statute or North Carolina law. Thus, one cannot discern the required mental state.

51

111. Making the mental state required by N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(2) even more confounding is that § 99A-2(b)(2) incorporates a third mental state requirement, which is absent from § 99A-2(b)(1). Section 99A-2(b)(2) requires that a person have "intentionally gain[ed] access to the nonpublic areas" and "<u>intentionally enter[ed]</u> the nonpublic areas" without a "bona fide intent of seeking or holding employment or doing business." (emphasis added). Section 99A-2(b)(1) reproduces this exact language except that it does not require that an employee "intentionally" enter the nonpublic areas. While adding a third mental state requirement into § 99A-2(b)(2) must have meant to alter its scope as compared to § 99A-2(b)(1), there is no way to determine to what extent or how.

112. Further, N.C. Gen. Stat. § 99A-2(b)(1) can be violated by an employee collecting "data" but the statute fails to explain what "data" includes, such as whether it includes recordings or images. Deciphering what § 99A-2(b)(1) means by "data" is particularly difficult because N.C. Gen. Stat. § 99A-2(b)(3) expressly provides that it encompasses recording "images or data," distinguishing between the two, but neither § 99A-2(b)(1) nor N.C. Gen. Stat. § 99A-2(b)(2) expressly create any liability for collecting "images."

113. Because of these ambiguities, the Anti-Sunshine Law creates liability without due process and thus will force individuals to refrain from engaging in constitutionally protected speech for fear of running afoul of the law. This chilling effect on protected speech is substantial. Therefore, N.C. Gen. Stat. §§ 99A-2(b)(1)-(b)(2) of the Anti-Sunshine Law are unconstitutionally vague.

52

## V.    CAUSES OF ACTION

### Count I
### The Anti-Sunshine Law Violates the First Amendment
### of the United States Constitution

114.    Plaintiffs re-allege and incorporate by reference all of the allegations set forth above.

115.    The Anti-Sunshine Law violates the First Amendment of the United States Constitution in five distinct ways.

116.    First, the Anti-Sunshine Law violates the First Amendment protections of free speech because the statute regulates speech and is a content-based statute that also discriminates based on the viewpoint of the speaker.  It targets speech that works against employers' and property owners' interests, particularly by those who wish to disclose that information to the public.  Indeed, this is precisely why the law was drafted and passed.  Accordingly, it is presumptively unconstitutional under the First Amendment and cannot stand unless the state can establish the statute is narrowly tailored to serve compelling state interests, which the state cannot do.  Thus, the law violates 42 U.S.C. § 1983.

117.    Second, the Anti-Sunshine Law violates the First Amendment protections of a free press.  It is meant to censor and burden press-related investigations and reporting.  Indeed, this was the legislature's purpose in passing the statute. Accordingly, the law is presumptively unconstitutional and cannot stand unless the state can establish a counterbalancing interest of compelling importance that it cannot

53

achieve in another manner, which it cannot do.  Thus, the law violates 42 U.S.C. § 1983.

118.    Third, the Anti-Sunshine Law is unconstitutionally overbroad.  Although Plaintiffs contend that the law cannot be constitutionally applied, even if a court were to conclude otherwise, the speech the Anti-Sunshine Law seeks to unconstitutionally regulate substantially outweighs the statute's constitutional applications.  Thus, the law violates 42 U.S.C. § 1983.

119.    Fourth, the Anti-Sunshine Law violates the First Amendment right to petition.  It restricts the channels and content of communications between citizens and their government.  Indeed, it establishes liability for individuals communicating information other statutes entitle them to provide their government.  Therefore, it limits the viewpoints and causes citizens can present to their government.  As a result, the Anti-Sunshine Law can only be sustained in the most extreme circumstances, not present here.  Thus, the law violates 42 U.S.C. § 1983.

120.    And fifth, the Anti-Sunshine Law is unconstitutionally vague.  It is a quasi-criminal statute that regulates protected speech, yet § 99A-2(b)(1) and § 99A-2(b)(2) both fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited, and authorize arbitrary and discriminatory enforcement.  As a result, these provisions chill a substantial amount of constitutionally protected speech.  Thus, § 99A-2(b)(1) and § 99A-2(b)(2) are unconstitutional and violate 42 U.S.C. § 1983.

54

121.    Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory relief for this claim.

**Count II**
**The Anti-Sunshine Law Violates the Fourteenth Amendment**
**of the United States Constitution**

122.    Plaintiffs re-allege and incorporate by reference all of the allegations set forth above.

123.    The Anti-Sunshine Law violates the Fourteenth Amendment of the United States Constitution in two distinct ways.

124.    First, the Anti-Sunshine Law violates the Fourteenth Amendment's Equal Protection and Due Process Clauses because the Anti-Sunshine Law's purpose and effect is to express the state's disapproval of a class of individuals and restrict their fundamental right to free speech.  It targets those whose speech is perceived as working against employers' and property owners' interests and those who communicate that information publically.  Thus, at the very least, the law is subject to strict scrutiny, placing the burden on the state to demonstrate the law's constitutionality, a burden the state cannot carry.  Accordingly, the Anti-Sunshine Law is unconstitutional under the Equal Protection Clause and violates 42 U.S.C. § 1983.

125.    Second, the Anti-Sunshine Law is unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause.  It is a quasi-criminal statute that regulates protected speech, yet § 99A-2(b)(1) and § 99A-2(b)(2) both fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct

55

is prohibited, and authorize arbitrary and discriminatory enforcement. As a result, these provisions chill a substantial amount of constitutionally protected speech, are inconsistent with due process, and violate 42 U.S.C. § 1983.

126.     Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory relief for this claim.

### Count III
### The Anti-Sunshine Law Violates the Protections Afforded by North Carolina Constitution Art. I, Sec.14

127.     Plaintiffs re-allege and incorporate by reference all of the allegations set forth above.

128.     The Anti-Sunshine Law violates North Carolina Constitution Art. I, Sec.14 in four distinct ways.

129.     First, the Anti-Sunshine Law violates North Carolina Constitution Art. I, Sec.14's protections of free speech because the statute regulates speech and is a content-based statute that also discriminates based on the viewpoint of the speaker. It targets speech that works against employers' and property owners' interests, particularly by those who wish to disclose that information to the public. Indeed, this is precisely why the law was drafted and passed. Accordingly, it is presumptively unconstitutional and cannot stand unless the state can establish the statute is narrowly tailored to serve compelling state interests, which it cannot do.

130.     Second, the Anti-Sunshine Law violates North Carolina Constitution Art. I, Sec.14's protections of a free press. It is meant to censor and burden press-related investigations and reporting. Indeed, this was the legislature's purpose in passing the

56

statute. Accordingly, the law is presumptively unconstitutional and cannot stand unless the state can establish a counterbalancing interest of compelling importance that it cannot achieve in another manner, which it cannot do.

131. Third, the Anti-Sunshine Law is unconstitutionally overbroad. Although Plaintiffs contend that the law cannot be constitutionally applied, even if a court were to conclude otherwise, the speech the Anti-Sunshine Law seeks to unconstitutionally regulate substantially outweighs the statute's constitutional applications.

132. And fourth, the Anti-Sunshine Law is unconstitutionally vague. It is a quasi-criminal statute that regulates protected speech, yet § 99A-2(b)(1) and § 99A-2(b)(2) both fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited and authorize arbitrary and discriminatory enforcement. As a result, these provisions chill a substantial amount of constitutionally protected speech. Thus, § 99A-2(b)(1) and § 99A-2(b)(2) are unconstitutional.

133. Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory relief for this claim.

## Count IV
### The Anti-Sunshine Law Violates the Right to Petition Afforded by North Carolina Constitution Art. I, Sec. 12

134. Plaintiffs re-allege and incorporate by reference all of the allegations set forth above.

135. The Anti-Sunshine Law violates the right to petition afforded by North Carolina Constitution Art. I, Sec. 12. The Anti-Sunshine Law restricts the channels

57

and content of communications between citizens and their government. Indeed, it establishes liability for individuals communicating information other statutes entitle them to provide their government. As a result, it limits the viewpoints and causes citizens can present to their government. Thus, it is inconsistent with the right to petition and can only be sustained in the most extreme circumstances, not present here.

136. Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory relief for this claim.

## Count V
### The Anti-Sunshine Law Violates the Protections Afforded by North Carolina Constitution Art. I, Sec. 19

137. Plaintiffs re-allege and incorporate by reference all of the allegations set forth above.

138. The Anti-Sunshine Law violates the protections set forth in North Carolina Constitution Article I, Sec. 19 in two distinct ways.

139. First, the Anti-Sunshine Law violates Article I, Sec. 19's assurances of equal protection and due process of the laws because the Anti-Sunshine Law's purpose and effect is to express the state's disapproval of a class of individuals and restrict their fundamental right to free speech. It targets those whose speech is perceived as working against employers' and property owners' interests and those who communicate that information publically. Thus, at the very least, the law is subject to strict scrutiny, placing the burden on the state to demonstrate the law's

58

constitutionality, a burden the state cannot carry.  Accordingly, the Anti-Sunshine Law is unconstitutional under Article I, Sec. 19.

140.   Second, the Anti-Sunshine Law is unconstitutionally vague in violation of the Article I, Sec. 19's assurance of due process of law.  It is a quasi-criminal statute that regulates protected speech, yet § 99A-2(b)(1) and § 99A-2(b)(2) both fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited and authorize arbitrary and discriminatory enforcement.  As a result, these provisions chill a substantial amount of constitutionally protected speech, are inconsistent with due process, and are unconstitutional.

141.   Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory relief for this claim.

## VI.   **PRAYER FOR RELIEF**

142.   Plaintiffs request that the court enter a judgment:

   a.   Declaring the Anti-Sunshine Law, on its face, and as-applied to Plaintiffs, is unconstitutional under the First and Fourteenth Amendments of the United States Constitution, and Article I, Sections 12, 14, and 19 of the North Carolina Constitution;

   b.   Permanently enjoining Defendants, in their official capacities, as well as their officers, agents, employees, attorneys, and all other persons in active concert or participation with them or their officers, from enforcing the Anti-Sunshine Law;

   c.   Striking down the Anti-Sunshine Law;

59

d.  To ensure that the public has accurate notice of the requirements of the law, and to prevent chilling speech, requiring Defendants to provide public notice, including in the official and online editions of the North Carolina statutes, that the Anti-Sunshine Law is unconstitutional and will not be enforced;

e.  Awarding Plaintiffs their reasonable attorneys' fees and costs; and

f.  Awarding such other relief as may be just and proper.

February 25, 2016                    Respectfully submitted,

/s/ Daniel K. Bryson
Daniel K. Bryson
N.C. Bar Number: 15781
Jeremy Williams
N.C. Bar Number: 48162
Whitfield Bryson & Mason LP
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5000
dan@wbmllp.com
jeremy@wbmllp.com
*Counsel for Plaintiffs*

David S. Muraskin*
Public Justice, P.C.
1825 K St. NW, Suite 200
Washington, DC 20006
(202) 861-5245
dmuraskin@publicjustice.net
*Counsel for Plaintiffs*

60

Leslie A. Brueckner*
Public Justice, P.C.
555 12th Street, Suite 1230
Oakland, CA 94607
(510) 622-8205
lbrueckner@publicjustice.net
*Counsel for Plaintiffs*

Matthew Strugar*
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263
matthew-s@petaf.org
*Counsel for People for the Ethical Treatment of Animals, Inc.*

Cristina R. Stella*
Paige Tomaselli*
Center for Food Safety
303 Sacramento Street, Second Floor
San Francisco, CA 94111
(415) 826-2770
CStella@centerforfoodsafety.org
PTomaselli@centerforfoodsafety.org
*Counsel for Center for Food Safety*

Matthew Liebman*
Animal Legal Defense Fund
170 East Cotati Avenue
Cotati, CA 94931
(707) 795-7533
mliebman@ALDF.org
*Counsel for Animal Legal Defense Fund*

Justin Marceau*
University of Denver—Strum College of Law
(*for reference purposes only*)
2255 E. Evans Ave.
Denver, CO 80208
(303) 871-6000
jmarceau@law.du.edu
*Counsel for Animal Legal Defense Fund*

Scott Edwards*
Food & Water Watch
1616 P St. NW
Washington, DC 20036
(202) 683-2500
sedwards@fwwatch.org
*Counsel for Food & Water Watch*

Sarah L. Nash*
Government Accountability Project
1612 K St. NW, Suite 1100
Washington, DC 20006
(202) 457-0034, ext. 127
sarahn@whistleblower.org
*Counsel for Government Accountability Project*

Michael S. McFadden*
Farm Forward
325 W Pierpont Ave.
Salt Lake City, UT 84101
(877) 313-3276
Michael@farmforward.com
*Counsel for Farm Forward*

Jennifer H. Chin*
Robert Hensley*
ASPCA
520 Eighth Avenue, 7th Floor
New York, NY 10018
(212) 876-7700
jennifer.chin@aspca.org
robert.hensley@aspca.org
*Counsel for American Society for the
Prevention of Cruelty to Animals*

*Appearing by Special Appearance

Case 1:16-cv-00025-TDS-JEP   Document 21   Filed 02/25/16   Page 63 of 64

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of February, 2016, a copy of the foregoing First Amended Complaint for Declaratory and Injunctive Relief Concerning the Constitutionality of a State Stature was filed with the Clerk of the Court using the CM/ECF System and served by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

*/s/ Daniel K. Bryson*
Daniel K. Bryson
**Whitfield Bryson & Mason LLP**

64