**In The United States District Court**
**For The Middle District of North Carolina**
**Greensboro Division**

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; CENTER FOR FOOD SAFETY; ANIMAL LEGAL DEFENSE FUND; FARM SANCTUARY; FOOD & WATER WATCH; GOVERNMENT ACCOUNTABILITY PROJECT; FARM FORWARD; and AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS | |
| | Case No.: 1:16-cv-25 |
| *Plaintiffs*, | |
| | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| ROY COOPER, in his official capacity as Attorney General of North Carolina, and CAROL FOLT, in her official capacity as Chancellor of the University of North Carolina-Chapel Hill, | |
| *Defendants*. | |

1

## I.    Introduction and Summary of Argument.

Over the Governor's veto, North Carolina enacted General Statute § 99A-2, an "Anti-Sunshine Law" (or "Law") designed to suppress undercover investigations of government and private facilities by journalists and activists who seek to provide information to the public. Plaintiffs are groups that conduct such investigations and rely on the information they generate to advocate for change. Plaintiffs plan to investigate North Carolina government facilities, including a particular laboratory at the University of North Carolina-Chapel Hill ("UNC-CH") that was previously subject to investigation by Plaintiffs. They have not undertaken those investigations, however, for fear of being sued under the Law. Plaintiffs are challenging the Anti-Sunshine Law as violating the First Amendment, Equal Protection Clause, and Due Process Clause of the United States Constitution, and the equivalent provisions of the North Carolina Constitution.

Defendants move to dismiss principally contending that: (1) they possess sovereign immunity from suit; (2) Plaintiffs lack standing; and (3) Plaintiffs' free speech claims fail because the Anti-Sunshine Law is not a content-based restriction on speech.

Defendants are wrong on each count. (1) The *Ex parte Young* exception to sovereign immunity only requires that Plaintiffs' lawsuit have the potential to provide Plaintiffs with effective prospective relief for Plaintiffs' claimed harm. That is the case here. The Anti-Sunshine Law is enforceable by the State against Plaintiffs, and Defendants are the officials authorized to file and initiate such suits. That power has kept Plaintiffs from investigating government facilities. A declaration from this Court that Defendants' enforcement of the Law would be unlawful or an injunction preventing Defendants from exercising their authority would prevent the State from carrying out the alleged unconstitutional suit and enable the planned investigations to go forward, which is all that is needed to bring this case within the ambit of *Ex parte Young* and its progeny. *McBurney v. Cuccinelli*, 616 F.3d 393, 400-01 (4th Cir. 2010).

2

Such a holding is particularly appropriate in this case, given that First Amendment interests are at stake. The Supreme Court has repeatedly recognized that the mere potential for a State to penalize speech creates a chill that is, itself, a First Amendment injury. *United States v. Alvarez*, 132 S. Ct. 2537, 2548 (2012) (plurality opinion). Thus, the potential that Defendants' *may* exercise their authority under the Anti-Sunshine Law is *already* producing a constitutional harm, and a declaration or injunction from this Court would nullify that harm. If Defendants' authority under the Law could not be subject to judicial review, statutes like the Anti-Sunshine Law would become a ready means to suppress speech.

(2) For these same reasons, Plaintiffs have standing. Because Defendants have the authority to file suit under the Anti-Sunshine Law for investigations of government facilities, Defendants have chilled Plaintiffs' planned investigations, and interfered with the ability of each Plaintiff to receive information from such investigations, on which they rely for their media efforts and in petitioning and challenging the government. These harms are more than sufficient to establish injury-in-fact. *N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999). And, because these injuries stem from Defendants' unconstitutional power to file and initiate suit under the Law, they are traceable to Defendants and redressible through a declaration or injunction. Nothing more is required to establish standing to sue. *Drutis v. Rand McNally & Co.*, 499 F.3d 608, 612 (6th Cir. 2007) ("Article III standing ultimately turns on whether a plaintiff gets something (other than moral satisfaction) if the plaintiff wins.").

(3) Defendants' arguments on the merits fare no better. Defendants admit that a statute "signal[ing] out any particular entity" or "restrict[ing] the manner in which individuals can report" information would be unconstitutional. Defendants' Brief in Support of Motion to Dismiss, Dkt. No. 31 ("Defs.' MTD") 22. To get around this inconvenient fact, Defendants seek to rewrite the Anti-Sunshine Law, claiming that the Law "does not prohibit a *bona fide* employee from disclosing information to the

3

appropriate authorities, the media, or any other organization," and "does not prevent the media from using any information gathered by *any* individual—whether *bona fide* or not." Defs.' MTD 25 (emphasis in original).

Defendants' attempt to salvage the Anti-Sunshine Law in this manner fails on multiple levels. First, the term "bona fide," as used within the Anti-Sunshine Law, actually underscores that the Law targets certain types of speakers, and thus is content based. As used in the Law, the phrase "bona fide" does not exempt any disclosures from the Law's reach. Instead, where that phrase appears, it narrows the Law's coverage to those who *collect* information without a "bona fide intent of seeking or holding employment or doing business with the employer." In this manner, the term "bona fide" exempts those who collect information for other purposes, and targets the speakers and speech that relies on information collected "without a bona fide intent of seeking or holding employment," such as undercover investigations meant to inform the public. N.C. Gen. § 99A-2(b)(1)-(2).

Second, Defendants' argument is directly contradicted by the Anti-Sunshine Law's legislative history, which confirms that the Law is aimed at certain types of speakers, namely the media and activists who release information to the public. Under Supreme Court precedent, this legislative history alone is sufficient to hold the law content based. *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2227-28 (2015).

Third, even if Defendants' interpretation of "bona fide" were correct, it does nothing to narrow N.C. Gen. Stat. § 99A-2(b)(3), (5), wherein "bona fide" does not appear and which still prohibit public whistleblowing—for instance, N.C. Gen. Stat. § 99A-2(b)(3) prohibits leaving a recording device unattended to collect information to release.

As a result, there can be no doubt that the Anti-Sunshine Law is content based, "presumptively unconstitutional," and only enforceable if Defendants establish the Law satisfies strict scrutiny. *Reed*, 135 S. Ct. at 2226. Defendants do not attempt to carry this burden. Their motion should be denied.

II.     **Background.**

   a.  *The Anti-Sunshine Law.*

The Anti-Sunshine Law represents North Carolina's third attempt to suppress the free speech of public whistleblowers. The first two iterations of the Law were "Ag-Gag" statutes targeted at undercover investigations of the agricultural industry. First Amended Complaint, Dkt. No. 21 ("Comp.") ¶ 56. Courts have consistently indicated such laws violate the First and Fourteenth Amendments of the United States Constitution. *ALDF v. Otter ("Otter")*, 118 F. Supp.3d 1195 (D. Idaho Aug. 3, 2015) (striking down law, appeal pending); *ALDF v. Herbert*, No. 13-00679, Dkt. No. 53 (D. Utah Aug. 8, 2014) (Exhibit 1) (denying motion to dismiss); *W. Watersheds Project v. Michael*, No. 15-0169, Dkt. No. 40 (D. Wyo. Dec. 28, 2015) (Exhibit 2) (same).

Rather than heed these decisions, the North Carolina legislature expanded the Anti-Sunshine Law to cover undercover investigations of any and all *public and private* facilities. As enacted, the Anti-Sunshine Law enables *any* "owner or operator of [a] premises" to recover punitive damages, attorneys' fees, and other costs from a person who engages in the covered conduct, or an individual or entity that "intentionally directs, assists, compensates, or induces" that conduct. N.C. Gen. Stat. § 99A-2(a), (c).

Three parameters delineate the conduct the Law covers. First, the conduct must relate to a "person who intentionally gains access to the nonpublic areas of another's premises and engages in an act that exceeds the person's authority to enter those areas," with "nonpublic areas" defined to mean "areas not accessible to or not intended to be accessed by the" public. *Id.* § 99A-2(a). Second, the Law defines "an act that exceeds a person's authority to enter the nonpublic areas" as one of five enumerated acts:

   (1) An employee "enter[ing] the nonpublic areas" without a "bona fide intent of seeking or holding employment or doing business with the employer," removing information from those areas, and "us[ing]" that information to "breach the person's duty of loyalty," *id.* § 99A-2(b)(1);

5

(2) An employee "intentionally enter[ing] the nonpublic areas" without a "bona fide intent of seeking or holding employment or doing business with the employer," making a recording, and "us[ing]" that recording to "breach the person's duty of loyalty," *id.* § 99A-2 (b)(2);

(3) Any person "[k]nowingly or intentionally placing on the employer's premises an unattended camera or electronic surveillance device and using that device to record images or data," *id.* § 99A-2(b)(3);

(4) Any person "[c]onspiring in organized retail theft," *id.* § 99A-2(b)(4); and

(5) Any person "substantially interfer[ing] with the ownership or possession of real property," *id.* § 99A-2(b)(5).[1]

Third, the Law excludes from its coverage individuals who engage in the enumerated acts, but who report the information they gather to their supervisors or officials as provided for under certain specified statutes. *Id.* § 99A-2(e). Among the authorized disclosures are certain methods of reporting that solely pertain to government employees, confirming that the Law covers investigations of government facilities. *Id.* § 99A-2(e) (allowing reporting as provided for in Article 14 of Chapter 126, the chapter governing "the State [] system of personnel administration"). However, none of the exemptions allow for individuals to release information to the public. *Id.* Instead, they seek to ensure whistleblowers' information will be reported through certain official channels, prohibiting all other methods of communication.

In this manner, the plain text of the Anti-Sunshine Law reveals that its function is to suppress journalists' and activists' undercover investigations of public and private facilities meant to provide information to the public. The Law targets the gathering of information from "nonpublic areas," where undercover investigations typically occur. *Id.* § 99A-2(a). It does not cover all types of information gathering; instead, the Law covers the specific methods of information gathering associated with undercover

---

[1] Plaintiffs agree that had the Law been limited to outlawing retail theft it would have been facially constitutional, N.C. Gen. § 99A-2(b)(4), but Plaintiffs contend the Law's other provisions render it facially unconstitutional.

investigations, particularly by the media and activists, *i.e.*, collecting and using information in breach of the "duty of loyalty," *id.* § 99A-2(b)(1)-(2); leaving a recording device unattended, *id.* § 99A-2(b)(3); and transgressing property rights, *id.* § 99A-2(b)(5). The public disclosure of information does not fall within the Anti-Sunshine Law's authorized exemptions. *Id.* § 99A-2(e). Further, the Law creates third-party liability for those who "direct[], assist[], compensate[], or induce[]" others to engage in investigations. *Id.* § 99A-2(c). The media and activists are some of the only entities that work in concert with undercover investigators.

Lest there be any doubt about the Anti-Sunshine Law's objectives, the legislature made clear that the Law is aimed at the media's and activists' "undercover operation[s]." Comp. ¶ 73. Legislators explained that the Law was designed to stop "exposé[s]" and people "running out to a news outlet." *Id.* ¶¶ 74, 76. They acknowledged that, because the Law does not exempt all types of whistleblowing required or encouraged by existing statutes, the Anti-Sunshine Law will also interfere with citizens reporting information to the government, but the legislators insisted this is not a "major flaw[]," as the Law's breadth is necessary to ensure information does not get to "the media [or] private special-interest organizations." *Id.* ¶ 75 & n.12. The legislators targeted these groups because they believed these groups, who get "cameras involved," are "fraud[s]" and "li[ars]." *Id.* ¶¶ 76-77.

Because of the Law's scope, a wide variety of organizations and Governor McCrory himself worked against its enactment. AARP lobbied against the Law, arguing that it would discourage individuals from documenting and reporting elder abuse. *Id.* ¶ 57. Governor McCrory vetoed the Law because he too concluded it would chill such whistleblowing. He also stated that the Law "contradict[ed]" Burt's Law, a recent North Carolina statute that mandates individuals report abuse of the mentally ill and intellectually disabled, but is not one of the Anti-Sunshine Law's approved bases for disclosure. *Id.* Nonetheless, the legislature overrode the Governor's veto. *Id.* ¶ 58.

### B. The Lawsuit.

Plaintiffs are groups whose expressions and advocacy are targeted by the Anti-Sunshine Law because of the legislators' animus towards the media and activists. Plaintiffs also allege that the Law is overbroad, penalizing a substantial amount of others' protected speech. Specifically, two Plaintiffs (PETA and ALDF) currently engage in undercover investigations like those prohibited by the Law—such as gaining employment for the purpose of accessing nonpublic areas and leaving recording devices unattended, in order to provide information to the public—and plan to conduct such investigations of government facilities in North Carolina, including (PETA) planning to investigate UNC-CH. These Plaintiffs have not conducted these planned investigations because of the Law. *E.g.*, Comp. ¶¶ 16, 18, 21-22, 29-31. Moreover, each Plaintiff engages in advocacy that builds on information gathered by the whistleblowers and undercover investigators targeted by the Law; publishing books, magazines, reports, articles, movies and videos that rely on that information, and using the information to lobby legislators and regulators, submit regulatory comments, and work with law enforcement and Federal and State agencies to ensure existing statutes are enforced. *E.g.*, *id.* ¶¶ 17, 23-27, 32, 34, 36, 38-39, 41-45, 48-52. Therefore, the chill created by the Law has interfered with their advocacy and will continue to do so.[2]

The Law also restricts a substantial amount of protected speech beyond that of Plaintiffs. It prohibits public whistleblowing by any individual or entity that sets out to gather information to substantiate its concerns, N.C. Gen. § 99A-2(b)(1)-(3)—or potentially even if the person or entity did not seek to gather information, but the disclosure is determined to "substantially interfere[]" with the ownership or possession of property, *id.* § 99A-2(b)(5)—and creates liability for reporting information to the

---

[2] Moreover, even those Plaintiffs who do not conduct their own investigations fear that their requests for and use of the information could be found to "direct[]" or "induce[]" a person to violate the Law, resulting in third-party liability under the Law. *E.g.*, *id.* ¶¶ 26, 32, 36, 39, 42, 45, 47.

government under the numerous statutes that do not fall within the Law's exemption, *id.* § 99A-2(e); *see also* Comp. ¶¶ 92-95.

On this basis, Plaintiffs brought suit alleging that the Anti-Sunshine Law violates the Federal and State constitutional protections of (1) free speech, (2) the press, (3) the right to petition, and (4) equal protection and due process of the laws, including the prohibitions against overly vague laws. Plaintiffs are proceeding against the two State officials charged with enforcing the Anti-Sunshine Law on the government property that Plaintiffs wish to investigate: (1) the Attorney General, who represents "all State departments" in affirmative litigation, N.C. Gen. Stat. § 114-2(2); Defs.' MTD 10 (Attorney General's common law duties include "prosecut[ing] actions to protect and defend [State] property" (citing *Martin v. Thornburg*, 320 N.C. 533, 546, 359 472, 479 (1987)); and (2) UNC-CH's Chancellor, the executive in charge of that institution, N.C. Gen. Stat. § 116-34(a), who must "initiate" all litigation on the University's behalf, Defs.' MTD Ex. 1, at 1. Plaintiffs ask the Court to declare that Defendants' enforcement of the Law would be unconstitutional and enjoin them from filing or initiating suits under the Law.

## III.    Standard of Review.

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Despite Defendants' suggestion that this standard is somehow different for Rule 12 motions contesting jurisdiction, Defs.' MTD 7, Defendants' own authority states that where it is "contended that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based … the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams v. Bain*, 697

F.2d 1213, 1219 (4th Cir. 1982); *see also AGI Associates, LLC v. City of Hickory*, 773 F.3d 576, 578 (4th Cir. 2014) (same).[3]

## IV. Argument.

### A. Plaintiffs' claims fall well within the exception to sovereign immunity.

To establish that Defendants are not immune from suit, and the constitutionality of their power to enforce the Anti-Sunshine Law is subject to judicial review, one need look no further than *Ex parte Young*, 209 U.S. 123 (1908), and Defendants' primary Fourth Circuit authority applying it, *McBurney v. Cuccinelli*, 616 F.3d 393 (4th Cir. 2010).

*Ex parte Young* held that to ensure "the supreme authority of the United States," sovereign immunity does not prohibit suits for prospective relief to prevent a State official from engaging in "an act [that would] violate[] the Federal Constitution." *Id.* at 167. *Ex parte Young* authorizes suits against those officials who possess some "duty" to carry out the alleged unconstitutional act—even if that duty "exists under the general authority of some law"—and thus the official's power "threatened" plaintiffs with the "commenc[ing] of suits" "either of a civil or criminal nature" that could violate the Constitution *Id.* at 156, 157.

*Ex parte Young* emphasized that its exception does not require the official sued to have begun proceeding against the plaintiff. *Id.* at 157. In *Ex parte Young*, the official's "duty" that created an actionable "threat" of enforcement was his power "to cause proceedings to be instituted" against the plaintiff. *Id.* at 161. The Court explained it was irrelevant that the official possessed "discretion[]" in deciding whether or not to proceed.

_____

[3] Should the Court wish to hear evidence substantiating Plaintiffs' jurisdictional allegations, Plaintiffs are prepared to submit declarations or present witnesses attesting to them. The Fourth Circuit has explained a court "may [] go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations" only if Defendants contest the veracity of Plaintiffs' allegations. *Adams,* 697 F.2d at 1219. Thus, as Defendants have not pointed to any fact they question, Plaintiffs have not burdened the Court with declarations repeating what the parties agree should be taken as true.

*Id.* So long as the remedy the plaintiff sought could prevent the "risk" that the official could bring about the "great and irreparable" harm of an unconstitutional suit, immunity could not bar judicial review of the official's power. *Id.* at 167.

In *McBurney* the Fourth Circuit summarized *Ex parte Young* as holding that a State official is not immune from suit if the equitable relief sought would be "'effective with respect to the underlying claim.'" 616 F.3d at 399 (quoting *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008)).[4] Consistent with this, *McBurney* held that the *Ex parte Young* exception does not apply where the defendant official's role in enforcement is so "attenuated" the equitable relief might have no impact on the "risk" of unconstitutional action. 616 F.3d at 400-01. Thus, the *McBurney* court concluded the Attorney General could not be sued to compel him to advise *other* officials to comply with the constitution in implementing a State FOIA law, a law which the Attorney General lacked any "specific statutory duty to enforce" himself. *Id.* at 400. The Attorney General's power to offer advice, when that power had not been exercised, did not create any "'responsibility for the challenged state action.'" *Id.* at 400-01 (quoting *S. Carolina Wildlife Fed'n*, 549 F.3d at 333). The declaratory or injunctive relief sought against the Attorney General would not have been "'effective'" and therefore he was immune. *Id.* (quoting *S. Carolina Wildlife Fed'n*, 549 F.3d at 333).

---

[4] Other courts have held similarly. *Planned Parenthood v. Wasden,* 376 F.3d 908, 919 (9th Cir. 2004) (*"Whether these officials are, in their official capacities, proper defendants in the suit is really the common denominator of two separate inquiries: first, whether there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress, and second, whether our jurisdiction over the defendants is proper under the doctrine of *Ex parte Young*[.]" (citations omitted)); *see also Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013) (same); *accord Dombrowski v. Pfister,* 380 U.S. 479, 487 (1965) (explaining that, particularly in the First Amendment context, standing and the *Ex parte Young* analysis overlap, with the goal to "[p]ermit[] determination of the invalidity of the[] statutes").

Here, in contrast, Defendants *are* empowered "to cause proceedings to be instituted" against Plaintiffs. N.C. Gen. Stat. § 99A-2(a), (e) (making clear that the Anti-Sunshine Law can be enforced by government officials). Indeed, Defendants concede that Attorney General Cooper is the official charged with representing the State in litigation under the Anti-Sunshine Law. *Id.* § 114-2(2); Defs.' MTD 10. Chancellor Folt, as the "administrative and executive head" of UNC-CH, is the person who "initiates" such suits on behalf of the University. N.C. Gen. Stat. § 116-34(a); Defs.' MTD, Ex. 1, at 1 ("upon the approval of the chancellor" an institution "may initiate a lawsuit in the name of the University of North Carolina if the amount in controversy is less than the jurisdictional amount"; "[a] request to initiate litigation shall be made by the chancellor of a constituent institution" for litigation above the jurisdictional amount).

As a result, in sharp contrast to the facts of *McBurney*, an order declaring it would be unlawful for Defendants to enforce the Anti-Sunshine Law, or enjoining them from doing so, would be "effective with respect to the underlying claim." Far from their roles being "attenuated," Defendants are the beginning and ending links in the chain of State action that would result in enforcement of the Law and bring about the alleged constitutional injuries that have given rise to this suit. If Plaintiffs are successful, the Attorney General would not be able to exercise his power to file suit under the Anti-Sunshine Law on behalf of the State agencies that Plaintiffs wish to investigate, and the Chancellor would not be able to exercise her power to initiate suits against Plaintiff PETA when it carries out its desired investigation of UNC-CH. Plaintiffs would not have to continue to self-censor for fear of the "great and irreparable harm" of an unconstitutional suit under the Anti-Sunshine Law if they carry out their planned investigations of State facilities. Thus, Defendants are not immune. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 632-33 (8th Cir. 2011) (providing that the "broad discretion to commence civil actions" against

12

plaintiffs or the potential to be involved later in the litigation brings a defendant within the *Ex parte Young* exception).[5]

### B. Defendants' arguments misread Ex parte Young *and its progeny.*

Defendants take two of the terms *Ex parte Young* used to articulate its rule—(a) that the State official must have a "duty" to enforce the statute, which Defendants call a "special relationship requirement," Defs.' MTD 8, 11, and (b) that there be a "threat" of enforcement, which Defendants call an "ongoing harm" requirement, Defs. MTD 14-15—and claim they establish separate, additional limitations on the exception to sovereign immunity that require an especially tight "nexus" between Defendants' powers and the alleged unconstitutional action, Defs. MTD 9. Defendants' contentions are not supported by their case law and do not withstand scrutiny.

a. Again, Defendants' own Fourth Circuit authority confirms what is shown by the language of *Ex parte Young* itself: the "special relationship" requirement is merely a

---

[5] Defendants argue that the Chancellor is not an appropriate Defendant because she "does not have independent authority to file lawsuits in her name or on behalf of the Board of Governors," just the "delegated" authority to "initiate" suits, which, in some instances, requires later approval by the Board of Governors. Defs.' MTD 12-13. Yet, *Ex parte Young* and *McBurney* provide that a defendant State official need only have "responsibility" for the Law's enforcement, not *sole* responsibility for its enforcement. If accepted, Defendants' argument would allow the State to structure its bureaucracy so that no officer can ever be prospectively enjoined, simply by stripping decision makers of the authority to act independently. Such a result would fly in the face of the principle that a plaintiff need only seek "effective" relief that will prevent the "risk" of the alleged harm by stopping the gears of the State machinery from working to violate the plaintiff's rights. *McBurney*, 616 F.3d at 399-401. Defendants' only cited authority, *Bd. of Governors Univ. of N.C. v. U.S. Dep't of Labor*, 917 F.2d 812 (4th Cir. 1990) (cited at Defs.' MTD 12), does not address sovereign immunity or standing; it merely discusses how the UNC institutions should be treated for the purposes of Federal contracting rules. Nonetheless, should the Court determine that it lacks jurisdiction, Plaintiffs request the opportunity to amend their complaint to add the President of the University of North Carolina System and its Board of Governors as defendants. *See Alexander v. City of Greensboro*, 762 F. Supp.2d 764, 779 (M.D.N.C. 2011) (Schroeder, J.) (right to amend should be freely given).

13

means of articulating the rule that the prospective relief sought must be effective in remedying the "risk" of the alleged constitutional injury. *McBurney*, 616 F.3d at 399 ("The special-relation requirement protects a state's Eleventh Amendment immunity while, at the same time, ensuring that, in the event a plaintiff sues a state official in his individual capacity to enjoin unconstitutional action, '[any] federal injunction will be effective with respect to the underlying claim.'" (quoting *S.C. Wildlife Fed'n*, 549 F.3d at 333 (alteration in original)). "[T]he requirement has been a bar to injunctive actions where the relationship between the state official sought to be enjoined and the enforcement of the state statute is significantly attenuated." *S. Carolina Wildlife Fed'n*, 549 F.3d at 333 (cited at Defs.' MTD 9).

Consistent with this, the cases Defendants cite where courts found the *Ex parte Young* exception did not apply because there was an insufficient "relationship" between the defendant and statute concerned instances in which the official sued had *no role* in enforcement and thus the relief could not reduce the risk of suit. *See* Defs.' MTD 8, 11. In *Summit Medical Associates, P.C. v. Pryor*, the court found abortion providers could not seek an injunction against the State regarding a statute that enabled "a husband or maternal grandparent" to sue the providers. 180 F.3d 1326, 1342 (11th Cir. 1999); *see also Sherman v. Cmty. Consol. Sch. Dist. 21,* 980 F.2d 437, 441 (7th Cir. 1992) (explaining the statute at issue "does not prescribe a penalty" and therefore both the State Attorney General and county attorneys "have nothing to do with the subject"). *Waste Management Holdings, Inc. v. Gilmore* prohibited a suit against Virginia's Governor, where his only connection to effectuating the statute at issue was his State constitutional obligation to "take care" of the laws. 252 F.3d 316, 331 (4th Cir. 2001); *see also id.* at 350-51 (King, J., concurring in part and dissenting in part). Under the Virginia Constitution the obligation to "take care" does not provide any authority, but rather

14

obligates the governor to conduct the State's business "in good faith." *Barry v. Landsidle*, No. HQ-841, 2001 WL 936370, at *2 (Va. Cir. Ct. Aug. 10, 2001).[6]

Defendants, in contrast, are the officials authorized to file and initiate the suits under the Anti-Sunshine Law that have kept Plaintiffs from investigating government facilities and releasing the information they uncover to the public.

b. Defendants' second argument—that *Ex parte Young* does not apply here because Defendants have not *already* violated the Constitution by enforcing the Anti-Sunshine Law, creating an "ongoing" harm—would turn *Ex parte Young* on its head. The entire purpose of the exception is to ensure a plaintiff need *not* "refuse[] to obey [a] new law, and assert[] its unconstitutionality as a defense" by creating a "practicable means" to subject an official who could violate the Constitution "to the restrictions of the United States Constitution." 17A Charles A. Wright et al., *Federal Practice & Procedure* § 4231 (West 2016); *see also Doe v. Annucci,* No. 14 CIV. 2953 PAE, 2015 WL 4393012, at *16 (S.D.N.Y. July 15, 2015) (summarizing *Ex parte Young* case law as holding that sovereign immunity is waived so long as there is a "'plausible threat of future'" enforcement (quoting *Clark v. DiNapoli*, 510 F. App'x 49, 51 (2d Cir. 2013) (unpublished))).

*Ex parte Young*'s statement that there needs to be a "threat" of harm, a/k/a "ongoing" harm, again serves to "distinguish[] between cases where the relief sought is prospective

---

[6] Although not cited by Defendants, dicta in the plurality opinion in *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc), has also been erroneously relied on for the notion that *Ex parte Young* requires a defendant to have a "close" connection with the alleged unconstitutional action. *Id.* at 413. But, *Okpalobi* held that the State officials were immune from suit because they "ha[d] *no enforcement connection*" with the law. *Id.* at 422 (emphasis in original). The *Okpalobi* plurality relied on *Fitts v. McGhee*, 172 U.S. 516 (1899), which the plurality summarized as providing that the official sued must have "some enforcement powers"—such that an injunction would be effective—and not simply be "charged with the general authority and responsibility to see that all of the laws of the state be faithfully executed," akin to the obligation to "take care" of the laws—in which case the only remedy would be an advisory opinion. *Okpalobi*, 244 F.3d at 415-16.

in nature, *i.e.,* designed to prevent injury that will occur in the future"—and thus where equitable relief would be effective—from cases "where relief is retrospective"—and thus where equitable relief would not provide redress. *Summit*, 180 F.3d at 1338; *see also Papasan v. Allain*, 478 U.S. 265, 277-78 (1986) ("*Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past[.]"); *accord Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998) (concluding there is no "ongoing" violation because of the "obvious fact that the actual violation alleged is a past event that is not itself continuing"; cited at Defs.' MTD 9). In fact, Defendants' case law expressly warns against their proposed rule, "that the enforcement of the allegedly unconstitutional State statute actually must be in progress." *Summit*, 180 F.3d at 1338. To the contrary, "[t]he Supreme Court unambiguously recognized the efficacy of pre-enforcement challenges." *Id*.

It is the threat of future action by Defendants that Plaintiffs fear and has kept Plaintiffs from investigating State facilities. Plaintiffs are not seeking to remedy a harm that occurred in the past. Instead, Plaintiffs are seeking a declaration and injunction so they will not have to continue to suppress their activities because they do not wish to be subject to suit by Defendants. No more active threat by Defendants is required for the exception to sovereign immunity to apply.

### C. Defendants' Ex parte Young *arguments fail to acknowledge the unique concerns presented by First Amendment claims.*

Even were the Court to agree with Defendants that in some instances *Ex parte Young* requires more than that the official have some responsibility for initiating an unconstitutional suit, such a holding should not apply here, where there are First Amendment interests at stake. The Supreme Court has explained the "mere potential" for penalties that punish speech will "cast[] a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."

16

*United States v. Alvarez*, 132 S. Ct. 2537, 2548 (2012) (plurality opinion). The risk of chill from the Anti-Sunshine Law is particularly severe as Plaintiffs have alleged, and Defendants do not contest, that the Law's penalties are so extreme it is a quasi-criminal statute, increasing the likelihood that, without court intervention, citizens will simply refrain from engaging in the covered speech. Comp. ¶ 107. In fact, Plaintiffs allege that this chill is already underway. *Id.* ¶¶ 18-22, 28-30. Per *Alvarez,* this is a present and continuing constitutional injury. If Defendants' authority were not subject to judicial review they could unconstitutionally suppress speech unless and until a plaintiff risked the statute's penalties to defend its rights. The need to avoid such harms has led the Supreme Court to carve out exceptions to the traditional standing requirements when First Amendment interests are at stake. *Gooding v. Wilson,* 405 U.S. 518, 521 (1972). The *Ex parte Young* exception to sovereign immunity—which, as described above, overlaps with standing analysis—should be no different. *See Summit*, 180 F.3d at 1339 (The choice "between the Scylla of intentionally flouting state law and the Charybdis of foregoing what [the plaintiff] believes to be constitutionally protected activity" is precisely what *Ex parte Young* was intended to avoid. (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)).

Indeed, *Western Watersheds Project* recently allowed a challenge to an "Ag-Gag" law to proceed based on these exact concerns. The State Attorney General argued the court lacked jurisdiction over a First Amendment challenge against him, which alleged that a statute empowering the State to seek civil damages if an individual collects data on public land was unconstitutional. Exhibit 2, at 3-4, 7. After acknowledging the limits in *Ex parte Young*, the court concluded plaintiffs had standing and could proceed because "the State is a potential plaintiff under the civil statute" and would be represented by the Attorney General. *Id.* at 14. Therefore "the Court finds Plaintiffs' fear that the State of Wyoming would seek civil penalties to be credible and not speculative." *Id.* Since the plaintiffs' fear

17

was "reasonably causing them to refrain from constitutionally protected [First Amendment] activities," their claim needed to be heard. *Id.* at 16.

*     *     *

For the reasons stated, *Ex parte Young* removes Defendants' claim to sovereign immunity. Plaintiffs are asking this Court to declare unconstitutional and enjoin specific State officials from exercising authority that is necessary to bring the alleged unconstitutional litigation against Plaintiffs. Such relief would enable Plaintiffs to engage in the investigations of government facilities that they have refrained from undertaking for fear of suit under the Law, which is all that is needed for *Ex parte Young* to apply.[7]

### D. Each Plaintiff has standing.

Defendants argue Plaintiffs lack standing because Defendants do not personally "own or operate a farm, an agricultural industrial facility, or a pharmaceutical company" and thus cannot proceed against Plaintiffs under the Anti-Sunshine Law. Defs.' MTD 17-18. But investigating government facilities can give rise to liability under the Anti-Sunshine Law. *E.g.*, N.C. Gen. Stat. § 99A-2(a), (e). Because Defendants can bring about actions against Plaintiffs for their investigations, which has prevented those investigations, and the generation of information on which all Plaintiffs rely, Defendants have caused an injury-in-fact to each Plaintiff, which is traceable to Defendants and redressible through a declaration or injunction against them. Plaintiffs have adequately alleged standing.

### 1. Plaintiffs have adequately alleged injury-in-fact.

"A non-moribund statute that facially restrict[s] expressive activity by the class to which the plaintiff belongs presents [] a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary. This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First

---

[7] Despite Defendants' suggestion to the contrary, Defs.' MTD 14, "[o]f course a state official" who can be sued for injunctive relief under *Ex parte Young* also "would be a person under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (citing *Ex parte Young*).

Amendment rights." *N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (quotation marks and citation omitted); *see also Alvarez*, 132 S. Ct. at 2548 (plurality opinion); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 184 (2000) (a "realistic threat" causing a party to "curtail" an activity "is enough for injury in fact"; cited at Defs.' MTD 16-17). That the government has not declared it will prosecute Plaintiffs does not negate the injury. *See* Defs.' MTD 17-18. There is "no reason to assume that the [] legislature enacted this statute without intending it to be enforced," thus, so long as a plaintiff has reason to believe it could be sued, causing it to "self-censor[] itself by complying with the statute," the plaintiff has incurred a "harm." *Mobil Oil Corp. v. Attorney Gen. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991).

The Fourth Circuit also recognizes an injury if one is denied access to information because the threat of suit has chilled *others'* expressions. There is "standing to assert a right to receive speech" for which a plaintiff only must allege that "there exists a speaker willing to convey the information to her," which has been constrained by the potential for the defendant's action. *Stephens v. Cty. of Albemarle*, 524 F.3d 485, 492 (4th Cir. 2008).

Plaintiffs' complaint lays out how they are suffering both injuries. PETA and ALDF allege that they wish to undertake investigations of government facilities, including UNC-CH, like those prohibited by the Anti-Sunshine Law, but have not done so for fear of prosecution under the Law. *E.g.*, Comp. ¶¶ 18-22, 28-30. Each Plaintiff further alleges that it relies on information produced through investigations like those of PETA and ALDF. *E.g.*, *id.* ¶¶ 17, 25-26, 31-32, 36, 38-39, 42, 44-45, 49-52. Accordingly, Plaintiffs have been denied the opportunity to receive speech because PETA, ALDF, and likely others have declined to engage in investigations they would have conducted absent the Law. As a result, each Plaintiff has been hindered in its ability to produce publications and videos; serve as sources for other members of the media; act as advocates to the public, legislators, and regulators; and assist law enforcement in identifying and prosecuting misconduct. *E.g.*, *id.* ¶¶ 17, 24-26, 27, 31-32, 34, 36, 38-39, 41-45, 48-52.

19

2. Plaintiffs have adequately alleged traceability and redressability.

For these same reasons, it is incorrect to claim Plaintiffs' injuries are not traceable to and redressible against Defendants because the Anti-Sunshine Law requires "independent action of some third party." Defs.' MTD 19-20. Not only may the State prosecute violations of the Law that occur on public land, but Defendants are the individuals responsible for carrying out such litigation (the Attorney General) or initiating it (the Chancellor). Declaring Defendants' conduct unlawful or enjoining it would remove the chill that has kept Plaintiffs from carrying out their planned investigations of public facilities, including UNC-CH, and enable them to release the information they uncover to Plaintiffs. *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988) (plaintiffs "satisf[ied] Art. III's requirement[s]" when they sought a declaration that an adjudicatory process would be unconstitutional because it posed "'a realistic danger" of injury through an adverse decision and its ultimate "'enforcement'" (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298)); *Rothamel v. Fluvanna Cty.*, 810 F. Supp.2d 771, 777 n.3 (W.D. Va. 2011) ("Any injury can be traced to the existence and threatened enforcement of the challenged ordinance and would be redressable through declaratory or injunctive relief.").

Defendants' complaint that Plaintiffs' suit "would not enjoin any private litigant," Defs.' MTD 19, is "irrelevant," *Mobil Oil Corp.*, 940 F.2d at 76. Whether Plaintiffs also have a "dispute with" someone else "does not bear on whether [they have] a dispute with" Defendants. *Id.* "[T]he Declaratory Judgments Act was designed … [to] encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power." *Id.* at 75. Plaintiffs need not name every person who *could* do them harm, so long as they sue a State official involved in the enforcement. *Id.* at 75-77. Exactly what they have done.

### E. This Court has jurisdiction over the State constitutional claims.

Defendants argue that they are immune from Plaintiffs' State constitutional claims because North Carolina has not "waived" immunity, Defs.' MTD 16, but North Carolina

20

has done exactly that. Thus, this Court should exercise supplemental jurisdiction over the State claims, which overlap with the Federal claims. 28 U.S.C § 1367(a).

North Carolina courts "established" the doctrine of sovereign immunity, and waived that immunity for Plaintiffs' claims under the North Carolina Constitution. *Corum v. Univ. of N. Carolina*, 413 S.E.2d 276, 291 (N.C. 1992) ("The doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights."). Indeed, they have established a cause of "action under the State Constitution against State officials for violations of rights guaranteed by the [State Constitution's] Declaration of Rights," encompassing all of the claims at issue here. *Corum*, 413 S.E.2d at 290; *see also State v. Petersilie,* 432 S.E.2d 832, 841 (N.C. 1993). The only limitation on the waiver is that there must be no other "adequate state remedy," a fact that Plaintiffs have alleged and Defendants do not contest. *Corum*, 413 S.E.2d at 289; Comp. ¶¶ 133, 136, 141.[8]

Because the State has waived sovereign immunity for Plaintiffs' claims arising under the State Constitution, this Court possesses jurisdiction pursuant to 28 U.S.C. § 1367(a). While the Court "may decline to exercise" that jurisdiction if: (1) "the claim raises a novel or complex issue of State law"; (2) the State law issues "substantially predominate[] over the [federal] claim[s]"; or (3) other "exceptional circumstances" exist, none of these rationales apply here because the North Carolina courts look to Federal law to interpret the State constitutional provisions at issue. *See* 28 U.S.C § 1367(c). In fact, in *Petersilie*, the North Carolina Supreme Court "adopt[ed] the United State[s] Supreme Court's First Amendment jurisprudence" for the purposes of determining whether "our State Constitution's Free Speech Clause" had been violated. 432 S.E.2d at 841. North

---

[8] The two North Carolina cases cited by Defendants are inapplicable. *See* Defs.' MTD 15-16. Both concerned non-constitutional claims combined with constitutional claims for which the courts determined that there *were* adequate State law remedies. *Szabo v. E. Carolina Univ.*, No. 4:07-CV-10-BO, 2007 WL 2226006, at *2-3 (E.D.N.C. Aug. 2, 2007); *Hooper v. North Carolina*, 379 F. Supp.2d 804, 812-14 (M.D.N.C. 2005).

Carolina has declined to say it will follow Federal law in every instance in which the State and Federal constitutions parallel one another, but it will always "'give great weight to decisions of the Supreme Court of the United States interpreting provisions of the Constitution of the United States which are parallel to provisions of the State Constitution to be construed.'" *Id.* (quoting *State v. Hicks*, 428 S.E.2d 167, 176 (N.C. 1993)).

Because Federal law will ultimately guide the resolution of all of the claims, Federal adjudication of them is proper. Dismissing Plaintiffs' claims would force Plaintiffs from the Federal forum into the courts of the locality, which would in turn look to Federal law to determine how Federal courts would construe the United States Constitution. Defendants offer no authority supporting this outcome or why this Court should ignore the clear, unequivocal waiver that allows Plaintiffs' claims to proceed.

### F. The Anti-Sunshine Law violates the protections of free speech.

Plaintiffs' central contentions on the merits are that the nature of the conduct covered by and exceptions to the Anti-Sunshine Law render the Law facially content based, making it "presumptively unconstitutional" and requiring the State to satisfy strict scrutiny before the Law can be allowed to take effect, *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2226 (2015); and that those same provisions also suppress a substantial amount of protected speech, making the Law unconstitutionally overbroad, *City of Houston v. Hill,* 482 U.S. 451, 458 (1987). Rather than responding to these arguments, Defendants attempt to portray the Anti-Sunshine Law as content neutral by providing a revised, unrealistic meaning for the Law's phrase "bona fide," *United States v. Stevens*, 559 U.S. 460, 478 (2010) (explaining law cannot be saved by litigant rewriting it); and suggesting *two* potential constitutional applications of the statute, *City of Houston,* 482 U.S. at 459 (statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate applications"). Plaintiffs have alleged a facial challenge because Defendants have failed to undermine Plaintiffs' showings that the Law's purpose and reach make it unenforceable.

22

1. <u>The Anti-Sunshine Law is a content-based statute that Defendants have not and cannot demonstrate satisfies strict scrutiny.</u>

Content-based statutes are: (a) laws that allow the collection of information for some purposes, but not others, *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663 (2011); (b) laws that target certain types of speakers, *id.*; or (c) laws that provide "unfettered discretion to burden or ban speech," *Child Evangelism Fellowship v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (4th Cir. 2006).[9]

The Anti-Sunshine Law falls within all of these categories. Two of the five types of covered conduct only occur if information collected is used "to breach the person's duty of loyalty." N.C. Gen. Stat. § 99A-2(b)(1)-(2). The Law allows the collection and use of the information for some purposes, but "then bars any disclosure when [] speakers will use the information" in other manners. *See Sorrell*, 131 U.S. at 2663. Relatedly, the Law only prohibits the collection if the information is not disclosed through the approved channels. N.C. Gen. Stat. § 99A-2(e). The Law targets a particular type of speaker—an individual conducting uncover investigations to release the information through non-approved channels, particularly to the public—"even though the information may be … acquired by other speakers with diverse purposes and viewpoints." *See Sorrell*, 131 U.S. at 2663. Further, the Law defines "nonpublic areas," where the covered conduct occurs, to mean those areas "not *intended* to be accessed by the general public." N.C. Gen. Stat. § 99A-2(a) (emphasis added). Thereby, it provides "unfettered discretion" to employers and property owners to decide what types of investigations and releases of information are allowable or prosecutable. *See Child Evangelism Fellowship*, 470 F.3d at 1068.[10]

---

[9] These same characteristics can also render a law viewpoint discriminatory, "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Plaintiffs allege this is the case with the Anti-Sunshine Law, Comp. ¶¶ 4, 80, 82, 87, but the Court need not be concerned with this distinction here.

[10] *See also City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 769 (1988) (explaining that allowing an official to "deem[]" what violates the provisions provides unconstitutional "unbridled discretion"); *W. Watersheds Project*, <u>Exhibit 2</u>, at 32 (law

Lest there be any doubt about this reading of the Anti-Sunshine Law, the legislators who supported the Anti-Sunshine Law explained its purpose was to provide employers and property owners a tool to suppress the activities of investigators who release to the public information that employers and property owners wish to suppress. Labeling such investigators "[]fraud[s]" and "li[ars]," the legislators stated that the Anti-Sunshine Law is meant to stop the work of "the media" and "private special-interest organizations." Comp. ¶¶ 75-77. The legislators explained that the "crux" of the Law is that it requires individuals to share the information they obtain with who the legislature declares are "appropriate authorities," preventing an individual from "tak[ing] [a] job because [he] want[s] to do an exposé for ABC News." *Id.* ¶¶ 74, 76; *see also Otter*, 118 F. Supp.3d at 1202 (laws that "target[] undercover investigators who intend to publish videos they make through the press" are content-based laws subject to strict scrutiny).[11]

Such statements not only confirm Plaintiffs' reading of the Law's text, but are reason enough to hold that the Law is content based. Even laws that are "facially content neutral, will be considered content based" if they "were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 135 S. Ct. at 2227 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (alteration in *Reed*). The North Carolina legislature explained that the Law targets the media and activists to prevent the release of information that would expose employers and owners. This is sufficient to state a claim that the law is content based. *Id.*[12]

---

allowing landowner to prosecute unfavorable releases of information and providing "no liability" for "favorable" releases of the same information "appears to simply be a façade for content or viewpoint discrimination").

[11] *Accord ALCU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." (emphasis in original)).

[12] Based on this precedent, Defendants' claim that, in certain circumstances, North Carolina courts have narrowly construed what sorts of legislative history they will consider is inconsequential. Defs.' MTD 24-25. Per *Reed*, controlling Federal precedent

Defendants' efforts to counteract these facts fail. Defendants' claim that the Law does not apply to employees who have "*bona fide* purposes toward[] [their] employer" regardless of what they do with the information is incorrect. Defs.' MTD 22-23. The phrase "bona fide" is used in the Anti-Sunshine Law to explain that it applies to employees who come across information in nonpublic areas when they are there "for a reason other than a bona fide intent of seeking or holding employment." N.C. Gen. Stat. § 99A-2(b)(1)-(2). The function of "bona fide" is to differentiate between individuals who happen across information and those who seek it out. *See* Comp. ¶ 73 (statement of Representative Glazier that the Law does not cover those who merely happen upon "something illegal," but those whose "reason they're" in the nonpublic areas is to gather information). Within the Anti-Sunshine Law, the term "bona fide" underscores that the statute targets certain types of speakers—those who seek out information to release it— and thus is content based. *Sorrell*, 131 S. Ct. at 2663.[13]

holds such legislative history relevant to and even dispositive of Plaintiffs' Federal constitutional claims. Because the North Carolina courts have held that they follow Federal law in interpreting the State Constitution, this precedent also indicates the legislative history can establish Plaintiffs' State constitutional claims.

    Defendants are also wrong as to North Carolina law. North Carolina courts can consider legislators' statements that are part of the legislative record. *Lanvale Properties, LLC v. Cty. of Cabarrus*, 731 S.E.2d 800, 815 (N.C. 2012) ("'When interpreting a statute, we ascertain the intent of the legislature, first by applying the statute's language and, if necessary, considering its legislative history and the circumstances of its enactment.'" (quoting *Shaw v. U.S. Airways, Inc.*, 665 S.E.2d 449, 451 (N.C. 2008))). The cases cited by Defendants address whether evidence beyond such legislative history can be used to discern legislative intent. *Elec. Supply Co. of Durham v. Swain Elec. Co.*, 403 S.E.2d 291, 295 (N.C. 1991) (refusing to consider "[a] memorandum, written by the attorney who drafted the" language); *Styers v. Phillips*, 178 S.E.2d 583, 590 (N.C. 1971) (holding a court cannot consider the in court "testimony of a member" of the legislature provided after legislation's passage).

[13] Although it is not central to Plaintiffs' claims establishing jurisdiction or a constitutional violation, without any textual support, Defendants further claim that the Anti-Sunshine Law "does not give an employer a cause of action … against a third-party who comes into possession of information (whether this information is of public concern or not) from a *bona fide* whistleblower." Defs.' MTD 26. This too is incorrect. Section

Moreover, even if Defendants' interpretation of "bona fide" were correct, it would not render the Law content neutral. The Law's legislative history demonstrates it is content based. Its text would still allow the employer or property owner complete discretion to decide whether it "intended" the information to be "nonpublic" or would allow the information to be made public. N.C. Gen. Stat. § 99A-2(a); *see also Child Evangelism Fellowship*, 470 F.3d at 1068. Defendants' interpretation of "bona fide" also does nothing to narrow N.C. Gen. Stat. § 99A-2(b)(3), (5), where "bona fide" does not appear, and which outlaw leaving recording devices on a premises and infringing on property rights, targeting the media and activists. *See*, *e.g.*, *Sorrell*, 131 S. Ct. at 2663; *Otter*, 118 F. Supp.3d at 1204 (law that prohibits "audiovisual recording … not only restricts protected speech, but, in fact, discriminates based on both content and viewpoint").

In light of the Law's text and history, Defendants further err in relying on *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999). Defs.' MTD 28-29. *Food Lion* indicated that "generally applicable" common law torts, such as an action for breach of the "duty of loyalty," did not violate the First Amendment. 194 F.3d at 521. It did not and could not authorize a new statute like the Anti-Sunshine Law, where the text and legislative history establish it is targeted at certain types of speech, because this language and purpose demonstrate the law is not generally applicable and mandate strict scrutiny. *Reed*, 135 S. Ct. at 2227. Indeed, *Food Lion* justified its holding based on the court's belief that traditional background rules like a common law "duty of loyalty," which prohibit the breach of "promises," only have an "incidental effect" on speech. 194 F.3d at 521-22. However, liability under the Anti-Sunshine Law is not dependent on the breach of a promise, but the *communication* of information through non-approved channels. N.C. Gen. Stat. § 99A-2(e) (exempting all conduct so long as it results in disclosures

---

99A-2(c) creates joint liability for third-parties who "direct[], assist[], compensate[], or induce[]" a covered disclosure, encompassing not only those who work with or employ a whistleblower, but potentially even parties, like Plaintiffs, whose publications and advocacy can "direct" or "induce" a whistleblower to come forward.

26

under the listed statutes). In addition, under N.C. Gen. Stat. § 99A-2(b)(3), (5), the Anti-Sunshine Law can be violated absent the breach of any promise, but entirely based on *how* the information was gathered and communicated. The Law's impact on speech is not incidental. As confirmed by the State legislature, its purpose is to suppress the media and activists from releasing information to the public.[14]

A "content-based restriction[] on speech … can stand only if [it] survive[s] strict scrutiny, 'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed*, 135 S. Ct. at 2231 (quoting *Az. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011)). Yet, not only do Defendants fail to articulate how the Law satisfies strict scrutiny, but they only articulate *two* interrelated circumstances in which they claim the Law could be used "to protect legitimate rights"—where an employee steals or destroys an employer's property to benefit himself or others. Defs.' MTD 21. Such "legitimate rights" are already protected through standard contractual, tort, and equitable remedies, as well as North Carolina's Trade Secrets Protection Act, which provides a cause of action for an injunction, actual damages, punitive damages, and attorneys' fees against individuals who misappropriate "business or technical information" that confers "actual or potential commercial value" due to the fact that it is nonpublic. N.C. Gen. Stat. §§ 66-152—66-154. Defendants have not suggested any reason why there is a State interest in additional, largely duplicative causes of action. *Otter*, 118 F. Supp.3d at 1208 (holding

---

[14] It also appears that *Food Lion*'s holding that a cause of action for breaching the "duty of loyalty" does not violate the First Amendment is no longer precedential. As Defendants concede, *Food Lion* relied on the erroneous belief that North Carolina had a common law cause of action for breach of the "duty of loyalty." The North Carolina Supreme Court has since explained that there has never been such a cause of action. Defs.' MTD 28 n.4 (citing *Dalton v. Camp*, 548 S.E.2d 704, 709 (N.C. 2001)). Instead, the "duty of loyalty," as used in the Anti-Sunshine Law, is a new concept in North Carolina. Moreover, that "duty" is not defined in the Law, and the Law does not create an independent cause of action for breach of the duty, but, rather, breach of the "duty of loyalty" is one element in two the Law's five types of covered conduct

27

the State has failed to show "any need" for a law when "laws already exist that adequately protect those interests without impinging on free-speech rights"). Moreover, the Anti-Sunshine Law uses none of the language in the Trade Secrets Protection Act to target those who act for financial gain. The Anti-Sunshine Law's breadth reflects that the legislature was not interested in those who steal information for reward, but meant to target those who act to inform the public. *See, e.g.*, Comp. ¶ 74 (legislator stating the Law was aimed at those "running out to a news outlet"). The statute is neither narrowly tailored nor justified by a compelling State interest. Therefore, it is unconstitutional.

2. The Anti-Sunshine Law violates equal protection.

Defendants concede that equal protection of the laws requires "strict scrutiny" of "content-based" statutes. Defs.' MTD 23; *see also Zablocki v. Redhail,* 434 U.S. 374, 388 (1978)*; Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 312 & n.3 (1976). As detailed above, the Anti-Sunshine Law is content based. Defendants have not carried their burden to show it satisfies strict scrutiny. Thus, Plaintiffs have stated a claim that the Law is inconsistent with equal protection.[15]

3. The Anti-Sunshine Law is unconstitutionally overbroad.

The overbreadth doctrine permits a "challenge [to] a statute not because [the plaintiff's] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956-57 (1984) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (quotation marks omitted)). It is an "expansive remedy" that

---

[15] Even were the Court to accept Defendants' claim that the Law is content neutral, that does not render it free from scrutiny. *See* Defs.' MTD 23. Content-neutral laws that "incidentally" burden speech must pass "intermediate scrutiny," *i.e.*, not "adversely affect a 'substantial' amount of protected speech relative to their 'plainly legitimate sweep.'" *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 513-15 (4th Cir. 2002). For the reasons stated below, Plaintiffs have adequately alleged the Law fails this test.

"invalidates all enforcement of [a] law" that "'punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep'" whether the suppressed speech is Plaintiffs' or that of a third-party. *Does 1-5 v. Cooper,* 40 F. Supp.3d 657, 678 (M.D.N.C. 2014) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). Indeed, contrary to Defendants' suggestion that Plaintiffs must establish a more "concrete" harm to themselves and thus should re-allege their overbreadth claim as an as-applied challenge, Defs.' MTD 22, 27, overbreadth is a "textbook example of why we permit facial challenges," as it is meant to prevent the chilling effect on Plaintiffs as well as "other speakers in any capacity," and this third-party speech is central to the overbreadth analysis, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002).

Plaintiffs have alleged how the Anti-Sunshine Law inhibits a substantial amount of constitutionally protected speech as compared to the Law's claimed legitimate applications. Besides other groups and individuals that, like Plaintiffs, wish to investigate and publicize information, employees who witness something concerning—such as abuse of the mentally ill, which is required to be reported under North Carolina's Burt's Law—deviate from their responsibilities, return to the scene to gather information, and publically report that information could be liable under the Law. Comp. ¶¶ 93, 95; *see also* N.C. Gen. Stat. § 99A-2(b)(1)-(2). In addition, the Anti-Sunshine Law restricts the channels of communication for everyone within its reach. Individuals who fall within the statute are only exempt if they report the information through the approved mechanisms. N.C. Gen. Stat. § 99A-2(e). This is despite the fact that other laws, including the Federal False Claims Act, environmental statutes, and Burt's Law, require or encourage individuals to report information through channels not authorized by the Anti-Sunshine Law. Comp. ¶¶ 92-93. The resulting chill on reporting information is what led Governor McCrory to veto the Law. *Id.* ¶ 57.

The applications of the Anti-Sunshine Law suggested by Defendants do not outweigh the protected communications the Law chills. *See City of Houston,* 482 U.S. at 459.

29

Indeed, the constitutionally protected communications inhibited by the Law substantially exceed Defendants' claimed legitimate commercial applications in both number and import. Speech on matters of public concern, such as the public whistleblowing on abuse, contractor fraud, and environmental harm suppressed by the Law, deserves special protection as it is "'vital to informed decision-making by the electorate.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571-72 (1968)). Plaintiffs have sufficiently alleged the Law is unconstitutionally overbroad.

### G. Defendants fail to address Plaintiffs' other constitutional claims.

Defendants do not address Plaintiffs' four other distinct types of constitutional claims, failing to acknowledge the unique precedent and scrutiny applicable to each. Therefore, Plaintiffs just briefly outline how they have stated each claim.

<u>Freedom of the Press:</u> Beyond their protections of free speech, the State and Federal constitutions protect the freedom of the press and therefore demand even greater showings to sustain a law that provides for "differential treatment" of press activities, requiring the State to establish there was *no* other way to accomplish the same ends and that its objectives are of compelling importance. *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 583, 585 (1983). The Anti-Sunshine Law not only brings the media within its grasp, *see* N.C. Gen. Stat. § 99A-2(b)(1)-(3), (b)(5), but, as explained by legislators, purposefully targets the media, *e.g.*, Comp. ¶¶ 74, 76. Defendants have not attempted to carry their burden to justify such an attack on the press.

<u>Right to Petition:</u> The State and Federal constitutions also separately protect the right to petition, which includes gathering and submitting information to the government and efforts to "influence [the] government[] through direct lobbying, publicity campaigns," and the like. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 510 (1988). This right can only be infringed "in the most extreme circumstances." *McDonald v. Smith*, 472 U.S. 479, 486 (1985) (Brennan, J., concurring). The Anti-Sunshine Law prevents such campaigns because it prevents the investigations on which they rely. It also

prevents communications with the government, by only allowing disclosures through certain mechanisms, outlawing other, authorized communications. N.C. Gen. Stat. § 99A-2(e). Defendants have not claimed this is a "most extreme circumstance."

Equal Protection: In addition to protecting fundamental rights, the guarantees of equal protection and due process "'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (quoting *Dep't of Ag. v. Moreno*, 413 U.S. 528, 534–35 (1973)). In *Windsor* the Supreme Court stated a court is "require[d] … to hold … [such a law] unconstitutional." *Id.* at 2695. Prior to *Windsor*, the Court explained legislation motivated by animus at least mandated heighted scrutiny. *Moreno*, 413 U.S. at 534-38. North Carolina's legislators stated that the Anti-Sunshine Law was passed because they believe the "news outlets" and "special-interest organizations" targeted by the Law are "fraud[s]" and "li[ars]." Comp. ¶ 104. Thus, the Law either is *per se* unlawful or subject to heightened scrutiny that Defendants have not satisfied.

Void for Vagueness: Both the protections of free speech and due process outlaw statutes that are overly vague because their lack of clarity can suppress protected activities. In fact, because the Anti-Sunshine Law implicates speech and imposes quasi-criminal penalties in the form of punitive damages it is required to have a particularly high level of clarity, as people are more likely to be chilled by its prohibitions and the activities its vagueness can inhibit are of particular import. *See Parker v. Levy*, 417 U.S. 733, 752-57 (1974). Plaintiffs' complaint details how numerous aspects of N.C. Gen. Stat. § 99A-2(b)(1)-(2) are so vague they are likely to substantially interfere with protected activities. Comp. ¶¶ 106-13. Defendants do not attempt to explain these aspects of the Law.

## V. Conclusion.

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motion to dismiss be denied.

Case 1:16-cv-00025-TDS-JEP   Document 35   Filed 05/31/16   Page 31 of 35

May 31, 2016                            Respectfully submitted,


                                        */s/ Daniel K. Bryson*
                                        Daniel K. Bryson
                                        N.C. Bar Number: 15781
                                        Jeremy Williams
                                        N.C. Bar Number: 48162
                                        Whitfield Bryson & Mason LP
                                        900 W. Morgan Street
                                        Raleigh, NC 27603
                                        (919) 600-5000
                                        dan@wbmllp.com
                                        jeremy@wbmllp.com
                                        *Counsel for Plaintiffs*


                                        David S. Muraskin*
                                        Public Justice, P.C.
                                        1620 L St. NW, Suite 630
                                        Washington, DC 20036
                                        (202) 861-5245
                                        dmuraskin@publicjustice.net
                                        *Counsel for Plaintiffs*


                                        Leslie A. Brueckner*
                                        Public Justice, P.C.
                                        555 12th Street, Suite 1230
                                        Oakland, CA 94607
                                        (510) 622-8205
                                        lbrueckner@publicjustice.net
                                        *Counsel for Plaintiffs*


                                        Matthew Strugar*
                                        PETA Foundation
                                        2154 W. Sunset Blvd.
                                        Los Angeles, CA 90026
                                        (323) 210-2263
                                        matthew-s@petaf.org
                                        *Counsel for People for the Ethical Treatment of
                                        Animals, Inc.*

                                        32

Cristina R. Stella*
Paige Tomaselli*
Center for Food Safety
303 Sacramento Street, Second Floor
San Francisco, CA 94111
(415) 826-2770
CStella@centerforfoodsafety.org
PTomaselli@centerforfoodsafety.org
*Counsel for Center for Food Safety*

Matthew Liebman*
Animal Legal Defense Fund
170 East Cotati Avenue
Cotati, CA 94931
(707) 795-7533
mliebman@ALDF.org
*Counsel for Animal Legal Defense Fund*

Justin Marceau*
University of Denver—Strum College of Law
(*for reference purposes only*)
2255 E. Evans Ave.
Denver, CO 80208
(303) 871-6000
jmarceau@law.du.edu
*Counsel for Animal Legal Defense Fund*

Scott Edwards*
Food & Water Watch
1616 P St. NW
Washington, DC 20036
(202) 683-2500
sedwards@fwwatch.org
*Counsel for Food & Water Watch*

Sarah L. Nash*
Government Accountability Project
1612 K St. NW, Suite 1100
Washington, DC 20006
(202) 457-0034, ext. 127
sarahn@whistleblower.org
*Counsel for Government Accountability Project*

33

Michael S. McFadden*
Farm Forward
325 W Pierpont Ave.
Salt Lake City, UT 84101
(877) 313-3276
Michael@farmforward.com
*Counsel for Farm Forward*

Jennifer H. Chin*
Robert Hensley*
ASPCA
520 Eighth Avenue, 7th Floor
New York, NY 10018
(212) 876-7700
jennifer.chin@aspca.org
robert.hensley@aspca.org
*Counsel for American Society for the Prevention of Cruelty to Animals*

*Appearing by Special Appearance

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document, *Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss,* has been electronically filed with the Clerk of Court this 31st day of May 2016, by using the CM/ECF system which will send notice of the  electronic filing to all parties of record.

*/s/ Daniel K. Bryson*
Daniel K. Bryson
Whitfield Bryson & Mason LLP
