IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PEOPLE FOR THE ETHICAL          )
TREATMENT OF ANIMALS, INC.;     )
ANIMAL LEGAL DEFENSE FUND;      )
CENTER FOR FOOD SAFETY; FOOD &  )
WATER WATCH; FARM SANCTUARY;    )
GOVERNMENT ACCOUNTABILITY       )
PROJECT; AMERICAN SOCIETY FOR   )
THE PREVENTION OF CRUELTY TO    )
ANIMALS; and FARM FORWARD,      )
                                )
            Plaintiffs,         )
                                )
        v.                      )          1:16CV25
                                )
JOSH STEIN, in his official     )
capacity as Attorney General    )
of North Carolina; and CAROL    )
L. FOLT, in her official        )
capacity as Chancellor of the   )
University of North Carolina-   )
Chapel Hill,[1]                 )
                                )
            Defendants.         )

<u>**MEMORANDUM OPINION AND ORDER**</u>

THOMAS D. SCHROEDER, District Judge.

This case involves a pre-enforcement challenge to the North

Carolina Property Protection Act, 2015 N.C. Sess. Laws 50, <u>codified</u>

<u>at</u> N.C. Gen. Stat. § 99A-2 ("Property Protection Act" or "Act"),

which in relevant part creates a civil cause of action for a North

Carolina employer against an employee who "captures or removes"

documents from the employer's premises or records images or sound

---

[1] Josh Stein, the current Attorney General, is substituted automatically
for outgoing Attorney General Roy Cooper (who was elected Governor)
pursuant to Federal Rule of Civil Procedure 25(d).

on the employer's premises and uses the documents or recordings to breach the employee's duty of loyalty to the employer. N.C. Gen. Stat. §§ 99A-2(b)(1), (2). Plaintiffs are eight organizations that claim the Act stifles their ability to investigate North Carolina employers for illegal or unethical conduct and restricts the flow of information those investigations provide, in violation of the First (count I) and Fourteenth (count II) Amendments to the United States Constitution and provisions of the North Carolina Constitution (Free Speech under Art. I, § 14 (count III); Right to Petition under Art. I, § 12 (count IV); and Equal Protection under Art. 1, § 19 (count V)). Defendants are Josh Stein, Attorney General of North Carolina, and Carol Folt, Chancellor of the University of North Carolina at Chapel Hill ("UNC/Chapel Hill").

Before the court is Defendants' motion to dismiss. (Doc. 30.) The motion has been fully briefed, and the court held oral argument on April 4, 2017. With leave of court, amici law professors Erwin Chemerinsky and Jack Preis have filed a brief in support of Plaintiffs' arguments. (Doc. 45.) Because the amended complaint fails to allege that Plaintiffs have yet suffered an Article III injury-in-fact, the court finds that it lacks jurisdiction over Plaintiffs' claims. The motion to dismiss will therefore be granted, and the first amended complaint will be dismissed without prejudice.

## I.   BACKGROUND

Viewed in the light most favorable to Plaintiffs, the relevant facts are as follows:

On June 3, 2015, the North Carolina General Assembly overrode a veto to pass the Property Protection Act.  In relevant part, the Act allows the owner or operator of a premises to recover against any person who "intentionally gains access to the nonpublic areas[2] of [its] premises and engages in an act that exceeds the person's authority to enter those areas."  N.C. Gen. Stat. § 99A-2(a).  "An act that exceeds a person's authority to enter the nonpublic area of another's premises" is defined in the Act as follows:

> (1) An employee who enters the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization captures or removes the employer's data, paper, records, or any other documents and uses the information to breach the [employee's] duty of loyalty to the employer[;]
>
> (2) An employee who intentionally enters the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization records images or sound occurring within an employer's premises and uses the recording to breach the [employee's] duty of loyalty to the employer[;]
>
> (3) Knowingly or intentionally placing on the employer's premises an unattended camera or electronic surveillance device and using that device to record images or data[;]

---

[2] "Nonpublic areas" is defined as "those areas not accessible to or not intended to be accessed by the general public."  N.C. Gen. Stat. § 99A-2(a).

(4) Conspiring in organizing retail theft, as defined in Article 16A of Chapter 14 of the General Statutes[;] [or]

(5) An act that substantially interferes with the ownership or possession of real property.

N.C. Gen. Stat. § 99A-2(b). "Any person who intentionally directs, assists, compensates, or induces another person to violate this section" can be jointly liable with the employee or actor. Id. § 99A-2(c).

The Act provides for the recovery of equitable and compensatory relief, as well as costs, attorneys' fees, and "[e]xemplary damages as otherwise allowed by State or federal law in the amount of five thousand dollars ($5,000) for each day, or portion thereof, that a defendant has acted in violation of subsection (a) of this section." Id. § 99A-2(d). Finally, the Act provides that nothing in it may be construed "to diminish the protections provided to employees under Article 21 of Chapter 95 or Article 14 of Chapter 126 of the General Statutes, nor may any party who is covered by these Articles be liable under this section." Id. § 99A-2(e).

Plaintiffs are eight organizations dedicated to exposing illegal and unethical conduct in private and public industries. (Doc. 21.) Plaintiffs allege that three of the organizations, People for the Ethical Treatment of Animals ("PETA"), Animal Legal Defense Fund ("ALDF"), and Farm Sanctuary, engage in undercover

investigations to expose animal cruelty. (<u>Id.</u> ¶¶ 15, 27, 34.)
They further allege that PETA and ALDF wish to continue their
undercover investigations in North Carolina and are "deterred"
from doing so by fear of liability under the Act. (<u>Id.</u> ¶¶ 16,
28.)

To conduct these investigations, the organizations direct
their members to obtain employment with employers they believe are
engaged in illegal or unethical conduct. After such investigators
obtain employment, they collect information and record the
employer's conduct. Such persons "may also be instructed to leave
recording devices unattended to capture images and sound over a
longer duration." (<u>Id.</u> ¶ 29.) Plaintiffs allege that, among
others, PETA's and ALDF's investigators have recorded activities
in non-public areas. (<u>Id.</u> ¶¶ 21, 29.)

PETA uncovered unethical conduct at animal laboratories at
UNC/Chapel Hill from 2001 to 2003, and Plaintiffs allege on
information and belief that the laboratories continue to engage in
illegal and unethical treatment of animals. (<u>Id.</u> ¶¶ 21-22.) In
that investigation, investigators made recordings in non-public
areas of the laboratories "showing that workers disregarded animal
care protocols and government orders." (<u>Id.</u> ¶ 21.) PETA
publicized its findings and filed a report with the National
Institute of Health. (<u>Id.</u>) Plaintiffs allege that PETA "would
conduct" another investigation at UNC/Chapel Hill but that because

"PETA fears liability under the [Act]" and "because of the chill created by the [Act], PETA has chosen not to undertake this investigation." (Id. ¶ 22.)

ALDF has conducted at least a dozen undercover investigations in North Carolina. (Id. ¶ 28.) It "wishes to continue to conduct such investigations in North Carolina, but it has been deterred from doing so for fear of being sued for damages under the [Act]." (Id.) Plaintiffs allege that ALDF has an investigative team capable of conducting such investigations, that it has recruited investigators ready, willing, and able to investigate North Carolina facilities, and that it has spent several thousand dollars on radio advertisements in North Carolina to recruit more investigators. Plaintiffs further allege that ALDF has created a list of animal facilities in North Carolina, including "a number of" governmental facilities, and has collected applications for employment at some of these facilities. (Id. ¶ 30.)

Plaintiffs allege that all eight organizations rely on information from such undercover investigations in order to build support for their missions and to cultivate public pressure to pass legislation and effectuate other reforms. At least one of the organizations, Governmental Accountability Project ("GAP"), defends and provides legal services to whistleblowers who disclose information about various threats to public welfare. (Id. ¶¶ 40-42.) The organizations' missions vary, but they all involve the

distribution of information obtained through undercover investigations.

Defendant Stein is responsible for appearing in court to represent the State of North Carolina and its agencies. N.C. Gen. Stat. § 114-1.2. Defendant Folt exercises executive authority over UNC/Chapel Hill, id. § 116-34(a), which operates the facility PETA has investigated in the past and wishes to investigate again. (See Doc. 21, ¶¶ 21-22.)

Plaintiffs brought this action on January 13, 2016, less than two weeks after the law became effective (Doc. 1, ¶¶ 55, 58), and amended their complaint shortly thereafter to add two Plaintiffs. They allege that facially and as applied to Plaintiffs, the Act violates the First and Fourteenth Amendments because it constitutes a content-based restriction on speech and cannot pass strict scrutiny. They also allege that the Act violates free-press protections and the Petitions Clause and that it is overbroad and unconstitutionally vague. Finally, they argue that the Act violates various provisions of the North Carolina Constitution. Plaintiffs seek an injunction against enforcement of the Act by anyone and a judgment requiring Defendants "to provide public notice, including in the official and online editions of the North Carolina statutes, that the [Act] is unconstitutional and will not be enforced." (Doc. 21, ¶ 142.)

Defendants move to dismiss the amended complaint on three

grounds: Eleventh Amendment State sovereign immunity;[3] standing; and on the merits.[4]  (Doc. 30.)  Because the standing argument presents a challenge to this court's subject matter jurisdiction, it presents a threshold issue the court must resolve first.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89–101 (1998) (holding that a federal court cannot address the merits of a case without first determining that it has jurisdiction over the case); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 482 (4th Cir. 2005) (applying Steel Co. to Eleventh Amendment immunity and concluding that it is not a threshold jurisdictional issue (citing Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 394 (1998) (Kennedy, J., concurring))).

On the question of standing, Defendants argue first that Plaintiffs' fears of liability are hypothetical and conjectural,

---

[3] As to immunity, Defendants argue that because nothing in the Act vests the Attorney General or Folt with any responsibility under the Act to enforce its provisions, there is no nexus between either of the Defendants and the civil enforcement of the Act.  (Doc. 31 at 8-11.) Defendants also argue that the Board of Governors, which oversees the UNC system, has not delegated any responsibility to Folt to enforce the Act.  (Id. at 13.)  Finally, Defendants argue that neither Defendant is a proper party because there is no allegation that either has acted under color of State law with respect to any Plaintiff.  (Id. at 14.)  While Defendants' brief leads with these arguments, they need not be reached here because the standing challenge presents a question of the court's subject matter jurisdiction, which the court must determine as a threshold matter.

[4] As to the merits, Defendants argue principally that the conduct proscribed by the Act is not constitutionally protected but rather akin to the type of "run-of-the-mill torts" the Fourth Circuit found were not subject to constitutional challenge in Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505 (4th Cir. 1999).  (Doc. 31 at 28.)

failing to constitute an injury-in-fact for standing purposes. (Doc. 31 at 18.) They point out that nowhere in the amended complaint do Plaintiffs allege that either Defendant is likely to enforce the Act against them through a civil cause of action. (Id. at 19.) Defendants also argue that Plaintiffs fail to satisfy the causation and redressability prongs of the Article III standing inquiry. (Id. at 19-21.)

To Defendants' arguments regarding the injury-in-fact requirement, Plaintiffs respond that they fear employers will sue investigators like PETA pursuant to the Act, chilling their investigations. (Doc. 35 at 18-19.) They argue further that the non-investigator Plaintiffs – those whose alleged injury is the interrupted receipt of recordings and documents covered by the Act – have "'standing to assert a right to receive speech' for which a plaintiff only must allege that 'there exists a speaker willing to convey the information to her,' which has been constrained by the potential for the defendant's action." (Doc. 35 at 19 (quoting Stephens v. Cty. Of Albemarle, 524 F.3d 485, 492 (4th Cir. 2008)).)

The motion to dismiss is fully briefed and ready for decision.

## II.  ANALYSIS

### A.    Standard of Review

Upon a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff bears the burden of establishing standing to bring its claims.  White Tail Park, Inc. v. Stroube, 413 F.3d 451,

458-59 (4th Cir. 2005). Because standing is "an indispensable part of the plaintiff's case," a plaintiff must support each element "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." Id. (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). At the pleading stage, "general factual allegations of injury resulting from defendant's conduct may suffice," which the court views in the light most favorable to Plaintiffs. Id. (quoting Lujan, 504 U.S. at 561). In deciding a motion to dismiss under Rule 12(b)(1), this court may consider evidence outside the pleadings. Id. (citing Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)).

**B.   Injury-in-Fact**

To satisfy Article III's case-or-controversy requirement, a plaintiff must establish that its claim meets the three requirements of Article III standing:

> (1) an injury-in-fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

Beck v. McDonald, 848 F.3d 262, 269 (4th Cir. 2017) (quoting David v. Alphin, 704 F.3d 327, 333 (4th Cir. 2013)).

As to the first element, "[t]o establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. at *5 (quoting Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016)) (internal quotation marks omitted). For a threatened (as opposed to actual) injury to satisfy standing requirements, the injury must be "concrete in both a qualitative and temporal sense." Id. (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). The injury must be "distinct and palpable, as opposed to merely abstract." Id. (quoting Whitmore, 496 U.S. at 155). "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." Id. (quoting Lujan, 504 U.S. at 564-65, n.2). Either the injury must be "certainly impending," or there must be a "'substantial risk' that the harm will occur." Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (quoting Clapper, 133 S. Ct. at 1147, 1150 n.5).

Courts routinely hold that when challenging a criminal law before it is enforced, a plaintiff satisfies the injury-in-fact requirement where it "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of

11

prosecution thereunder.'" Driehaus, 134 S. Ct. at 2342 (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)). Plaintiffs argue that this exception, applied here to a law that authorizes a private, civil cause of action, establishes injury-in-fact.

In analyzing whether Plaintiffs have standing, the court must be careful to avoid "put[ting] the merits cart before the standing horse." Cooksey v. Futrell, 721 F.3d 226, 239 (4th Cir. 2013) (quoting Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1093 (10th Cir. 2006)). Logic dictates, and courts have routinely held, that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal" or unlawful. McConnell v. Fed. Election Comm'n, 540 U.S. 93, 227 (2003) (quoting Warth v. Seldin, 422 U.S. 490, 500 (1975)), overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010). Therefore, the court is constrained from reaching the merits of Plaintiffs' claims, notwithstanding the serious First Amendment issues at stake.

The complaint in the present case alleges that the Act invades two legally protected interests. First, Plaintiffs allege that PETA and ALDF have conducted undercover investigations in North Carolina, wish to continue doing so, and have been "deterred from doing so for fear of being sued for damages" under the Act. (Doc.

21, ¶¶ 16-22 (PETA); <u>id.</u> ¶¶ 28-30 (ALDF); <u>see also</u> Doc. 35 at 19.)[5]

Second, Plaintiffs allege that all eight organizations rely on information retrieved from undercover investigations covered by the Act and that without that information they are unable to engage in their "desired form of speech to further" their missions. (Doc. 21, ¶ 17.)  They allege that the Act chills their investigations and therefore prevents the organizations from distributing the information they gather.  (<u>E.g.</u>, <u>id.</u> ¶ 36.)[6]  Each ground will be addressed in turn.

---

[5] Plaintiff Farm Sanctuary alleges that it has conducted such investigations in the past, but it does not allege that it plans to conduct more investigations in North Carolina or anywhere else. (Doc. 21, ¶¶ 34-36.)  Plaintiffs' brief opposing the motion to dismiss does not argue that the Act prevents Farm Sanctuary from investigating misconduct. (Doc. 35 at 19.)

[6] Though not addressed in Plaintiffs' brief opposing summary judgment (<u>see</u> Doc. 35 at 19), the amended complaint articulates Plaintiffs' injuries as follows. First, all organizations except PETA fear they will be subjected to liability under the Act if they use or disseminate information obtained in violation of the Act. (<u>E.g.</u>, <u>id.</u> ¶ 26.) Second, American Society for the Prevention of Cruelty to Animals fears that it will be subject to liability because it encourages members of the public to engage in prohibited investigative work.  (<u>Id.</u> ¶ 47.)  Third, Plaintiff Government Accountability Project defends whistleblowers from prosecution and fears that its defense of whistleblowers and use of the information derived from them could subject it to liability. (<u>Id.</u> ¶ 42.) Similarly, Plaintiff Farm Forward fears that it could incur liability under the Act by "directly or indirectly inducing an individual or organization to violate the law's provisions."  (<u>Id.</u> ¶ 45.)  Fourth, Center for Food Safety expended substantial resources seeking to prevent the Act's passage, "harm[ing] [its] ability to carry out its core mission."  (<u>Id.</u> ¶ 24.)  ALDF makes a similar allegation.  (<u>Id.</u> ¶ 33.) To the extent these allegations differ from those advanced in the briefing, any argument as to them is deemed waived.  <u>See</u> <u>Carter v. Lee</u>, 283 F.3d 240, 252 n.11 (4th Cir. 2002) (deeming arguments not properly advanced waived).

### 1.  Fear of Liability

Plaintiffs cite four cases in support of their argument that PETA and ALDF sustain an adequate injury-in-fact by refraining from investigating North Carolina facilities.  (Id. at 18-19 (citing United States v. Alvarez, 132 S. Ct. 2537 (2012); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167 (2000); N.C. Right to Life, Inc. v. Bartlett, 168 F.3d 705 (4th Cir. 1999); Mobil Oil Corp. v. Attorney Gen. of Va., 940 F.2d 73 (4th Cir. 1991)).)  For the reasons set forth below, none establishes standing in Plaintiffs' case.

In Alvarez, the Supreme Court held unconstitutional the Stolen Valor Act, 18 U.S.C. § 704, which criminalized lying about having been awarded certain military honors.  132 S. Ct. at 2543. At no point in Alvarez did the Court address standing; indeed, the petitioner was indicted under the Stolen Valor Act and pleaded guilty.  The page of the plurality opinion that Plaintiffs cite, moreover, is devoted entirely to the merits of the validity of the Stolen Valor Act.  (Doc. 35 at 19 (citing Alvarez, 132 S. Ct. at 2548).)  As such, whatever assistance Alvarez may add to the merits analysis of the Property Protection Act, it is not helpful to the standing issue presented here.

In Laidlaw, the Court held that environmentalist groups had standing to sue through the Clean Water Act's citizen-suit provision to challenge a water treatment facility's illegal

discharge of pollutants (including mercury) on 489 occasions into a river, "directly affect[ing] [the plaintiffs'] recreational, aesthetic, and economic interests." 528 U.S. at 176, 184. While the plaintiffs' allegations were conditional (i.e., they alleged that they would use the river to fish, camp, picnic, and boat but for the pollution), their claims were supported by affidavits and "extensive deposition testimony." Id. at 182-83. The Court found that the various sworn statements adequately documented an injury-in-fact, making it reasonably likely that the defendants' ongoing conduct prevented the plaintiffs from using the river and therefore bringing the case outside the realm of the "speculative." Id. at 705-06.

Plaintiffs cite Laidlaw for the proposition that "a 'realistic threat' causing a party to 'curtail' an activity 'is enough for an injury in fact.'" (Doc. 35 at 19 (quoting Laidlaw, 528 U.S. at 184).) But this is an incomplete statement of Laidlaw's holding and reasoning. In the portion of Laidlaw Plaintiffs cite, the Court was distinguishing Los Angeles v. Lyons, 461 U.S. 95, in which the Court held that "a plaintiff lacked standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat from the policy." Laidlaw, 528 U.S. at 184 (citing Lyons, 461 U.S. at 107 n.7). In doing so, the Court noted, "Here, in contrast [to Lyons], it is undisputed that Laidlaw's

15

unlawful conduct . . . was occurring at the time the complaint was filed.") As such, when <u>Laidlaw</u> stated that "it is enough" for the plaintiffs to have curtailed their activities, it was with the understanding that the <u>defendant's</u> activities were ongoing, not merely speculative, rendering the threat of harm realistic. <u>Id.</u> (noting that "we see nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms").

The instant case is readily distinguishable. Here, Defendants have not engaged in any conduct. Indeed, as discussed in greater detail <u>infra</u>, Plaintiffs fail even to allege that it is <u>likely</u> that Defendants will engage in the allegedly harmful conduct. It is true that, as in <u>Laidlaw</u>, Plaintiffs make conditional allegations (i.e., that they would conduct investigations but are deterred from doing so for fear of liability under the Act). But unlike in <u>Laidlaw</u>, it is purely speculative whether Defendants – or anyone else – will engage in the complained-of conduct of invoking the Property Protection Act in a lawsuit against any Plaintiff.

The third case Plaintiffs cite is <u>North Carolina Right to Life, Inc. v. Bartlett</u>. (<u>See</u> Doc. 35 at 18-19.) In <u>Bartlett</u>, the Fourth Circuit held that various political organizations had

standing to challenge various provisions of North Carolina's election and campaign-finance laws. One provision subjected organizations' officers to criminal prosecution if they failed to comply with the laws' terms. 168 F.3d at 710-11. The court held that the challenged provision appeared to apply to the plaintiff-organization and that in failing to comply with its terms, the plaintiff would risk subjecting its officers to criminal prosecution. Id. at 710. Plaintiffs present the following quotation from Bartlett to support their argument:

> A non-moribund statute that facially restrict[s] expressive activity by the class to which the plaintiff belongs presents [] a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary. This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights.

(Doc. 35 at 18-19 (quoting Bartlett, 168 F.3d at 710) (alterations in original).)

Plaintiffs selectively quote Bartlett. They omit the word "such"; the full sentence actually states that a non-moribund statute "presents such a credible threat." Plaintiffs also omit the first sentence of the paragraph, which makes clear that the phrase "such a credible threat" refers to the threat of criminal prosecution:

> When a plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement challenge to that statute.

168 F.3d at 710 (quoting N.H. Right to Life PAC v. Gardner, 99

F.3d 8, 15 (1st Cir. 1996)) (citing <u>Doe v. Bolton</u>, 410 U.S. 179, 188 (1973); <u>Wilson v. Stocker</u>, 819 F.2d 943, 946 (10th Cir. 1987)).[7] Here, of course, the Property Protection Act provides a <u>civil</u> cause of action.

The last case Plaintiffs cite in support of their injury-in-fact argument is <u>Mobil Oil Corp. v. Attorney General of Virginia</u>. In that case, an oil company challenged amendments to a Virginia statute that imposed civil penalties for violating its terms and empowered Virginia's Attorney General to investigate violations and enforce the statute. 940 F.2d at 75. Rather than violate the law and face fines, the company complied with the statute at great expense. The Fourth Circuit held that the company alleged "an actual and well-founded fear" that the Attorney General would enforce the law against it and that in response, the company had

---

[7] In other sections of their brief addressing sovereign immunity and the merits of their claim, Plaintiffs argue that the Act is "quasi-criminal" because of its "extreme" penalties. (Doc. 35 at 17; <u>see also</u> <u>id.</u> at 31.) True, the Act authorizes exemplary damages in the amount of $5,000 per day (or portion thereof) of violation. Entitlement to exemplary damages, like that of compensatory damages, is conditioned on being "otherwise allowed by State or federal law." N.C. Gen. Stat. Ann. §§ 99A-2(d)(2) & (4). Unlike a civil penalty, exemplary damages are not automatic or available simply upon a violation. Rather, to recover exemplary damages, a plaintiff must meet the standard for exemplary damages under North Carolina law, which requires a showing, by clear and convincing evidence, of fraud, malice, or willful or wanton conduct. N.C. Gen. Stat. §§ 1D-15(a) & (b). Such damages may not be awarded against a person "solely on the basis of vicarious liability for the acts or omissions of another." <u>Id.</u> § 1D-15(c). Moreover, although the parties have not developed their arguments in this regard, the plain language of the exemplary damages provision of the Act states that it applies only to subsection (a), which applies only to the person who "intentionally gains access to the nonpublic areas" of another's premises and engages in the prohibited act. N.C. Gen. Stat. § 99A-2(d)(4).

"self-censored" by complying with the statute, "incurring harm all the while." Id. at 76. Although the Attorney General argued that the statute was "intended to be enforced by private suits," id., the court noted that "the Attorney General ha[d] an independent power to enforce VPPFA." Id. at 77.

Plaintiffs cite Mobil Oil Corp. to defend against Defendants' assertion that they fail to allege that Defendants are likely to enforce the statute against them. (See Doc. 35 at 19 ("That the government has not declared it will prosecute Plaintiffs does not negate the injury. There is 'no reason to assume that the . . . legislature enacted this statute without intending it to be enforced[]' . . . ." (citing Doc. 31 at 18-19) (quoting Mobil Oil Corp., 940 F.2d at 76)).) Plaintiffs also cite the case for the proposition that "so long as a plaintiff has reason to believe it could be sued, causing it to 'self-censor[,]' . . . the plaintiff has incurred a 'harm.'" (Doc. 35 at 19 (quoting Mobil Oil Corp., 940 F.2d at 76).)

This case differs from Mobil Oil Corp. in significant ways. The statute in that case regulated certain business practices (including limiting credit card fees, limiting new retail outlets, and prohibiting purchase/sales quotas in franchise agreements). While creating a private cause of action, the act contains a specific section, Va. Code Ann. § 59.1-21.6, that vests Virginia's Attorney General with authority to exercise his statutory powers

to enforce the law and to investigate violations.[8]  The court saw "no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced" by the State.  940 F.2d at 76.

Here, by contrast, the Property Protection Act authorizes a private cause of action,[9] leaving it to individual owners and operators of premises to decide whether to sue.  Attorney General Stein is named in this action only because, Plaintiffs allege, he would act as counsel to UNC/Chapel Hill if it ever decided to sue any Plaintiff under the Act.  Unlike in Mobil Oil Corp., the North Carolina Attorney General is not authorized by the Act to ensure its enforcement, and it would not be his decision whether to enforce the Act.  Rather, the Attorney General's authority to appear in courts on behalf of the State is found in N.C. Gen. Stat. § 114-1.1, which provides simply, "The General Assembly reaffirms

---

[8] Section 59.1-21.16 provides that "[n]othing in this chapter shall be construed as limiting the authority of the Attorney General under the provisions of § 59.1-68.2."  Section 59.1-68.2 provides in turn: "Notwithstanding any other provisions of the law to the contrary, the Attorney General may investigate and bring an action in the name of the Commonwealth to enjoin any violation of Chapters 2.1 (§ 59.1-21.1 et seq. [the Virginia Petroleum Products Franchise Act at issue in the Mobil Oil case] through 3.1 (§ 59.1-41.1 et seq.) and of Article 8 (§ 18.2-214 et seq.), Chapter 6 of Title 18.2."  Va. Code Ann. § 59.1-68.2.

[9] Plaintiffs argue that because the statute also permitted private lawsuits, it is similar to the Property Protection Act.  But it was the Virginia act's enforcement authority granted its Attorney General, and not the general authority for third parties to sue, that was important to the standing issue.  Mobil Oil Corp., 940 F.2d at 76 (noting that "[w]hether Mobil has a dispute with its franchisees does not bear on whether it has a dispute with the Attorney General").

that the Attorney General has had and continues to be vested with those powers of the Attorney General that existed at the common law, that are not repugnant to or inconsistent with the Constitution or laws of North Carolina." This general grant of authority has been held to establish "the common law duty to prosecute all actions necessary for the protection and defense of the property and revenue of the sovereign people of North Carolina," including "the duty to appear for and to defend the State or its agencies in all actions in which the State may be a party or interested." Martin v. Thornburg, 320 N.C. 533, 546, 359 S.E.2d 472, 479 (1987). Thus, the real party in interest in this case is UNC/Chapel Hill, and the Attorney General is situated similarly to a private lawyer or law firm that would represent a private employer in a civil claim under the Act.[10]

Furthermore, the Act gives neither Folt nor any other person affiliated with UNC/Chapel Hill any specific authority to enforce it. True, UNC/Chapel Hill might someday choose to bring a cause of action under the Act, but if it does, it will be situated just as any private employer. As in Mobil Oil Corp., there is "no reason to assume that the [North Carolina] legislature enacted

---

[10] Indeed, it is not at all clear that the Attorney General would act as counsel, as a State agency may retain private counsel if granted permission by the Attorney General to do so. See N.C. Gen. Stat. § 114-2.3(a); cf. N.C. Gen. Stat. § 147-17(a) (permitting outside counsel upon gubernatorial approval).

this statute without intending it to be enforced." 940 F.2d at 76. But while it is reasonable to assume that the legislature intended an act to be enforced where it grants the State enforcement power, the same cannot be said when the act is not regulatory but creates only a potential civil cause of action available to any number of employers, public and private, without authorizing any particular State actor to enforce it. In addition, the decision whether to bring a private, civil lawsuit and what legal theories to assert is fact-specific, nuanced, and sometimes complicated. Even if UNC/Chapel Hill choose to sue Plaintiffs for conducting undercover investigations, it is far from likely it would invoke the Act (as opposed to other legal theories at its disposal). When a State actor sues to enforce a particular regulation (such as those at issue in <u>Mobil Oil Corp.</u>), by contrast, its cause of action is the regulation itself.

It is also far from likely that the Act would be enforced by UNC/Chapel Hill upon whose threat of enforcement Plaintiffs' claims depend. Because the purpose of Plaintiffs' organizations is to expose wrongdoing, it is entirely possible that UNC/Chapel Hill – as opposed to a private enterprise – is uniquely motivated not to seek to punish those involved. Indeed here, Plaintiffs stress that State law protects State employees against any retaliation, undermining any threat of litigation. <u>See</u> N.C. Gen.

Stat. § 126-84 et seq.[11]

Because of the speculative nature of Plaintiffs' claims, it is difficult to predict how or even whether any employer would sue under the Act. By comparison, at the time it filed its complaint, the plaintiff in Mobil Oil Corp. had suffered actual monetary damage by complying with the statute. Here, Plaintiffs allege only that the Act "deters" PETA and ALDF from undergoing some future investigation(s) or using some information they might receive yet cannot even represent actually exists at any UNC/Chapel Hill facility. Of course, this reflects the fact that nothing in the Act prevents an investigator from being hired by UNC/Chapel Hill (or any other employer), learning of whatever practice is

---

[11] Defendants argue that depending on the facts of the particular conduct, the investigator/employee may be protected from suit by law. For example, North Carolina's "Burt's Law" requires employees of certain elder-care facilities to report elder abuse and grants a reporting employee "immun[ity] from any civil liability that might otherwise occur for the report." N.C. Gen. Stat. Ann. § 122C-66(d). And in some circumstances, investigators who expose fraud against the government have a statutory right not to be retaliated against. See 31 U.S.C. § 3730(h); Twigg v. Triple Canopy, Inc., No. 1:10CV122 (JCC), 2010 WL 2245511, at *5 (E.D. Va. June 2, 2010) ("Under 31 U.S.C. § 3730(h) of the [False Claims Act], employer retaliation against 'whistle-blowers' is prohibited.").

Defendants argue that even assuming the employer prevails, PETA and ALDF are already exposed to liability apart from the Act under other legal theories, including trespass, interference with prospective economic advantage, unfair and deceptive trade practices under North Carolina General Statute § 75-1.1, and breach of contract. (Doc. 31 at 28.) While it is true that without the Act, North Carolina does not recognize an independent cause of action for breach of the duty of loyalty, see Dalton v. Camp, 353 N.C. 647, 653, 548 S.E.2d 704, 709 (2001), the court need not address Defendants' argument at this stage.

allegedly unsavory, and disseminating that information.[12]  It is
the additional act of taking an employer's documents or recording
in non-public areas that the Property Protection Act subjects to
a potential civil cause of action.

Defendants argue that Plaintiffs' fears of liability are
"hypothetical and conjectural" and are not sufficiently imminent
to constitute an injury-in-fact.  (Doc. 31 at 18-19; Doc. 40 at 6-
7.)  In support of their argument, they rely principally on Clapper
v. Amnesty International USA, 133 S. Ct. 1138 (2013), Golden v.
Zwickler, 394 U.S. 103 (1969), Kemler v. Poston, 108 F. Supp. 2d
529 (E.D. Va. 2000), Laird v. Tatum, 408 U.S. 1 (1972), and Charter
Federal Savings Bank v. Office of Thrift Supervision, 976 F.2d 203
(4th Cir. 1992).[13]  (See Doc. 31 at 18-19; Doc. 40 at 6-7.)

In Clapper, the Supreme Court held that various organizations
lacked standing to challenge a provision of the Foreign
Intelligence Surveillance Act ("FISA") that allows surveillance of

---

[12] At oral argument, Plaintiffs' counsel conceded as much, arguing that
the First Amendment "chill" doctrine protects Plaintiffs from having to
"spend [their] financial resources to prove that" there is something to
record.

[13] Defendants' reliance on Southern Walk at Broadlands Homeowner's Ass'n,
Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175 (4th Cir. 2013), and
Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26 (1976), for
the proposition that "an injury to organizational purpose, without more,
does not provide a basis for standing" is misplaced.  (Doc. 35 at 18
(quoting Broadlands Homeowner's Ass'n, 713 F.3d at 183) (citing Simon,
426 U.S. at 40).)  All eight Plaintiffs allege more than injury to their
stated organizational purposes.  PETA and ALDF allege that the Act deters
them from engaging in protected expressive activity, and all eight
Plaintiffs allege infringement on their rights to receive speech.

certain individuals outside the United States. Noting that "'[a]llegations of possible future injury' are not sufficient" to convey standing, the Court found it speculative whether the plaintiffs would ever be targeted by FISA surveillance. 133 S. Ct. at 1147 (quoting Whitmore, 495 U.S. at 158) (emphasis in original). Although not identical, this is similar to Plaintiffs' situation in the present case, where it remains speculative whether UNC/Chapel Hill has information worth recording or would even sue PETA or ALDF under the Act. Clapper also noted that for the plaintiffs to incur harm, several independent actors would have to make very particular decisions. Id. at 1150 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."); accord United Presbyterian Church in the U.S.A. v. Reagan, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (holding that plaintiffs lacked standing to challenge on First Amendment grounds an Executive Order authorizing certain intelligence gathering and observing that the plaintiffs "have not adequately averred that any specific action is threatened or even contemplated against them").

For Plaintiffs to have an immediate threat of harm they fear – liability under the Act - they would have to wait for a job opening to be posted at a particular facility and find a candidate who is qualified for the job (or willing to present himself as qualified), willing to lie about his employment history (or as

PETA puts it, "omitting from their applications their current employment" (Doc. 21, ¶ 18)), and willing to engage in conduct that violates the Act. Then, Defendants must select PETA's or ALDF's candidate for an interview, hire that candidate to fill the position, and engage in objectionable conduct. Even then, the PETA- or ALDF-sponsored employee must record that conduct in a manner specified in the Act.[14] Here, PETA has not even attempted to have one of its investigators seek employment at a UNC/Chapel Hill facility, much less to identify any unsavory activity it wishes to record. (Doc. 21, ¶ 22.) These allegations are far from "a claim of a specific present objective harm or a threat of specific future harm." Laird, 408 U.S. at 13-14. They reveal a string of events that are speculative, attenuated, and dependent in part upon the decisions of independent persons.

As the Fourth Circuit recently reiterated, while a "threatened rather than actual injury can satisfy Article III standing requirements," not all threatened injuries constitute an injury-in-fact. Beck, 848 F.3d at 271 (quoting Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 160 (4th Cir. 2000)). The court noted that injury must be qualitatively and temporally concrete, as well as "distinct and

---

[14] Of course, the employer would have to decide to sue the investigator (if not protected from suit under N.C. Gen. Stat. § 126-84 et seq. or another law) and the organization for which he or she works, using the cause of action available under the Act.

palpable, as opposed to merely abstract." Id. (quoting Whitmore, 495 U.S. at 155).

In Beck, the Fourth Circuit applied Clapper's requirement that "threatened injury must be certainly impending to constitute injury in fact" to hold that the increased risk of future identity theft and the costs of protecting against that risk were insufficient to constitute an injury-in-fact. Id. (quoting 133 S. Ct. at 1148). In that case, the threat of plaintiffs' injury turned on the actions of third parties – there, identity thieves who had gained access to plaintiffs' personal information. For the plaintiffs to suffer actual harm, it was up to the thieves to choose their data from that of thousands of other individuals. As noted above, Plaintiffs' case presents a similar concern, as PETA's and ALDF's injuries depend on a number of contingencies, from a Defendant hiring one of Plaintiffs' investigators (as opposed to all other applicants) to that investigator being willing to distribute the prohibited data or information. However characterized, PETA's and ALDF's alleged injury is, as in Beck, by no means "certainly impending."

Plaintiffs also fail to meet their burden to show that there is a "substantial risk" that Defendants will enforce the Act against them. Indeed, at oral argument, Plaintiffs' counsel took the position that First Amendment "chill" doctrine altogether excuses Plaintiffs from having to allege a credible threat of

enforcement, conceding that no State actor has threatened any kind of action against Plaintiffs and arguing that "injury-in-fact for First Amendment purposes only requires chill, and chill only requires that [Plaintiffs] fall within the statutes." Plaintiffs do not allege even cursorily that either Defendant in this case is likely to enforce the Act against them. For all the investigations Plaintiffs allege PETA and ALDF have conducted (see, e.g., Doc. 21, ¶ 17; id. ¶¶ 19-20), the complaint contains not a single allegation that either Defendant – or anyone else – has ever sued or threatened to sue PETA or ALDF for investigatory conduct.[15] Even when faced with the threat of criminal liability, plaintiffs in a pre-enforcement challenge are required to allege that there is some likelihood they will be prosecuted under the challenged statute. See Babbitt, 442 U.S. at 298-99 ("When plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." (quoting Younger v. Harris, 401

---

[15] The most Plaintiffs argue on this front is that § 99A-2 can be enforced by State actors. In support of this position, Plaintiffs note that § 99A-2 exempts from its terms "the protections provided to employees under . . . Article 14 of Chapter 126 of the General Statutes," which protects government employees who report illegality, fraud, and other government misconduct. See N.C. Gen. Stat. § 126-84(a). From this, Plaintiffs posited at oral argument that the Act's drafters anticipated its application to public employers. Plaintiffs read too much into the provision. Facially, it only seeks to preserve other protections extant in State law.

U.S. 37, 42 (1971))).

As Plaintiffs stress, standing requirements are relaxed in the First Amendment context. Most cases involve pre-enforcement challenges to criminal statutes. But not all do. "Line-drawing in standing cases is rarely easy," and the standing question is "particularly delicate" where the alleged injury is a chilling effect on free speech. Initiative and Referendum Institute v. Walker, 450 F.3d 1082, 1088 (10th Cir. 2006). Where there is potential State action, as in Mobil Oil Corp., and a "danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." Maryland v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984). Nevertheless, "[t]he constitutional question, First Amendment or otherwise, must be presented in the context of a specific live grievance." Golden, 394 U.S. at 110. Here, Plaintiffs fail to show why they should not have to demonstrate some threat of injury.

This is borne out by other civil cases. For example, in Ostergren v. McDonnell, Civil No. 3:03CV362, 2008 WL 3895593 (E.D. Va. Aug. 22, 2008), the court found injury-in-fact where the plaintiff contended that Virginia's Personal Information Privacy Act, which prohibited the intentional communication of another's social security number, infringed on the plaintiff's First Amendment right to post public records of legislators containing

29

social security numbers to make her point that such records should be redacted in their public form. In Ostergren, the plaintiff had already engaged in conduct the statute prohibited, and the Attorney General, who had enforcement power, did not eschew enforcement of the regulatory statute. Citing Mobil Oil Corp., the court reasoned that it would be unreasonable to assume the legislature enacted the law without intending that it be enforced by the State. Here, for the reasons noted, the State is not tasked with enforcement of the Act. 2008 WL 3895593, at *4.

In Western Watersheds Project v. Michael, Civil No. 15CV0169-SWS, 2015 WL 12852338 (D. Wyo. Dec. 28, 2015), which Plaintiffs cite in support of their Ex parte Young analysis (Doc. 35 at 17-18), the court found standing to challenge Wyoming laws that provided criminal and civil penalties for unauthorized entry upon land. There, the court was persuaded that, among other things, violation of the civil statute constituted a violation of the criminal statute as well. 2015 WL 12852338, at *6. Here, there is no criminal law imposing a criminal penalty.[16]

And in Meese v. Keene, 481 U.S. 465, 473 (1987), the Court found that a State politician's stated desire to show three Canadian films that the Department of Justice had labeled "political propaganda" under the Foreign Agents Registration Act

---

[16] The Act's civil penalties are discussed previously at note 7.

of 1938 established a sufficient chill because it threatened to cause cognizable injury to his personal, political, and professional reputation. The mere showing of the films would result in the injury.

Here, there are multiple factual contingencies that render PETA's and ALDF's injury premature and speculative for purposes of Article III's imminence requirement. That the court must postulate multiple contingencies and hypothetical scenarios to determine whether Plaintiffs would suffer a subjective chill demonstrates the standing problem. Allowing Plaintiffs' claims to advance under these circumstances would violate the very reason for the imminence requirement: "to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is 'certainly impending.'" Lujan, 504 U.S. at 564 n.2 (quoting Whitmore, 495 U.S. at 158).

### 2. Receipt of Speech

Plaintiffs' second protected interest asserted is an infringement on their right to receive speech.[17] Plaintiffs rely on Stephens v. County of Albemarle, in which the Fourth Circuit reiterated the well-established principle that the First Amendment protects the right to receive information from a willing speaker. 524 F.3d 485, 491-92 (4th Cir. 2008). Stephens also recognized,

---

[17] Plaintiffs do not contend that the Act is a prior restraint that prohibits them from publishing the information they seek.

however, that "to have standing to assert a right to receive speech, a plaintiff must show that there exists a speaker willing to convey the information to her."  Id. at 492.

Stephens held that the plaintiff lacked standing to challenge two settlement agreements that Albemarle County, Virginia, entered into that prevented certain third parties from criticizing the development of a local landfill.  The plaintiff's theory was that the agreements unconstitutionally restricted the settlors' First Amendment rights and that but for the agreements, two settlors would have spoken publicly about a practice that eventually killed the plaintiff's husband.  The plaintiff offered testimony from two parties to the settlement that the court found constituted "evidence that [the signatories to the agreement] would be . . . willing speaker[s] in the absence of the agreements."  Id. at 492. Despite that evidence, the court held that there was not a direct enough connection between the plaintiff and the signatories to show that absent the agreements, the plaintiff would expect to receive the information.  Id.  The court also rejected the plaintiff's argument that she was a member of the "core class of foreseeable recipients of the banned . . . speech," relying on "the absence of any indication" that the plaintiff ever received or tried to receive such information from the signatories.  Id. at 493.  Ultimately, the court held that the plaintiff's assertion

that she was harmed because she would have received the speech in question was "merely speculat[ion]." Id.

Stephens involved a complete ban on information, whereas the Act provides a cause of action that a Defendant may or may not wish to bring if conduct falling within it occurs. Furthermore, where Stephens involved a specifically identified piece of information, Plaintiffs here fail to identify the information they seek with any semblance of particularity. At most, PETA alleges on information and belief that "the unethical and illegal treatment of animals continues at the[] UNC-Chapel Hill laboratories" (Doc. 21, ¶ 22), and the non-investigating Plaintiffs allege only that they "rel[y] on and use[] information obtained by whistleblowers . . . like those conducted by Plaintiffs" (e.g., id. ¶ 25). This stands in stark contrast with the information Ms. Stephens sought, information about a particular practice in a particular landfill. Indeed, Plaintiffs fail to allege that most of the information they seek actually exists at all. Notably, the Act does not affect any investigator's ability to infiltrate UNC/Chapel Hill's laboratories or any other North Carolina facility to determine whether any conduct worthy of recording is actually taking place; rather, it proscribes the recording of that conduct or taking of documentary evidence. Thus, the Act does not prevent Plaintiffs from discovering whether the information they seek actually exists.

To the extent Plaintiffs' allegation that they "rel[y] on and use[] information obtained by whistleblowers" (_e.g._, _id._ ¶ 25) refers to information provided by non-parties, this echoes Ms. Stephens' argument that she "stands among the core class of foreseeable recipients of the banned safety speech." _Stephens_, 524 F.3d at 493 (citation omitted). As in _Stephens_, the court is "left to speculate" that the Act prevents others from obtaining such information and that without the Act, Plaintiffs would "hear from" the investigators, "forget[ing] that, to satisfy Article III's standing requirements, a plaintiff must suffer an injury that is 'actual and imminent,' not 'conjectural or hypothetical.'" _Id._ (quoting _Lujan_, 504 U.S. at 560). To this end, the standing inquiry depends on "the unfettered choices made by independent actors not before the court[] and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict." _Friends for Ferrell Parkway, LLC v. Stasko_, 282 F.3d 315, 324 (4th Cir. 2002) (denying standing where plaintiff failed to adduce facts showing that choices have been or will be made to produce causation). Unlike in _Stephens_, Plaintiffs cannot say that the Act will prevent them from receiving the information they fear may be withheld. _Cf._ _Scherr v. Marriott Int'l, Inc._, 703 F.3d 1069, 1074 (7th Cir. 2013) (holding that a plaintiff has standing in part based on her allegation that she would use a hotel but for its alleged violations of the Americans with Disabilities

Act); <u>Saga Broad. Corp. v. F.C.C.</u>, 38 F. App'x 8, 10 (D.C. Cir. 2002) (holding that a plaintiff lacked standing to challenge a regulation establishing a television license because he failed to allege that he would seek the license but for the regulation).

In some ways, the plaintiff in <u>Stephens</u> had a stronger argument for standing than do the present Plaintiffs. One signatory stated that "there were 'times [he] wanted to say something and realized [he] could not,'" while another "expressed resentment toward the inclusion of a speech restraint in the Burke Agreement and a desire to see the restriction lifted." 524 F.3d at 492 (citation omitted). There was a high likelihood that the settlement agreements actually prevented the signatories from speaking, thereby preventing the plaintiff from receiving the desired speech.

Here, as discussed above, it remains highly speculative whether the Act prevents the speakers in question – investigators employed to obtain information from Defendants – from obtaining the information they want. Plaintiffs' argument becomes even more remote when the question involves the likelihood of others in the distribution chain of information to fail to pass along such information to Plaintiffs. Similarly, Plaintiffs do not allege that they seek particular information from PETA, ALDF, or any other allegedly deterred investigator, pointing instead to the general flow of information from undercover investigators to their

organizations.  No such individual investigator is before the court claiming that the Act will deter him or her from providing any Plaintiff any information.  While courts have relaxed the prudential standing limitation to permit a party to raise the rights of others, this exception applies only where practical obstacles prevent the others from raising their rights on their own behalf.  Munson, 467 U.S. at 956.  That no such obstacles are claimed here demonstrates the hypothetical nature of Plaintiffs' claim of subjective chill.

The court therefore finds that Plaintiffs' claim that the Act abridges their rights to receive speech from investigators is too remote and speculative to confer standing.  Consequently, counts I and II of the amended complaint alleging federal constitutional violations will be dismissed without prejudice.  S. Walk at Broadlands Homeowner's Ass'n, Inc. v. Openband at Broadlands, 713 F.3d 175, 185 (4th Cir. 2013) (noting that a dismissal for a defect in subject matter jurisdiction must be without prejudice).

### C.    State-Law Claims

Plaintiffs' remaining claims are based on North Carolina law. (See Doc. 21, ¶¶ 127-41.)  The parties have not addressed whether the case-or-controversy requirement is met for the State constitutional claims.  Nevertheless, even if the court had subject matter jurisdiction over those claims, it would not exercise it in this case.  Under 28 U.S.C. § 1367(c), a federal district court

"may decline to exercise supplemental jurisdiction" over State-law claims if "the district court has dismissed all claims over which it has original jurisdiction." The Fourth Circuit has noted in a similar circumstance that "[w]ith all its federal questions gone, there may be the authority to keep [the case] in federal court[,] . . . but there is no good reason to do so." Waybright v. Frederick Cty., Md., 528 F.3d 199, 209 (4th Cir. 2008). This is especially true where, as here, the case presents novel, complex questions of North Carolina constitutional law. These are best left to the State courts to resolve.

Thus, because the court will dismiss Plaintiffs' federal claims, it will decline to exercise supplemental jurisdiction over their State-law claims, which will also be dismissed without prejudice.

## III. CONCLUSION

For the reasons stated, the court finds that Plaintiffs fail to meet their burden to allege sufficient facts to demonstrate standing. The court therefore lacks jurisdiction to adjudicate their claims. Consequently, the court is constrained from determining, and thus expresses no conclusion as to, the merits of the Act or the claims Plaintiffs assert. To do otherwise would be to "put the merits cart before the standing horse," which this court cannot do. Cooksey, 721 F.3d at 239.

IT IS THEREFORE ORDERED that Defendants' motion to dismiss (Doc. 30) is GRANTED and the first amended complaint (Doc. 21) is DISMISSED WITHOUT PREJUDICE.

                              /s/    Thomas D. Schroeder
                              United States District Judge

May 2, 2017