UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1669

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; ANIMAL LEGAL DEFENSE FUND; CENTER FOR FOOD SAFETY; FOOD & WATER WATCH; FARM SANCTUARY; GOVERNMENT ACCOUNTABILITY PROJECT; AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS; FARM FORWARD,

       Plaintiffs - Appellants,

   v.

ATTORNEY GENERAL JOSHUA STEIN, Attorney General of the State of North Carolina; CAROL L. FOLT, in her official capacity as Chancellor of the University of North Carolina-Chapel Hill,

       Defendants - Appellees.

------------------------

ALAN CHEN; ERWIN CHEMERINSKY; ERIC FINK; JUSTIN PIDOT; JOHN F. PREIS; ALEXANDER A. REINERT; THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS; AMERICAN SOCIETY OF NEWS EDITORS; ASSOCIATED PRESS MEDIA EDITORS; ASSOCIATION OF ALTERNATIVE NEWSMEDIA; ASSOCIATION OF AMERICAN PUBLISHERS, INC.; BRECHNER CENTER FOR FREEDOM OF INFORMATION; THE CHARLOTTE OBSERVER; FIRST AMENDMENT COALITION; FREEDOM OF THE PRESS FOUNDATION; GATEHOUSE MEDIA, LLC; INTER AMERICAN PRESS ASSOCIATION; INTERNATIONAL DOCUMENTARY ASSOCIATION; INVESTIGATIVE REPORTING PROGRAM AT UC BERKELEY; INVESTIGATIVE REPORTING WORKSHOP AT AMERICAN UNIVERSITY; MEREDITH CORPORATION, d/b/a WHNS-TV (Greenville, SC); MPA- THE ASSOCIATION OF MAGAZINE MEDIA; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; THE NEWS & OBSERVER; PEN AMERICA; RADIO TELEVISION DIGITAL NEWS ASSOCIATION; REPORTERS WITHOUT BORDERS; SINCLAIR BROADCAST GROUP, INC.;

SOCIETY OF PROFESSIONAL JOURNALISTS; STUDENT PRESS LAW CENTER; TULLY CENTER FOR FREE SPEECH; WTVD TELEVISION, LLC,

Amici Supporting Appellants.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, Chief District Judge.  (1:16-cv-00025-TDS-JEP)

---

Argued:  January 24, 2018                                              Decided:  June 5, 2018

---

Before TRAXLER and FLOYD, Circuit Judges, and SHEDD, Senior Circuit Judge.

---

Reversed and remanded by unpublished per curiam opinion.

---

**ARGUED:**  David Samuel Muraskin, PUBLIC JUSTICE, PC, Washington, D.C., for Appellants.  Sripriya Narasimhan, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  Leslie A. Brueckner, PUBLIC JUSTICE, P.C., Oakland, California; Daniel K. Bryson, Jeremy Williams, WHITFIELD BRYSON & MASON LP, Raleigh, North Carolina; Matthew Liebman, ANIMAL LEGAL DEFENSE FUND, Cotati, California, for Appellants.  Josh Stein, Attorney General, Matthew W. Sawchak, Solicitor General, Kimberly D. Potter, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  Alexander A. Reinert, BENJAMIN A. CARDOZO SCHOOL OF LAW, New York, New York; Burton Craige, Paul E. Smith, PATTERSON HARKAVY LLP, Chapel Hill, North Carolina, for Amici Alan Chen, Erwin Chemerinsky, Eric Fink, Justin Pidot, John F. Preis, and Alexander A. Reinert.  Bruce D. Brown, Caitlin Vogus, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Washington, D.C., for Amici The Reporters Committee for Freedom of the Press, American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, Association of American Publishers Incorporated, Brechner Center for Freedom of Information, The Charlotte Observer, First Amendment Coalition, Freedom of the Press Foundation, Gatehouse Media, LLC, Inter American Press Association, International Documentary Association, Investigative Reporting Program at UC Berkeley, Investigative Reporting Workshop at American University, Meredith Corporation, MPA - The Association of Magazine Media, National Press Photographers Association, The News & Observer, Pen America, Radio Television Digital News Association, Reporters Without Borders, Sinclair Broadcasting Group, Incorporated,

2

Society of Professional Journalists, Student Press Law Center, Tully Center for Free Speech, and WTVD Television, LLC. Kevin M. Goldberg, FLETCHER, HEALD & HILDRETH, PLC, Arlington, Virginia, for Amici American Society of News Editors and Association of Alternative Newsmedia. Jonathan Bloom, WEIL, GOTSHAL & MANGES LLP, New York, New York, for Amicus The Association of American Publishers, Inc. Frank D. LoMonte, Director, THE BRECHNER CENTER FOR FREEDOM OF INFORMATION, Gainesville, Florida, for Amicus The Brechner Center for Freedom of Information. David Snyder, FIRST AMENDMENT COALITION, San Rafael, California, for Amicus First Amendment Coalition. Marcia Hofmann, FREEDOM OF THE PRESS FOUNDATION, San Francisco, California, for Amicus Freedom of the Press Foundation. Polly Grunfeld Sack, SVP, General Counsel and Secretary, GATEHOUSE MEDIA, LLC, Pittsford, New York, for Amicus GateHouse Media, LLC. Joshua N. Pila, MEREDITH CORPORATION, Atlanta, Georgia, for Amicus Meredith Corporation. James Cregan, Executive Vice President, MPA - THE ASSOCIATION OF MAGAZINE MEDIA, Washington, D.C., for Amicus MPA - The Association of Magazine Media. Mickey H. Osterreicher, Buffalo, New York, for Amicus National Press Photographers Association. Juan Cornejo, THE MCCLATCHY COMPANY, Sacramento, California, for Amici The Charlotte Observer and The News & Observer. Katherine Glenn Bass, PEN AMERICA, New York, New York, for Amicus PEN America. Kathleen A. Kirby, WILEY REIN LLP, Washington, D.C., for Amicus Radio Television Digital News Association. Barry Faber, Executive Vice President/General Counsel, SINCLAIR BROADCAST GROUP, INC., Hunt Valley, Maryland, for Amicus Sinclair Broadcast Group, Inc. Bruce W. Sanford, Mark I. Bailen, BAKER & HOSTETLER LLP, Washington, D.C., for Amicus Society of Professional Journalists.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiffs-Appellants People for the Ethical Treatment of Animals, Inc. ("PETA"), Animal Legal Defense Fund ("ALDF"), and six additional public-interest organizations brought this action against Carol Folt, in her official capacity as Chancellor of the University of North Carolina-Chapel Hill ("UNC-Chapel Hill"), and Josh Stein, in his official capacity as Attorney General of North Carolina, asserting a pre-enforcement challenge to the North Carolina Property Protection Act.  *See* N.C. Gen. Stat. § 99A-2 (2016).  The district court dismissed Plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(1), holding that Plaintiffs had failed to allege an injury-in-fact sufficient to confer standing for purposes of Article III of the United States Constitution.  We hold that the district court erred in dismissing Plaintiffs' claims at this stage of the proceedings.  Accordingly, we reverse and remand for further proceedings.

I.

The North Carolina Property Protection Act (hereinafter the "Act") provides a private right of action against any person who "exceed[s] the scope of authorized access" to the property of an owner or operator.

> Any person who intentionally gains access to the nonpublic areas of another's premises and engages in an act that exceeds the person's authority to enter those areas is liable to the owner or operator of the premises for any damages sustained.  For the purposes of this section, "nonpublic areas" shall mean those areas not accessible to or not intended to be accessed by the general public.

N.C. Gen. Stat. § 99A-2(a).  "Act[s] that exceed[] a person's authority to enter the nonpublic areas of another's premises" include the following scenarios:

4

> (1) An employee who enters the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization *captures or removes the employer's data, paper, records, or any other documents* and uses the information to breach the person's duty of loyalty to the employer.
>
> (2) An employee who intentionally enters the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization *records images or sound occurring within an employer's premises* and uses the recording to breach the person's duty of loyalty to the employer.
>
> (3) Knowingly or intentionally placing on the employer's premises *an unattended camera or electronic surveillance device and using that device to record images or data*
> . . . .
>
> (5) An act that substantially interferes with the ownership or possession of real property.

N.C. Gen. Stat. § 99A-2(b) (emphasis added).[1]  The statute provides for equitable relief, as well as the recovery of compensatory damages, costs and attorneys' fees, and exemplary damages in the amount of $5,000 for each day that the person has acted in violation of the Act.  *See* N.C. Gen. Stat. § 99A-2(d)(1)-(4).  In addition, "[a]ny person who intentionally directs, assists, compensates, or induces another person to violate [the Act] shall be jointly liable."  N.C. Gen. Stat. § 99A-2(c).

---

[1] "Conspiring in organized retail theft, as defined in Article 16A of Chapter 14 of the General Statutes" is also included as a prohibited act, N.C. Gen. Stat. § 99A-2(b)(4) (2016), but Plaintiffs do not contend that this would be an unconstitutional provision standing alone.

5

Two of the Plaintiffs in this action—PETA and ALDF—are animal protection charities that engage in undercover investigations of public and private facilities for the purpose of uncovering acts of animal cruelty. "PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, undercover investigations, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals." J.A. 16. ALDF "uses education, public outreach, investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those animals who are raised for food, used in biomedical research, exhibited to the public, or bred as pets." J.A. 23. The remaining plaintiffs—Farm Sanctuary, Center for Food Safety, Food & Water Watch, Government Accountability Project, Farm Forward, and American Society for the Prevention of Cruelty to Animals—rely upon and use information from whistleblowers and undercover investigations conducted by organizations such as PETA and ALDF to accomplish their distinct missions.[2]

Shortly after the Act became effective, Plaintiffs brought this action, alleging that the Act interferes with their plans to conduct undercover investigations of government facilities in North Carolina for the purpose of gathering evidence of unethical and illegal animal practices and to disseminate this information to the public, in violation of the First and Fourteenth Amendments to the United States Constitution and various provisions of

---

[2] Although Plaintiff Farm Sanctuary alleges that it has also conducted undercover investigations in the past, it does not allege any plans to conduct future investigations in North Carolina.

6

the North Carolina Constitution. Plaintiffs sought an order declaring the Act unconstitutional and enjoining Defendants from enforcing the Act. Defendants moved to dismiss Plaintiffs' amended complaint under Rule 12(b)(1), asserting that Plaintiffs' claims of injury were too speculative to confer standing. The district court agreed, granted the motion, and dismissed the amended complaint.[3]

II.

When reviewing the dismissal of a complaint for lack of subject-matter jurisdiction under Rule 12(b)(1), "we must assume all well-pled facts to be true and draw all reasonable inferences in favor of the plaintiff." *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (internal quotation marks omitted). We review the district court's grant of the motion *de novo*. *See id.*

We begin with the Plaintiffs' allegations pertaining to PETA and ALDF. Both PETA and ALDF have a long history of conducting undercover investigations, including in North Carolina, to accomplish their missions. They recruit qualified persons to secure employment with employers that they have reason to believe are engaged in acts of animal cruelty. Once these persons secure employment and gain access to the employer's premises, they act as undercover investigators tasked with collecting incriminating information.

---

[3] Defendants also moved for dismissal on the basis of Eleventh Amendment immunity and on the merits, which the district court did not reach.

7

Both organizations have had success with these investigative techniques. Of particular relevance, PETA uncovered illegal and unethical abuse of animals at UNC-Chapel Hill from 2001 to 2003. Two PETA investigators secured at-will jobs in the UNC-Chapel Hill animal testing laboratories. "In the non-public areas of the facilities, PETA's investigators gathered information, including making recordings, showing that the workers disregarded animal care protocols and government orders, for instance, cutting off the heads of rat pups while the pups were still conscious and in violation of protocol." J.A. 19. When "PETA's investigators tried to report these violations to university personnel, . . . other employees in the lab discarded and hid evidence, and a supervisor instructed PETA's investigators not to tell him about the violations." J.A. 19. PETA later "publicized its findings and filed a report with the National Institutes of Health, which confirmed PETA's allegations." J.A. 19.

PETA alleges that, "[o]n information and belief, the unethical and illegal treatment of animals continues at these UNC-Chapel Hill laboratories." J.A. 19. PETA alleges that, "[a]s part of its mission, [it] would conduct another undercover investigation of these facilities," but it "has chosen not to undertake this investigation" because it "fears liability under the [Act]." J.A. 20.

ALDF alleges that its agents have also "conducted undercover investigations at animal facilities around the country, including at least a dozen in North Carolina." J.A. 23. In addition to planting ALDF employees "with an organization that ALDF believes is engaged in the unethical or illegal treatment of animals" to "collect[] information and/or make[] recordings regarding the organization's conduct," the "ALDF investigators

8

may also be instructed to leave recording devices unattended to capture images and sound over a longer duration, such as to document the severity of repetitive pathological stereotypies in captive wild animals, or the length of time for which a sick or injured animal goes without veterinary care," J.A. 23-24.  ALDF alleges that it "has an investigative team" in place that is capable of conducting these investigations and that "a comprehensive list of animal facilities[,] including farms, research facilities, puppy mills, and animal hoarders in North Carolina" have been targeted for investigation.  J.A. 24.  Like PETA, ALDF "wishes to continue to conduct such investigations in North Carolina, but it has been deterred from doing so for fear of being sued for damages under the [Act]."  J.A. 23.

Finally, Plaintiffs PETA and ALDF allege that their fear of liability under the Act is reasonable.  According to Plaintiffs, the primary purpose of the Act, as revealed by its text and the legislative history, is to punish private special-interest organizations like PETA and ALDF, who plant investigators in public and private facilities to collect and share information with the goal of informing the public about wrongdoing.  In short, they allege the Act was targeted at them and, therefore, they have every reason to believe that the Chancellor at UNC-Chapel Hill and the Attorney General of North Carolina will pursue action against them if they carry out their plans at UNC-Chapel Hill and the other targeted state-owned facilities.

With regard to the remaining Plaintiffs, they allege that the Act interferes with their First Amendment right to receive information from organizations such as PETA and

9

ALDF that would further their missions, and to disseminate the information to their members, the public, and the government.

III.

Under Article III of the United States Constitution, the jurisdiction of federal courts is limited to deciding "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. "'The doctrine of standing gives meaning to these constitutional limits by identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017) (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)). To satisfy the constitutional standing requirement, a plaintiff must demonstrate (1) "an injury in fact"; (2) "a causal connection between the injury and the conduct complained of," such that the injury is "fairly traceable" to the defendant's actions; and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (alteration and internal quotation marks omitted).

This appeal primarily concerns the first element of the standing doctrine—the injury-in-fact requirement. We must determine whether the Plaintiffs sufficiently alleged that they have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560); *see also Wikimedia*, 857 F.3d at 207. "A concrete injury must be *de facto*; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.*

10

(internal quotation marks omitted). "The purpose of the imminence requirement 'is to ensure that the alleged injury is not too speculative for Article III purposes.'" *Wikimedia*, 857 F.3d at 208 (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013)). Although "threatened rather than actual injury can satisfy Article III standing requirements, not all threatened injuries constitute an injury in fact." *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017) (citation and internal quotation marks omitted). "Allegations of *possible* future injury are not sufficient" to convey standing. *Clapper*, 133 S. Ct. at 1147 (internal quotation marks and alteration omitted). However, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony*, 134 S. Ct. at 2341 (quoting *Clapper*, 133 S. Ct. at 1147, 1150, n.5) (internal quotation marks omitted).

In First Amendment cases, however, the "standing requirements are somewhat relaxed." *Cooksey*, 721 F.3d at 235.

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Id.* (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)). Thus, we have held that, "under the First Amendment standing framework," plaintiffs "sufficiently satisf[y] the . . . injury-in-fact requirement by showing that [the challenged statute] had an *objectively reasonable chilling effect*" on the exercise of their rights. *Cooksey*, 721 F.3d at 229 (emphasis added); *see also Benham v. City of Charlotte*, 635

11

F.3d 129, 135 (4th Cir. 2011) (noting that a "cognizable injury under the First Amendment is self-censorship, which occurs when a claimant is chilled from exercising her right to free expression." (internal quotation marks omitted)).

To decide the objective reasonableness of the claimed chilling effect from the Act, the court evaluates whether there is a credible threat of enforcement against the plaintiff. As we have noted,

> [w]hen a plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement challenge to that statute. A non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary. This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights.

*N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (citation, alteration and internal quotation marks omitted). "Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey*, 721 F.3d at 236 (internal quotation marks omitted).

## IV.

### A.

Relying primarily upon the Supreme Court's decision in *Clapper*, the district court held that because the Act imposes only civil and no criminal penalties, Plaintiffs would have to show that their alleged injury-in-fact was "certainly impending" or that there was a "substantial risk" that the harm will occur. The district court then concluded that Plaintiffs' allegations failed to meet this standard because Plaintiffs might not uncover evidence of animal abuse; and, even if they did, Defendants might choose not to bring a

12

lawsuit under the Act. Plaintiffs argue that the district court erred in dismissing their amended complaint under *Clapper* because their allegations of injury pertain to an objectively reasonable chill on the exercise of their rights and self-censorship—an actual injury-in-fact for purposes of standing to assert a First Amendment challenge to the Act—and not to any imminent or threatened lawsuit.

We agree that Plaintiffs' amended complaint sufficiently alleges an injury-in-fact for purposes of their First Amendment challenge. Plaintiffs "have alleged an intention to engage in a course of conduct arguably affected with a constitutional interest," a credible threat that the Act will be enforced against them if they proceed with their plans, and that they have refrained from proceeding for fear of being subjected to the severe civil remedies provided for in the Act. *Susan B. Anthony*, 134 S. Ct. at 2343 (internal quotation marks omitted). We cannot say that the claimed "chilling" effect of the Act is objectively unreasonable or that Plaintiffs' claims of injury are too speculative to satisfy the First Amendment standing framework at the Rule 12(b)(1) stage.

First, both PETA and ALDF have in the past conducted actual undercover investigations in public and private facilities for the purpose of uncovering unethical or illegal treatment of animals and disseminating such information to the public. They have plausibly alleged that they wish to continue such investigations in furtherance of their missions and that they are fully prepared to go forward but for their fear of liability under the Act. PETA, in particular, has successfully conducted such an investigation at UNC-Chapel Hill, during which it faced opposition from university personnel, and that it is currently in possession of information that illegal and unethical animal practices continue

13

to take place at UNC-Chapel Hill. ALDF has also "conducted undercover investigations at animal facilities around the country, including at least a dozen in North Carolina," J.A. 23, and "a comprehensive list of animal facilities[,] including farms, research facilities, puppy mills, and animal hoarders in North Carolina" that have already been targeted for investigation. J.A. 24. *Cf. Hill v. City of Houston*, 764 F.2d 1156, 1161 (5th Cir. 1985) (holding that plaintiff "face[d] a 'credible threat' of future criminal prosecutions under [challenged] ordinance that [was] more that a mere speculative and remote possibility," as plaintiff had previously violated the ordinance and "repeatedly and steadfastly asserted that he intend[ed] to continue" to violate it).

Second, the Act appears by its terms to prohibit Plaintiffs' planned activities and to subject them to civil liability, including severe exemplary damages. It prohibits an employee from entering the nonpublic areas of an employer's premises and, once there, "captur[ing] or remov[ing] the employer's data, paper, records, or any other documents," "record[ing] images or sound occurring within an employer's premises," or "placing on the employer's premises an unattended camera or electronic surveillance device and using that device to record images or data." N.C. Gen. Stat. § 99A-2(b)(1)-(3). These are precisely the types of activities that Plaintiffs engaged in before and intend to engage in again during their future investigations. Moreover, Defendants have not disputed that a civil action *could be* brought under the Act by the appropriate officials at UNC-Chapel Hill if PETA undertakes its intended investigation, or by the other targeted governmental agencies, via the Attorney General, if PETA and ALDF proceed with their plans.

14

Finally, Plaintiffs have alleged a reasonable and well-founded fear that the Act *will be* enforced against them if they carry out their plans. According to Plaintiffs' allegations, the Act was specifically targeted at public-interest organizations to stop them from surreptitiously gaining access to an employer's premises to uncover illegal and unethical conduct. Plaintiffs have also plausibly alleged that Defendants are the officials who are empowered to initiate or file suits under the Act if Plaintiffs carry out their investigations, and neither the UNC Chancellor nor the Attorney General have "disavowed enforcement" if Plaintiffs proceed with their plans. *Susan B. Anthony*, 134 S. Ct. at 2345. In sum, at this stage of the proceedings, there is no reason to assume that the Defendants intend to refrain or would refrain from filing suit against Plaintiffs on behalf of UNC-Chapel Hill or the other targeted state agencies if Plaintiffs violate the Act. *See Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 393 (1988) (holding that "the pre-enforcement nature of th[e] suit" was not "troubl[ing]" because "[t]he State ha[d] not suggested that the newly enacted law [would] not be enforced, and [there was] no reason to assume otherwise"); *Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (noting that there was "no reason to assume that the Virginia legislature enacted [the challenged] statute without intending it to be enforced").

Because Plaintiffs have sufficiently alleged an actual injury, we need not visit the district court's determination of whether *Clapper* would strip Plaintiffs of their standing to assert a claim of a threatened or imminent injury in the form of a civil lawsuit. Again, Plaintiffs' alleged injury is not just the imminent threat of a civil lawsuit, which would only occur if they go forward with their plans to investigate in the nonpublic areas of a

state employer's premises *and* Defendants choose to file suit against them. Rather, Plaintiffs alleged injury for standing purposes is that they have refrained from carrying out their planned investigations based on their reasonable and well-founded fear that they will be subjected to significant exemplary damages under the Act if they move forward at all. *See Am. Booksellers Ass'n,* 484 U.S. at 393 (noting that where "the alleged danger of [a] statute is, in large measure, one of self-censorship," it is "a harm that can be realized even without an actual prosecution"); *Wikimedia*, 857 F.3d at 211 (noting that "*Clapper*'s discussion of speculative injury" was "based . . . on prospective or threatened injury and actions taken in response thereto," unlike "'self-censorship, which occurs when a claimant is chilled from exercising his right to free expression'") (quoting *Cooksey*, 721 F.3d at 235)).[4]

For these reasons, we hold that Plaintiffs have sufficiently alleged, at least at this stage of the litigation, an injury-in-fact sufficient to meet the first prong of the First Amendment standing framework; they have alleged "an actual and well-founded fear that the [Act] will be enforced, and ha[ve] in fact self-censored [themselves] by complying

---

[4] To the extent the district court relied upon the fact that the Act only provides for civil as opposed to criminal sanctions, the Defendants do not advance this distinction as a basis for upholding the decision. As noted above, the Act provides for "stiff civil remed[ies]," including exemplary damages in the amount of $5,000 per day that a person violates the Act, plus attorneys' fees and costs, which we have no trouble concluding would be an impediment to Plaintiffs' plans to move forward. *Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 75 (4th Cir. 1991) (finding standing in pre-enforcement challenge to the Virginia Petroleum Products Franchise Act which created a "stiff civil remedy": $2,500 in liquidated damages, actual damages, and attorneys' fees).

with the [Act], incurring harm all the while." *Mobil Oil*, 940 F.2d at 76 (internal quotation marks omitted).[5]

B.

Defendants urge us to affirm the district court's dismissal at the Rule 12(b)(1) stage on the alternative basis that the alleged injury-in-fact is not "fairly traceable" to Chancellor Folt or Attorney General Stein. *Lujan*, 504 U.S. at 560 (providing that "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable" to the defendants) (alteration and internal quotation marks omitted).

First, Defendants argue that only the Board of Governors of UNC has the authority to file suit against the Plaintiffs. Although the Board of Governors has delegated a portion of the authority to the Chancellor—lawsuits with less than $25,000 at stake—Defendants argue that any lawsuit seeking to enforce the Act against Plaintiffs would not qualify as a minor lawsuit because of the $5,000-per-day exemplary damages provision and, therefore, that the Chancellor could do nothing without prior approval from the Board. Second, Defendants argue that the Act only creates a private right of action for "the owner or operator of the premises," N.C. Gen. Stat. 99A-2(a), and Attorney General Stein would not likely *be* the owner or operator of any targeted facility. Instead, he

---

[5] We, of course, express no opinion on the balance of Defendants' motion to dismiss or on the merits of the underlying controversy. "'[W]hether the statute in fact constitutes an abridgement of the plaintiff's freedom of speech is . . . irrelevant to the standing analysis.'" *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (quoting *Meese v. Keene*, 481 U.S. 465, 473 (1987)).

17

would only be the *attorney* for any owner or operator of the facility. *See* N.C. Gen. Stat. § 114-2(2) (providing that one of the statutorily prescribed duties of the Attorney General is to "represent all State departments, agencies, institutions, commissions, bureaus or other organized activities of the State which receive support in whole or in part from the State").

We decline to affirm the district court's decision on this basis. It appears that Chancellor Folt would be the state official tasked with either initiating or requesting approval for a lawsuit under the Act if PETA carried out its planned investigation of UNC-Chapel Hill. And Attorney General Stein would, at a minimum, be the state official charged with representing any targeted state agency that chose to sue under the Act. Thus, while we can envision a number of *additional* parties that could have brought suit against Plaintiffs if they had carried out their investigative plans prior to bringing this pre-enforcement action, an order preventing these Defendants from exercising their powers to initiate or bring a lawsuit under the Act would seem to be sufficient to quell Plaintiffs' fear of liability. Moreover, in the proceedings below, the district court granted Defendants' motion to dismiss the amended complaint solely on the basis of the injury-in-fact element of standing. It did not need to reach the issue of whether the actual injury-in-fact is fairly traceable to these Defendants, or whether the Plaintiffs need to and should be allowed to amend their complaint to add additional defendants to maintain their pre-enforcement challenge. We leave that determination to the district court on remand as the case progresses.

V.

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*