IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PEOPLE FOR THE ETHICAL          )
TREATMENT OF ANIMALS, INC.;     )
CENTER FOR FOOD SAFETY; ANIMAL  )
LEGAL DEFENSE FUND; FARM        )
SANCTUARY; FOOD & WATER WATCH;  )
GOVERNMENT ACCOUNTABILITY       )
PROJECT; FARM FORWARD; and      )
AMERICAN SOCIETY FOR THE        )
PREVENTION OF CRUELTY TO        )
ANIMALS,                        )
                                )
          Plaintiffs,           )
                                )
     v.                         )          1:16CV25
                                )
JOSH STEIN, in his official     )
capacity as Attorney General    )
of North Carolina, and DR.      )
KEVIN GUSKIEWICZ, in his        )
official capacity as            )
Chancellor of the University    )
of North Carolina-Chapel Hill,  )
                                )
          Defendants,           )
                                )
          And                   )
                                )
NORTH CAROLINA FARM BUREAU      )
FEDERATION, INC.,               )
                                )
          Intervenor-Defendant. )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

Plaintiffs People for the Ethical Treatment of Animals, Inc. ("PETA"), Center for Food Safety ("CFS"), Animal Legal Defense Fund ("ALDF"), Farm Sanctuary, Food & Water Watch ("FWW"), Government Accountability Project ("GAP"), Farm Forward, and the

American Society for the Prevention of Cruelty to Animals ("ASPCA") seek to permanently enjoin North Carolina Attorney General, Josh Stein, and University of North Carolina-Chapel Hill Chancellor, Dr. Kevin Guskiewicz, from enforcing subsections of North Carolina General Statute § 99A-2 as unconstitutional under the First and Fourteenth Amendments to the United States Constitution. (Doc. 21 ¶ 142.)

Before the court are cross-motions for summary judgment filed by Plaintiffs (Doc. 98) and Defendants (Doc. 107), as well as Intervenor-Defendant North Carolina Farm Bureau Federation, Inc. ("Intervenor") (Doc. 109). With leave of court, *amici* Reporters Committee for Freedom of the Press and twenty-one other organizations[1] have filed a brief in support of Plaintiffs' motion for summary judgment. (Doc. 106.) The motions have been fully briefed, and the court held oral argument on February 6, 2020. For the reasons set forth below, the court will grant in part and deny in part the parties' motions for summary judgment, finding that the challenged provisions of the law fail to pass muster under

---

[1] *Amici* are as follows: American Society of News Editors; The Associated Press Media Editors; Association of Alternative Newsmedia; Capitol Broadcasting Company, Inc.; First Look Media Works, Inc.; Forbes Media LLC; Freedom of the Press Foundation; Gannett Co., Inc.; GateHouse Media; The International Documentary Association; The Investigative Reporting Workshop; The National Press Club; The National Press Club Journalism Institute; The National Press Photographers Association; The North Carolina Press Association; The Online News Association; POLITICO; Radio Television Digital News Association; Reporters Without Borders; Society of Professional Journalists; and The Tully Center for Free Speech. (Doc. 106 at 25-30.)

the First Amendment - two provisions fail facially, and the remaining two provisions fail as applied to Plaintiffs.

## I.  BACKGROUND

### A.  Facts

The facts, either not in dispute or viewed in the light most favorable to the non-moving parties in the cross-motions for summary judgment, establish the following:

On June 3, 2015, over then-Governor Patrick McCrory's veto,[2] the North Carolina General Assembly passed the North Carolina Property Protection Act, 2015 N.C. Sess. Laws 50, codified at N.C. Gen. Stat. § 99A-2 ("Property Protection Act" or "Act").  (Doc. 21 ¶ 1; Doc. 108 at 4.)  The Act amended current law that provides a civil remedy for interference with certain property rights by creating a civil cause of action for the owner or operator of a premises as follows:

> (a) Any person who intentionally gains access to the nonpublic areas of another's premises and engages in an act that exceeds the person's authority to enter those areas is liable to the owner or operator of the premises for any damages sustained.  For the purposes of this section, "nonpublic areas" shall mean those areas not accessible to or not intended to be accessed by the general public.

_____

[2] In his veto statement, Governor McCrory stated: "While I support the purpose of this bill, I believe it does not adequately protect or give clear guidance to honest employees who uncover criminal activity.  I am concerned that subjecting these employees to potential civil penalties will create an environment that discourages them from reporting illegal activities."  (Doc. 99-8 at 4.)

3

N.C. Gen. Stat. § 99A-2(a). Under the law, "an act that exceeds the person's authority" within the meaning of section (a) "is any of the following":

(1) An employee who enters the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization captures or removes the employer's data, paper, records, or any other documents and uses the information to breach the person's duty of loyalty to the employer[;]

(2) An employee who intentionally enters the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization records images or sound occurring within an employer's premises and uses the recording to breach the person's duty of loyalty to the employer[;]

(3) Knowingly or intentionally placing on the employer's premises an unattended camera or electronic surveillance device and using that device to record images or data[;]

(4) Conspiring in organized retail theft, as defined in Article 16A of Chapter 14 of the General Statutes[; or,]

(5) An act that substantially interferes with the ownership or possession of real property.

Id. § 99A-2(b). "Any person who intentionally directs, assists, compensates, or induces another person to violate this section" can be held jointly liable with the employee or actor. Id. § 99A-2(c).

Any party who prevails in an action brought under the Act can recover equitable relief, compensatory damages, costs and

4

attorneys' fees, as well as "[e]xemplary damages as otherwise allowed by State or federal law in the amount of five thousand dollars ($5,000) for each day, or portion thereof, that a defendant has acted in violation of subsection (a)." Id. § 99A-2(d). The Act further provides that nothing in it shall be construed to "diminish the protections provided to employees under Article 21 of Chapter 95 [Retaliatory Employment Discrimination] or Article 14 of Chapter 126 [Protection for Reporting Improper Government Activities] of the General Statutes" or "limit any other remedy available at common law or provided by the general Statutes." Id. § 99A-2(e), (g).

Plaintiffs are eight organizations who either "engage in employment-based undercover investigations to document and expose animal abuse" (Doc. 99 at 2) or "use[] information from whistleblowers and investigators in their advocacy" (id. at 7). PETA says it has identified animal testing laboratories at the University of North Carolina-Chapel Hill that it would like to investigate through the use of an undercover investigator, but it has refrained from doing so out of fear and the "threat of exemplary damages and other civil penalties under [the Act]." (Doc. 100-1 ¶¶ 17-18, 24.) Similarly, ALDF says it is prepared to conduct undercover investigations at state-owned facilities in North Carolina, but those preparations were "thwarted when the [Act] passed." (Doc. 100-2 ¶ 8.) Both PETA and ALDF represent

5

that if the Act were held unconstitutional, they would resume their undercover investigations. The remaining Plaintiffs have each indicated that the Act's effect on PETA and ALDF has negatively impacted the mission and goals of their organizations. Plaintiffs charge that the Act was passed specifically to ward off undercover investigations of facilities and farms in which animal testing or processing takes place. By creating a strong disincentive for PETA and ALDF to conduct undercover investigations, the remaining Plaintiffs claim, the Act has obstructed their information stream and prevents them from publishing photographs and reports that are central to their missions. (Docs. 101-1 ¶¶ 6, 8, 17-18; 101-2 ¶¶ 4-5, 10-11; 101-3 ¶¶ 5-6, 13-14; 101-4 ¶¶ 5-6, 8, 11-12; 101-5 ¶¶ 5-6, 8, 10-11; 101-6 ¶¶ 7-8, 13-14.)

### B. Procedural History

Plaintiffs initiated this pre-enforcement action on January 13, 2016 (Doc. 1) and filed an amended complaint on February 25, 2016 (Doc. 21). Raising both facial and as-applied challenges, they claim the Act stifles their ability to investigate North Carolina employers for illegal or unethical conduct and restricts the flow of information those investigations provide, in violation of the First (Count I) and Fourteenth (Count II) Amendments to the United States Constitution and provisions of the North Carolina Constitution (Free Speech under Art. I, § 14 (Count III); Right to Petition under Art. I, § 12 (Count IV); and Equal

Protection under Art. 1, § 19 (Count V)).   On April 4, 2016, Defendants moved to dismiss the amended complaint on three grounds: Eleventh Amendment State sovereign immunity, standing, and on the merits.   (Doc. 30.)   In a memorandum opinion, this court found that Plaintiffs failed to allege sufficient facts to demonstrate standing and granted Defendants' motion to dismiss.   (Doc. 49 at 37.)

Plaintiffs appealed this court's judgment, and in a June 5, 2018 opinion the Fourth Circuit held that Plaintiffs "sufficiently alleged, at least at [the motion to dismiss] stage of the litigation, an injury-in-fact sufficient to meet the first prong of the First Amendment standing framework" and reversed this court's judgment.   PETA v. Stein, 737 F. App'x 122, 131 (4th Cir. 2018) (per curiam).   On remand, this court held argument on the remainder of Defendants' motion to dismiss, granting it in part and denying it in part, leaving only Plaintiffs' claims under the First Amendment (Count I) and Fourteenth Amendment (Count II) to the United States Constitution.   (Doc. 73.)

Thereafter, North Carolina Farm Bureau Federation, Inc. – a nonprofit organization dedicated to representing the interests of North Carolina farmers - moved to intervene as a Defendant pursuant to Federal Rule of Civil Procedure 24 and Local Rule 7.3 (Doc. 82), and Plaintiffs filed an unopposed motion to join the UNC System president and the UNC Board of Governors as Defendants (Doc.

7

87).  The court granted North Carolina Farm Bureau Federation's motion but denied Plaintiffs' motion for joinder. (Doc. 92 at 11.)

Plaintiffs, Defendants, and Intervenor each moved for summary judgment on September 3, 2019, based on a record developed largely of affidavits, and the court heard argument on February 6, 2020. The motions are thus ready for decision.

## II.  ANALYSIS

Defendants first renew their challenge to this court's subject matter jurisdiction.  (Docs. 108 at 9 n.2; 115 at 3-6.) Plaintiffs assert that the court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 (Doc. 21 ¶ 9) and that venue is proper (id. ¶ 14).

### A.  Standing

Plaintiffs, relying on the Fourth Circuit's prior opinion in this case, PETA, 737 F. App'x 122, contend that they have set out sufficient facts, supported by affidavits, to establish standing. (Doc. 99 at 8-10.)  Defendants disagree.  (Doc. 115 at 3.)

Article III of the United States Constitution limits the jurisdiction of federal courts to deciding cases or controversies. U.S. Const. art. III, § 2, cl. 1.  To satisfy this case-or-controversy requirement, a plaintiff must establish that its claim meets three requirements of Article III standing:

> (1) An injury-in-fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable

> connection between the alleged injury in fact and the
> alleged conduct of the defendant); and (3)
> redressability (i.e., it is likely and not merely
> speculative that the plaintiff's injury will be remedied
> by the relief plaintiff seeks in bringing suit).

Beck v. McDonald, 848 F.3d 262, 269 (4th Cir. 2017) (quoting David v. Alphin, 704 F.3d 327, 333 (4th Cir. 2013)).

"[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Id. at 270 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). At the summary judgment stage, a plaintiff must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." Id. (quoting Lujan, 504 U.S. at 561).

Plaintiffs have met this burden, having set forth by affidavit, the veracity of which has not been challenged, specific facts which, taken as true, establish Article III standing.

### 1. Injury-in-Fact

Defendants contend that Plaintiffs' basis for a chill on the exercise of their rights is "objectively unreasonable based on the record" and that their fears are "purely hypothetical, speculative, and conjectural, and do not rise to an injury-in-fact." (Doc. 115 at 4.) Plaintiffs argue that following the Fourth Circuit's ruling, to show injury-in-fact they must merely

9

establish that they have conducted undercover investigations in the past to uncover unethical or illegal treatment of animals and disseminate that information and that they are prepared to proceed with further investigations but are chilled from doing so because they fear liability under the Act. (Doc. 99 at 9.)

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Beck, 848 F.3d at 270 (internal quotation marks omitted) (quoting Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016)). In the First Amendment context, the "standing requirements are somewhat relaxed," Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013), and plaintiffs can satisfy the injury-in-fact requirement by "showing that [the challenged statute] ha[s] an objectively reasonable chilling effect on the exercise of their rights." PETA, 737 F. App'x at 129 (internal quotation marks omitted) (quoting Cooksey, 721 F.3d at 229). "To decide the objective reasonableness of the claimed chilling effect from the Act, the court evaluates whether there is a credible threat of enforcement against the plaintiff." Id. "Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights. Id. (quoting Cooksey, 721 F.3d at 236).

In addressing the issue of injury-in-fact on appeal, the

Fourth Circuit held that Plaintiffs "sufficiently allege[d] an injury-in-fact," stating:

> Plaintiffs' alleged injury is not just the imminent threat of a civil lawsuit, which would only occur if they go forward with their plans to investigate in the nonpublic areas of a state employer's premises *and* Defendants choose to file suit against them. Rather, Plaintiffs['] alleged injury for standing purposes is that they have refrained from carrying out their planned investigations based on their reasonable and well-founded fear that they will be subjected to significant exemplary damages under the Act if they move forward at all.

Id. at 129, 131 (emphasis in original) (internal quotation marks omitted). In reaching its holding, the court explained that Plaintiffs alleged (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) "a credible threat that the Act will be enforced against them if they proceed with their plans," and (3) "that they have refrained from proceeding for fear of being subjected to the severe civil remedies provided for in the Act." Id. at 129-130 (internal quotation marks omitted).

By its terms, the Act appears to prohibit Plaintiffs from conducting undercover investigations and "subject them to civil liability, including severe exemplary damages." Id. at 130. The actions in which Plaintiffs wish to engage, which are the same as those before enactment of the Act, could be targeted by the Defendants. Because a civil action could be brought under the Act to target not only the investigations in which Plaintiffs wish to

11

engage, but also the use of the information gathered from these investigations, the Fourth Circuit found there is a credible threat the Act will be enforced against them. Id. Therefore, to show injury-in-fact, Plaintiffs must establish that (1) they have engaged in or supported undercover investigations in the past for the purpose of gathering and disseminating information or have relied on undercover investigations to disseminate information, and (2) that they have refrained from doing so out of fear of liability under the Act.

At this stage of the litigation, Plaintiffs cannot rely on "mere allegations" but must establish specific facts by evidence. Beck, 848 F.3d at 270 (citation and internal quotation marks omitted). A declaration from an individual authorized to make statements on behalf of the organization has been filed by each of the eight Plaintiffs. (Docs. 100-1 [PETA], 100-2 [ALDF], 101-1 [ASPCA], 101-2 [CFS], 101-3 [Farm Forward], 101-4 [Farm Sanctuary], 101-5 [FWW], 101-6 [GAP].) Both PETA and ALDF have declared that they have engaged in undercover investigations at facilities in North Carolina in the past and are not willing to proceed with their planned investigations out of fear of liability under the Act. (Docs. 100-1 ¶¶ 4, 6-18, 21-25; 100-2 ¶¶ 7-10, 12-15.) The ASPCA has declared that the Act has both stopped investigations, which prevents the production of materials they rely on, and discouraged them from funding investigations in North

12

Carolina out of fear of liability. (Doc. 101-1 ¶¶ 6, 8, 17-19.) Finally, CFS, Farm Forward, Farm Sanctuary, FWW, and GAP have all declared that they rely on information from whistleblowers and undercover investigators to produce content central to their organizations' missions, and the Act is preventing that information from reaching them. (Docs. 101-2 ¶¶ 4-5, 10-11; 101-3 ¶¶ 5-6, 13-14; 101-4 ¶¶ 5-6, 8, 11-12; 101-5 ¶¶ 5-6, 8, 10-11; 101-6 ¶¶ 7-8, 13-14.)

Plaintiffs have set out specific facts to establish an injury in fact.

### 2. Causation and Redressability

Defendants argue that Plaintiffs "have not presented, nor can they, any evidence showing that the Defendants have threatened any kind of action against Plaintiffs or that they are likely to enforce the Act against them." (Doc. 115 at 5.) Plaintiffs argue that in the interlocutory appeal the Fourth Circuit found that "these Defendants must either initiate or prosecute [a suit], making [Plaintiffs'] chill traceable to and redress[a]ble against Defendants." (Doc. 99 at 9.)

The burden on Plaintiffs is to show (1) "a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the defendant's actions" and (2) "a likelihood that the injury will be redressed by a favorable decision." PETA, 737 F. App'x. at 128 (citation and internal

13

quotation marks omitted). As the Fourth Circuit noted, the injury here is that Plaintiffs "have refrained from carrying out their planned investigations based on their reasonable and well-founded fear that they will be subjected to significant exemplary damages under the Act if they move forward" with their plans to investigate in areas prohibited by the Act. Id. at 131. In its opinion, the Fourth Circuit stated that Plaintiffs "plausibly alleged that Defendants are the officials who are empowered to initiate or file suits under the Act if Plaintiffs carry out their investigations, and neither the UNC Chancellor nor the Attorney General have disavowed enforcement if Plaintiffs proceed with their plans." Id. at 130-31 (citation and internal quotation marks omitted).[3] They further found that "an order preventing these Defendants from exercising their powers to initiate or bring a lawsuit under the Act would seem to be sufficient to quell Plaintiffs' fear of liability." Id. at 132.

As set forth in Plaintiffs' declarations, the ability of Defendants to bring a civil action under the Act and subject Plaintiffs to civil liability and exemplary damages is the cause of Plaintiffs' injury - the prevention from moving forward with undercover investigations and disseminating information. As the

---

[3] This court had disagreed, noting that it was some 13 to 15 years ago that PETA last conducted an undercover investigation of a UNC facility and that the State never threatened or instituted any legal action in connection with it. (Doc. 49 at 5-6, 28.)

14

Fourth Circuit found already, barring Defendants from bringing suit would redress the injury. Id. Thus, Plaintiffs have set forth sufficient facts to establish both causation and redressability and consequently have standing.

**B. First Amendment Claims**

Plaintiffs move for summary judgment on their remaining claims, arguing that subsections (b)(1), (b)(2), (b)(3) and (b)(5) of the Act violate the First Amendment because they fail the requisite scrutiny and are unconstitutionally overbroad.[4] (Doc. 98 at 1-2.) Plaintiffs seek to strike the Act both facially and as applied to them. Defendants and Intervenor dispute both assertions, arguing that the Act regulates wrongful conduct and is not overbroad, and that any prohibited speech is not *protected* speech. (Docs. 115 at 6, 16-18; 121 at 7-8, 17-19.) Further, they contend that if found to regulate protected speech, the Act is content- and viewpoint-neutral and can withstand intermediate scrutiny. (Docs. 115 at 13-15; 121 at 14-17.)

**1. Standard of Review**

Summary judgment is appropriate where the pleadings, affidavits, and other proper discovery materials demonstrate that

---

[4] At oral argument, Plaintiffs acknowledged that N.C. Gen. Stat. § 99A-2(c) is not unconstitutional unless, in their view, it is used to create joint liability for violations of the challenged provisions, subsections (b)(1) through (b)(3) or (b)(5). Plaintiffs do not challenge § 99A-2(e) but instead argue that subsection (e) is further evidence that the Act is directed at First Amendment protected interests. (Doc. 99 at 11-13.)

15

no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of initially demonstrating the absence of a genuine dispute as to any material fact. Celotex, 477 U.S. at 323.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citation and internal quotation marks omitted). In considering each motion, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (citation and internal quotation marks omitted). There is no issue for trial unless sufficient evidence favoring the non-moving party exists for a reasonable factfinder to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 257 (1986).

The court is faced with cross-motions for summary judgment. No party contends that there are material facts in dispute, and all agreed at oral argument that summary judgment is an appropriate disposition in this case.

### 2. State Action

The First Amendment guarantees that "Congress shall make no

16

law . . . abridging the freedom of speech." U.S. Const. amend. I.
When considering an action brought under the First Amendment, "it
must be remembered that the First and Fourteenth Amendments
safeguard the rights of free speech and assembly by limitations on
*state* action, not on action by the owner of private property used
nondiscriminatorily for private purposes only." Lloyd Corp. v.
Tanner, 407 U.S. 551, 567 (1972) (emphasis added). But while the
Free Speech Clause prohibits only state action, "[t]he test is not
the form in which state power has been applied but, whatever the
form, whether such power has in fact been exercised." N.Y. Times
Co. v. Sullivan, 376 U.S. 254, 265 (1964). In fact, "sometimes
the state can censor just as effectively through legal forms that
are private as it can through ones that are public."[5] Overbey v.
Mayor of Baltimore, 930 F.3d 215, 224 (4th Cir. 2019) (quoting
Daniel J. Solove & Neil M. Richards, Rethinking Free Speech and
Civil Liability, 109 Colum. L. Rev. 1650, 1668 (2009)).

Defendants rightly note that the present case differs from
numerous other similar lawsuits across the country that challenge
restrictions on undercover investigations, particularly of
agricultural operations.[6] As far as the court can discern, nearly

---

[5] It is for this reason that libel laws, although enforced by private
parties, remain subject to First Amendment scrutiny. See, e.g., N.Y.
Times, 376 U.S. at 268-69.

[6] Litigation against so-called "Ag-Gag" laws have been pursued
nationwide, including in Arkansas, ALDF v. Vaught, No. 4:19-cv-00442-

17

all other similar laws impose criminal liability while the Property Protection Act provides a civil cause of action for damages.  But while the Act operates in the private sphere, it is state action to the extent the State has identified speech (or in some cases, conduct which can include speech) it wishes to allow to be proscribed and has empowered private parties to enforce the prohibition.  Cohen v. Cowles Media Co., 501 U.S. 663, 668 (1991) (finding in breach of contract dispute that "the application of state rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth Amendment").  "Calling a speech restriction a 'property right' . . . doesn't make it any less a speech restriction, and it doesn't make it constitutionally permissible."  Eugene Volokh, Freedom of Speech and Information Privacy: The Troubling Implications of a Right to Stop People from Speaking About You, 52 Stan. L. Rev. 1049, 1063 (2000).

---

JM, Doc. 51 (E.D. Ark. Feb. 14, 2020) (granting the defendants' motion to dismiss where plaintiffs did not allege facts sufficient to establish injury in fact), Idaho, ALDF v. Wasden, 878 F.3d 1184 (9th Cir. 2018) (holding that Idaho's statute prohibiting a person from making an unauthorized audio or video recording of an agricultural facility's operations violated the First Amendment), Iowa, ALDF v. Reynolds, 353 F. Supp. 3d 812 (S.D. Iowa 2019) (finding Iowa's "Ag-Gag" law facially unconstitutional and granting plaintiffs' motion for summary judgment), Kansas, ALDF v. Kelly, No. 18-2657-KHV, 2020 WL 362626, *1 (D. Kan. Jan. 22, 2020) (finding that the challenged provisions of the Kansas law violated the First Amendment and granting in part plaintiffs' motion for summary judgment), and Utah, ALDF v. Herbert, 263 F. Supp. 3d 1193 (D. Utah 2017) (finding Utah's law unconstitutional under the First Amendment and granting plaintiffs' motion for summary judgment).

18

In the present case, moreover, Plaintiffs have strategically targeted a State entity that would enforce the Act through State actors. As the Fourth Circuit stated:

> It appears that [the] Chancellor . . . would be the state official tasked with either initiating or requesting approval for a lawsuit under the Act if PETA carried out its planned investigation of UNC-Chapel Hill. And Attorney General Stein would, at a minimum, be the state official charged with representing any targeted state agency that chose to sue under the Act.

PETA, 737 F. App'x at 132. State action is therefore present through the actions of the UNC Chancellor and the North Carolina Attorney General. This provides a sufficient basis to challenge the Property Protection Act under the First Amendment as applied to the States through the Fourteenth Amendment.

### 3. Facial versus As-Applied Challenges

Plaintiffs challenge the Act both facially and as applied to them. "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010). Rather, "[t]he difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry." Educ. Media Co. at Va. Tech, Inc. v. Insley, 731 F.3d 291, 298 n.5 (4th Cir. 2013). In distinguishing between facial and as-applied challenges, the Fourth Circuit has noted:

19

Under a facial challenge, a plaintiff may sustain its burden in one of two ways. First, a plaintiff asserting a facial challenge may demonstrate that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep. Second, a plaintiff asserting a facial challenge may also prevail if he or she show[s] that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. Under either scenario, a court considering a facial challenge is to assess the constitutionality of the challenged law without regard to its impact on the plaintiff asserting the facial challenge. In contrast, an as-applied challenge is based on a developed factual record and the application of a statute to a specific person[.]

Id. (internal citations and quotation marks omitted). Further, facial challenges "are disfavored for several reasons." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008). First, facial challenges "often rest on speculation." Id. Additionally, they "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Id. at 450-51 (citation and internal quotation marks omitted). Finally, facial challenges may prevent laws "embodying the will of the people from being implemented in a manner consistent with the Constitution." Id. at 451.

With these principles in mind, the court turns to Plaintiffs' specific challenges.

20

### 4. Free Speech Analysis

The parties agree that the First Amendment Free Speech analysis proceeds in three stages. (Docs. 99 at 10-15; 108 at 10; 110 at 21-24.) First, the court must determine whether the Act regulates speech or conduct. Second, if the Act regulates speech, the court must determine what level of scrutiny applies by considering whether the Act is content- and viewpoint-neutral. Finally, applying the appropriate level of scrutiny, the court must determine whether the party with the burden has made the requisite showing. _Cornelius v. NAACP Legal Def. & Educ. Fund, Inc._, 473 U.S. 788, 797 (1985). _See, e.g._, _ALDF v. Wasden_, 878 F.3d 1184, 1193-94 (9th Cir. 2018); _ALDF v. Kelly_, No. 18-2657-KHV, 2020 WL 362626, at *15 (D. Kan. Jan. 22, 2020); _ALDF v. Reynolds_, 353 F. Supp. 3d 812, 821 (S.D. Iowa 2019).

### a. Speech or Conduct

Defendants and Intervenor argue that the challenged provisions of the Act are not subject to First Amendment scrutiny because they proscribe unprotected speech, that is, speech made in connection with a trespass. (Docs. 115 at 10-12; 116 at 15-17.) Further, they argue that the law is one of general applicability, and thus incidental effects on speech do not require scrutiny. (Docs. 115 at 6-12; 116 at 10-14.) Plaintiffs contend that the Act targets protected speech and is not one of general application because speech is what triggers liability, proving that speech is

21

the Act's true aim.  (Doc. 114 at 13.)

Speech is protected under the First Amendment, but the protection is not absolute.  United States v. Stevens, 559 U.S. 460, 468-69 (2010) (noting permissible restrictions for obscenity, defamation, fraud, incitement, and speech integral to criminal conduct).  Some categories of speech can be regulated not because they are "invisible to the Constitution," but "because of their constitutionally proscribable content."  R.A.V. v. City of St. Paul, 505 U.S. 377, 383-84 (1992).  The Government cannot use these categories of speech as "vehicles for content discrimination unrelated to their distinctively proscribable content," and restrictions based on particular viewpoints cannot stand under the First Amendment.  Id. at 383-85.

While the Supreme Court has held that motion pictures fall within the scope of the First Amendment, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-02 (1952), the Court has not definitively addressed whether recording itself is protected speech.  However, several courts have recognized recording as either expressive conduct warranting First Amendment protection, Wasden, 878 F.3d at 1203-04 (finding the creation of an audiovisual recording to be speech because "[t]he act of recording is itself an inherently expressive activity"), or conduct essentially preparatory to speech, Am. Civil Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 595 (7th Cir. 2012) (emphasis in original) ("The act

22

of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech . . . as a corollary of the right to disseminate the resulting recording."). The same is true for the act of taking or capturing a picture. See Fields v. City of Philadelphia, 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos . . . and for this protection to have meaning the Amendment must also protect the act of creating that material."). The act of disseminating a recording is of course speech. Sorrell v. IMS Health Inc., 564 U.S. 552, 568 (2011) (citation and internal quotation marks omitted) ("An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated.").

Defendants' and Intervenor's attempt to categorize image capture and recording following a trespass under the Act as unprotected speech rests on a misreading of the law. It is true that free speech cannot be used to justify violation of laws of general application that operate independent of speech, such as trespass, copyright, labor, antitrust, and tax laws. See, e.g., Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 521 (4th Cir. 1999) (rejecting free speech defense to trespass law). But while the press enjoys no special status to avoid such laws, it does not mean the category of speech is thus unprotected. See Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 791-92 (2011)

23

(reaffirming that "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated"). The Property Protection Act therefore does not escape First Amendment scrutiny altogether on the ground that the speech is not protected.

Similarly, Defendants' and Intervenor's argument that the Act avoids scrutiny because it is generally applicable is incorrect. Generally applicable laws are those that affect speech in a neutral way, and such laws with only an incidental effect on speech do not usually draw First Amendment scrutiny. Cohen, 501 U.S. at 669 (rejecting First Amendment exception to breach of contract claim, noting that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news"); Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 640 (1994) ("[T]he enforcement of a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment . . . ."). However, where a law has more than an incidental effect on speech or where liability is triggered by engaging in First Amendment protected activity, the law is subject to First Amendment scrutiny. Alvarez, 679 F.3d at 602-03 ("When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play."). And even a generally applicable law can be subject to First Amendment scrutiny as

24

applied to speech that falls within its terms. See Billups v. City of Charleston, No. 19-1044, 2020 WL 3088108, at *6 (4th Cir. June 11, 2020) (finding that laws regulating conduct can be subject to First Amendment scrutiny even though they do not directly regulate speech) (citing Holder v. Humanitarian Law Project, 561 U.S. 1, 28 (2010)); Capital Assoc. Indus., Inc. v. Stein, 922 F.3d 198, 209 (4th Cir. 2019).

These distinctions are seen in Food Lion, which Defendants and Intervenor claim justifies the Act. They contend that the Act merely codifies the case's holding that the torts of trespass and duty of loyalty are generally applicable laws and that undercover video recordings made by employees in the course of those torts were therefore not protected by the First Amendment. (Docs. 115 at 7; 116 at 12.) Plaintiffs argue that this misreads the case, especially as applied to the Property Protection Act, and that the court's statements regarding the breach of duty of loyalty were subsequently abrogated by the North Carolina Supreme Court and are therefore of no value. (Doc. 114 at 15.)

Defendants' and Intervenor's reliance on Food Lion is largely misplaced. The case involved a grocery chain's lawsuit over an investigation of its food handling practices by the television network American Broadcasting Company, whose employees obtained jobs with the chain that enabled the taking of videos with hidden cameras. Food Lion asserted several claims, including trespass

25

and breach of its employees' duty of loyalty. A jury found for Food Lion, and the Fourth Circuit affirmed in part. On appeal, the defendants contended that their recording was newsgathering that was protected by the First Amendment. The court rejected this argument, finding the torts of breach of duty of loyalty and trespass to be generally applicable, and thus not subject to First Amendment scrutiny, because they do not "target[] or single[] out" the press or have more than an incidental effect on it. 194 F.3d at 521-22. The court concluded that because the employees "went into areas of the stores that were not open to the public and secretly videotaped, an act that was directly adverse to the interests of their . . . employer, Food Lion," they trespassed and "breached the duty of loyalty, thereby committing a wrongful act in abuse of their authority to be on Food Lion's property." Id. at 519.

Subsequently, in Dalton v. Camp, the Supreme Court of North Carolina specifically addressed the Fourth Circuit's Food Lion opinion and concluded that the court "incorrectly interpreted [] state case law." 548 S.E.2d 704, 709 (N.C. 2001). The court held that while North Carolina courts "recognize the existence of an employee's duty of loyalty, [they] do not recognize its breach as an independent claim." Id. Instead, it is only a justification for terminating an employee. Id. Moreover, the court found no indication a fiduciary duty would apply to a lower-level grocery

store employee.  Id.  Plaintiffs contend this disposes of Defendants' argument.  Defendants respond that the General Assembly remedied this by creating a cause of action in the Property Protection Act for a breach of duty of loyalty.  (Doc. 115 at 10, 13, 14.)  It is not entirely clear, however, that the General Assembly has done so.  The PPA does not define acts that breach the duty of loyalty or the class of employees who would owe such a duty – issues addressed in Dalton v. Camp.  Rather, it creates a cause of action against one who enters the nonpublic areas of an employer's premises and engages in conduct with the purpose of breaching the employee's duty of loyalty, thus making the breach of an employee's duty of loyalty an element of a (b)(1) or (b)(2) claim, not a standalone cause of action.

In a related fashion, Defendants and Intervenor also rely generally on a line of cases that upheld claims for trespass and invasion of privacy where surreptitious videotaping or electronic surveillance occurred.  See, e.g., Miller v. Brooks, 472 S.E.2d 350 (N.C. Ct. App. 1996) (estranged wife trespassed into husband's home and installed video camera in bedroom); Dietemann v. Time, Inc., 449 F.2d 245 (9th Cir. 1971) (invasion of privacy under California law where Life Magazine published picture taken of plaintiff in his home without his consent).  They argue that these cases demonstrate that "[e]ven an authorized entry can be trespass if a wrongful act [such as a recording or photograph] is done in

27

excess of and in abuse of authorized entry." (Doc. 110 at 14-15 (quoting <u>Miller</u>, 472 S.E.2d at 355).)

This last contention is true. But in each of these cases, the claims were based on laws of general application – such as trespass and invasion of privacy – which do not require speech as an element of proof. The courts rejected arguments that the offender could seek the protection of the First Amendment simply because he engaged in speech while committing these torts. But where the law itself proscribes a form of expression, it differs from these laws of general application and is subject to heightened scrutiny. Here, the Property Protection Act appears to set out a law of general application in paragraph (a) – indeed, no Plaintiff has challenged the language of that subsection. But the General Assembly went on in subsections (b)(1) through (b)(5) to define the specific conduct that, if proven, would constitute a violation. Subsections (b)(1) through (b)(5) have been treated by the parties as elements of a Property Protection Act claim, and the court reads them the same way. Thus, to the extent the (b) subsections include speech as an element of proof or have more than an incidental effect on it, they implicate the First Amendment.[7]

---

[7] In this respect, the Property Protection Act may differ from the similar Arkansas statute that sets out a non-exclusive list of ways a person can exceed their authority to enter a non-public area. <u>See</u> Ark. Code Ann. § 16-118-113 (2017).

Case 1:16-cv-00025-TDS-JEP   Document 138   Filed 06/12/20   Page 28 of 73

### i.   Subsection (b)(1)

Under subsection (b)(1) of the Act, a person can be held liable if he intentionally accesses the nonpublic areas of an employer's premises without a bona fide intent, and "captures or removes the employer's data, paper, records, or any other documents and uses the information to breach the person's duty of loyalty to the employer."  N.C. Gen. Stat. § 99A-2(b)(1).  Plaintiffs argue that (b)(1)'s prohibition on capturing information implicates the First Amendment, contending that the First Amendment protects against restrictions on the creation of material for speech.  They further argue that "us[ing]" information implicates the First Amendment and cite Sorrell, 564 U.S. at 568, for the proposition that "'[a]n individual's right to speak is implicated when information he or she possesses is subjected to restraints on' its 'disseminat[ion].'"   (Doc. 99 at 10.)   To Defendants and Intervenor, proscribing "use" prohibits conduct, not speech, because it "affects what a person 'must do . . . not what they may or may not say.'"  (Doc. 115 at 7 (quoting Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc., 547 U.S. 47, 60 (2006) (emphasis in original)).)  They argue that "captures" generally does not involve speech but concede it could.  (Doc. 110 at 28.)  Plaintiffs respond that "there is no requirement a statute be perfectly crafted to only encompass speech before it will be understood to be aimed at First Amendment rights."  (Doc. 114 at 14.)

29

The terms "uses" and "captures" are not defined in the Act. When statutory words lack a technical meaning and are not defined in the text, "they are construed in accordance with their ordinary meaning" and "[c]ourts may and often do consult dictionaries for such meanings." State v. Ludlum, 281 S.E.2d 159, 162 (N.C. 1981). See Johnson v. Zimmer, 686 F.3d 224, 232 (4th Cir. 2012) (citation and internal quotation marks omitted) ("The Court customarily turn[s] to dictionaries for help in determining whether a word in a statute has a plain or common meaning."). "Use" means generally "[t]he act of putting something to work, or employing or applying a thing, for any (esp. a beneficial or productive) purpose." Oxford English Dictionary Online, https://www.oed.com/view/Entry/220635?rskey=JQRSrL&result=1&isAdvanced=false#eid. It is also defined as "[t]he application or employment of something." Use, Black's Law Dictionary (9th ed. 2009). While "use" as set out in subsection (b)(1) need not involve speech; for example, an individual who removes an employer's data and relies on it to start his own competitive business, the term itself can apply to speech. One could "use" the information gathered from the nonpublic areas of an employer's premises by publishing it or creating an expressive work based on its contents, making the prohibited action "speech." The prohibition on "captur[ing]" more plainly generates First Amendment concern. "Capture" is defined variously as "to take

30

prisoner; to catch by force," "[t]o take (an opposing piece) [as in chess]," and "[t]o represent, catch, or record (something elusive, as a quality) in speech, writing, etc." Oxford English Dictionary Online, https://www.oed.com/view/Entry/27660?rskey=Hy121K&result=2#eid. It also means "to record in a permanent file." Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/capture. Thus, capturing can be read in (b)(1) to prohibit physically obtaining an employer's data or information, but it can also prohibit the capturing of images via camera or other similar devices. See Seth F. Kreimer, Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record, 159 U. Pa. L. Rev. 335, 387-392 (2011) (reasoning that laws constraining image capture are not generally applicable and are not free from First Amendment scrutiny). Intervenor has conceded as much. (Doc. 110 at 28 ("[S]ubsection (b)(1) prohibits 'captur[ing] or remov[ing] the employer's data,' and to 'capture' data reasonably includes taking an image of it.").)

Absent a narrowing construction from North Carolina state courts, federal courts are without power to adopt one "unless such a construction is reasonable and readily apparent." Boos v. Barry, 485 U.S. 312, 330 (1988). While Defendants and Intervenor view subsection (b)(1) as exclusively regulating conduct, it is clear (indeed, conceded) that "capture" can cover speech. Whether or

31

not subsection (b)(1) is generally applicable, at a minimum its prohibition on speech is more than incidental. Image capture, a speech act in which Plaintiffs wish to engage, constitutes an element of a (b)(1) claim. Unlike in Food Lion where the torts of trespass and breach of the duty of loyalty operated independently of speech, the inclusion of speech as an element of a (b)(1) claim goes beyond an incidental effect, and subsection (b)(1)'s burden on speech is direct and requires First Amendment scrutiny.

That said, the court also cannot ignore the possible myriad legitimate applications of subsection (b)(1). The Act applies to one who captures or removes and uses an employer's "data, paper, records, or any other documents." A person who captures, by taking, and removes data or information and uses it in a non-speech manner (e.g., by reading it, acting on its information, etc.) falls within this subsection, and the First Amendment would be of no concern. To succeed on a facial challenge, Plaintiffs must demonstrate that there are "no set of circumstances" in which subsection (b)(1) can be validly applied or that it lacks any plainly legitimate sweep. See Educ. Media Co., 731 F.3d at 298 n.5.[8] Plaintiffs cannot do so here. Therefore, their First Amendment challenge to (b)(1) can only be brought as-applied to

---

[8] Plaintiffs may also raise facial challenges to a statute by showing that is it overbroad. A separate overbreadth analysis is set out in Part B.5 below.

32

their particular circumstances.

## ii. Subsections (b)(2) and (b)(3)

Subsections (b)(2) and (b)(3) both create liability for individuals who, in some form, record images. Subsection (b)(2) describes an act that exceeds a person's authority, in relevant part, as "record[ing] images or sound occurring within an employer's premises." N.C. Gen. Stat. § 99A-2(b)(2). Subsection (b)(3) defines exceeding one's authority as placing an unattended camera or surveillance device on an employer's premises and "using that device to record images or data." Id. § 99A-2(b)(3). As discussed above, recording is protected speech, and these provisions will proceed to the next step of the First Amendment analysis. Food Lion does not immunize these subsections because, unlike the claims in that case, these subsections expressly single out speech. They are not generally applicable laws and will be reviewed with the appropriate level of scrutiny.

## iii. Subsection (b)(5)

Subsection (b)(5) creates liability for acts that "substantially interfere[] with the ownership or possession of real property." N.C. Gen. Stat. § 99A-2(b)(5). Plaintiffs argue that because the Act "is aimed at stopping communications, particularly communications to 'the media,' and especially communications by 'private special interest organizations'" like theirs, subsection (b)(5) should be read to restrict both the

33

gathering of information and use of that information. (Doc. 99 at 11.) In essence, Plaintiffs argue, because subsections (b)(1), (b)(2), and (b)(3) are all directly aimed at speech and subsection (b)(5) has been categorized as a catch-all provision, (b)(5) must be understood to cover any speech that is not encompassed by (b)(1) through (3). (Doc. 114 at 17.) Defendants argue that this ignores the plain reading of the statute, citing State v. Beck, 614 S.E.2d 274, 277 (N.C. 2005), for the proposition that "[i]f the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." (Doc. 115 at 12.) They further argue that subsection (b)(5) is directed at conduct as opposed to speech, again relying on Rumsfeld. 547 U.S. at 60. Intervenor describes subsection (b)(5) as a catch-all provision consistent with Food Lion's trespass holding. (Doc. 110 at 17.)

"[U]nless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language . . . ." In re Sunterra Corp., 361 F.3d 257, 265 (4th Cir. 2004) (citation and internal quotation marks omitted). In contrast to previous subsections which specifically describe prohibited speech acts, subsection (b)(5) regulates conduct, prohibiting substantial interference. Speech is not singled out. Facially, the law applies to speech and nonspeech in a neutral manner. Moreover, as with subsection (b)(1), Plaintiffs fail to

34

show that there are no set of circumstances in which (b)(5) can be validly applied. All sorts of non-speech acts can "substantially interfere[] with the ownership or possession of real property," such as erecting a barrier or opening a gate to let livestock out. Plaintiffs also fail to show that subsection (b)(5) lacks any plainly legitimate sweep. See Educ. Media Co., 731 F.3d at 298 n.5. Plaintiffs' First Amendment challenge to subsection (b)(5) will therefore proceed on an as-applied basis.

### b. Level of Scrutiny

The next step of the First Amendment analysis is to determine the proper level of scrutiny to apply to each subsection. Plaintiffs argue that the Act restricts speech based on its content and purpose, and even more significantly, the viewpoint expressed. They argue that the Act's exceptions in subsection (e) "define its character, and establish it is content-based" because it restricts speech based on its function and shows that the Act is meant to punish those who wish to disclose information outside of specific government-approved channels. (Doc. 114 at 20.) As to subsections (b)(1) and (b)(2), Plaintiffs argue that "[a] court could not determine whether a communication was 'disloyal' except by knowing what words were spoken" and that "'breaching the duty of loyalty' depends on the specifics of what is communicated." (Id. at 22.) Defendants argue that the Act is content-neutral because it merely regulates "the manner in which information is obtained" and

35

liability "does not depend on the type of information obtained." (Doc. 115 at 13-14.) Intervenor argues that the Act is content-neutral because "it applies to all impermissibly obtained information, all unauthorized recordings made by unattended electronic surveillance devices, and all recordings used to breach the employee's duty of loyalty, regardless of the content of the information or the videos." (Doc. 116 at 20.) Both Defendants and Intervenor contend that because the Act does not single out any subset of messages and applies equally to all uses of information and all recordings used to breach an employee's duty of loyalty, it is viewpoint-neutral. (Docs. 115 at 14; 116 at 18.)

Restrictions on speech are subject to either strict scrutiny or intermediate scrutiny under the First Amendment. Turner Broad. Sys., 512 U.S. at 640-41. Both content- and viewpoint-based restrictions are subject to strict scrutiny. Ysursa v. Pocatello Educ. Ass'n., 555 U.S. 353, 358 (2009) ("Restrictions on speech based on its content are presumptively invalid and subject to strict scrutiny.") (internal quotation marks omitted) (citing Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 188 (2007); R.A.V., 505 U.S. at 382). Content-based restrictions on speech "target speech based on its communicative content" and are presumptively invalid. Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015). Before a law can be deemed content-neutral, the court must first

36

consider whether the law is content-based on its face, and then consider whether the purpose and justification for the law are content-based. Id. at 2228. In describing this two-pronged inquiry, the Supreme Court stated:

> Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose . . . . Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys.

Id. at 2227 (internal citation and quotation marks omitted). See Am. Ass'n of Political Consultants, Inc. v. FCC, 923 F.3d 159, 165-67 (4th Cir. 2019), cert. granted sub nom. Barr v. Am. Ass'n of Political Consultants, Inc., 140 S. Ct. 812 (2020) (applying Reed's two-pronged inquiry). In the same vein, viewpoint-based restrictions on speech are "'an egregious form of content discrimination,' and '[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 443 (4th Cir. 2013) (quoting Rosenberger v. Rector & Visitors of University of Virginia, 515 U.S. 819, 829 (1995)).

While content- or viewpoint-based restrictions on speech are subject to strict scrutiny, a law that is "neither content nor

37

viewpoint based . . . need not be analyzed under strict scrutiny." McCullen v. Coakley, 573 U.S. 464, 485 (2014). But a content-neutral law does not escape scrutiny altogether. Am. Ass'n of Political Consultants, 923 F.3d at 165. Content- and viewpoint-neutral laws are reviewed under an intermediate scrutiny standard. Turner Broad. Sys., 512 U.S. at 642.

### i. Subsections (b)(1) and (b)(2)

As discussed above, subsection (b)(1) creates liability for an employee who "captures or removes [an] employer's data, paper, records, or any other documents and uses the information to breach the person's duty of loyalty to the employer." N.C. Gen. Stat. § 99A-2(b)(1). Without deciding whether this subsection is a law of general application, the court found that (b)(1) as applied to Plaintiffs has more than an incidental impact on speech, and as such is subject to at least intermediate scrutiny. Capital Assoc. Indus., 922 F.3d at 209 ("[I]ntermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech . . . ."). However, subsections (b)(1) and (b)(2) create liability for employees who use information or recordings to "breach [their] duty of loyalty to [their] employer." N.C. Gen. Stat. § 99A-2(b)(1) and (b)(2). As to the content- and viewpoint- analysis, Defendants' and Intervenor's arguments, as well as those of Plaintiffs, primarily concern whether reviewing the content of the recording is necessary. But this is not the

38

only way a law can be content-based.  Here, liability under these subsections is triggered by the purpose of speech, that is, to breach a duty of loyalty.  While a more subtle form of content-based distinction, regulating speech based on its function or purpose is still a content-based restriction on speech.  Reed, 135 S. Ct. at 2227.

Defendants' argument that the Act regulates conduct as opposed to speech was addressed and rejected above.  Defendants further argue that the Act allows anyone to use the recordings gathered from an employer's premises so long as they are not used to breach a duty of loyalty.  (Doc. 115 at 13.)  But the condition imposed is based on the purpose of the speech.  Intervenor argues that "[w]hile the subsection (b)(2) prohibition applies only when the employee uses the video to breach his duty of loyalty, that does not require an examination of the content of the video but rather of the *purpose* for which the recording is used."  (Doc. 110 at 22) (emphasis added).  The same can be said for subsection (b)(1).

The parties take differing views on whether the content of the speech must be reviewed to determine whether it breaches a duty of loyalty.  But because the court finds that these provisions of the Act regulate speech by its purpose, the court need not address this argument.  Subsections (b)(1) and (b)(2) are content-based and will be subject to strict scrutiny.  See Greater

39

Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore, 879 F.3d 101 (4th Cir. 2018) (applying heightened scrutiny to an ordinance challenged as-applied); Wash. Post v. McManus, 355 F. Supp. 3d 272 (D. Md.), aff'd, 944 F.3d 506 (4th Cir. 2019) (applying strict scrutiny to a Maryland statute challenged on a First Amendment as-applied basis).

### ii. Subsection (b)(3)

Subsection (b)(3) prohibits placing an unattended camera or recording device on an employer's premises and "using that device to record images or data." N.C. Gen. Stat. § 99A-2(b)(3). Plaintiffs' argument that subsection (b)(3) is content-based rests on their belief that subsection (e) of the Act establishes that the entire law is content-based. (Doc. 114 at 20.) Defendants argue that subsection (b)(3) "applies to all unauthorized recordings made in nonpublic areas of an owner's premises" and that the content of the recordings is "irrelevant and immaterial." (Doc. 115 at 14.) Intervenor agrees, arguing that (b)(3) is "a blanket prohibition that applies without the need to examine the message of the video." (Doc. 116 at 20.)

A review of the provision shows that it is neither content- nor viewpoint-based and is thus subject to intermediate scrutiny. Liability for using an unattended camera to record images or data does not define the regulated speech by subject matter. The Act does not prohibit the recording of agricultural facilities or

40

research labs, but instead prohibits all unauthorized recording. Similarly, the regulated speech is not defined by its function or purpose. And as Defendants and Intervenor argue, there is no need to review the recording or consider its contents to find that someone has engaged in what the subsection proscribes. Subsection (b)(3) could just as easily be used to prohibit the recording of an employee birthday gathering as it could to prohibit the recording of practices at an agricultural facility. The content and viewpoint of the recordings captured by unattended cameras and recording devices play no role in the applications of subsection (b)(3).

Because subsection (b)(3) is content- and viewpoint-neutral, it is subject to intermediate scrutiny.

### iii. Subsection (b)(5)

As discussed above, subsection (b)(5) prohibits "act[s] that substantially interfere[] with the ownership or possession of real property." N.C. Gen. Stat. § 99A-2(b)(5). It does not target speech. As applied to Plaintiffs, however, it necessarily ensnares First Amendment protected activity because the act that "substantially interferes" with the ownership or possession of real property is the recording and image capture itself. In this respect, it differs from the torts in Food Lion.[9] In this context,

---

[9] In Food Lion, the trespass occurred independent of the recording, and

41

subsection (b)(5) is subject to intermediate scrutiny. See Capital Assoc. Indus., 922 F.3d at 209 ("[I]ntermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech . . . . For laws with only an incidental impact on speech, intermediate scrutiny strikes the appropriate balance between the states' police powers and individual rights."); see also Ross v. Early, 746 F.3d 546, 554 (4th Cir. 2014) (applying intermediate scrutiny where "the parties . . . stipulated that the Policy [designating areas where protests could be made] is 'generally applicable'").

### c. Application of Scrutiny

As noted above, subsections (b)(1) and (b)(2) are subject to strict scrutiny; and subsections (b)(3), and (b)(5) are subject to intermediate scrutiny. Throughout their briefing, Defendants and Intervenor failed to defend the Act on strict scrutiny grounds, instead arguing that at best intermediate scrutiny applies. (Docs. 115 at 14; 116 at 22.) Thus, they have failed to carry their burden as to subsections (b)(1) and (b)(2). However, as detailed below, even under intermediate scrutiny each of the challenged provisions fails.

---

the breach of duty of loyalty required conduct adverse to the employer's interests. Subsection (b)(5), in contrast, could be breached merely by making the recording.

### i.  Strict Scrutiny

As content-based restrictions on speech, subsections (b)(1) and (b)(2) require review under the exacting strict scrutiny standard.  As to Plaintiffs' as-applied challenge to subsection (b)(1), the court has no detailed account of how, or even whether, the Property Protection Act would be enforced against Plaintiffs, because the Act was challenged prior to enforcement.  Educ. Media Co., 731 F.3d at 298 n.5. (citation and internal quotation marks omitted) ("[A]n as-applied challenge is based on a developed factual record and the application of a statute . . . ."). This court is limited to a largely undeveloped record regarding enforcement.  However, Plaintiffs have "alleged an intention to engage in . . . conduct arguably affected with a constitutional interest, a credible threat that the Act will be enforced against them if they proceed with their plans, and that they have refrained from proceeding for fear of being subjected to the [Act's] severe civil remedies."  PETA, 737 F. App'x at 130 (citation and internal quotation marks omitted).  The court will look to Plaintiffs' declarations of the acts they would engage in if not for their fear of being subjected to the Act. (Docs. 100-1, 100-2, 101-1, 101-2, 101-3, 101-4, 101-5, 101-6.)  See Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 249 n.7 (2010) (finding that in the absence of exhibits or other evidence to ground the analysis of a pre-enforcement as-applied challenge, the

court would rely on the party's general claims).  Specifically, Plaintiff ALDF has detailed its use of photographs during undercover investigations (Doc. 100-2 at 4), and both PETA and ALDF have asserted their intention to disseminate the information they collect during their undercover investigations (Docs. 100-1 at 9-10; 100-2 at 8-9).  Rather than argue that the Act impacts differently situated Plaintiffs in differing ways, Plaintiffs ASPCA, CFS, Farm Forward, Farm Sanctuary, FWW, and GAP, who claim to merely disseminate the information that others obtain from such investigations, have not averred an intention to engage in acts prohibited by subsection (b)(1).  Consequently, they have not articulated a basis for challenging this provision as-applied.

To survive strict scrutiny, the State bears the burden of proving that a law's restriction on speech "furthers a compelling interest and is narrowly tailored to achieve that interest." Citizens United, 558 U.S. at 340 (citation and internal quotation marks omitted); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 16-17 (1973) (placing the burden on the government).  To be narrowly tailored, a law must be "the least restrictive means of achieving a compelling state interest."  McCullen, 573 U.S. at 478 (citing United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000)).  "Moreover, the restriction cannot be overinclusive by unnecessarily circumscrib[ing] protected expression, or underinclusive by leav[ing] appreciable damage to

44

[the government's] interest unprohibited." <u>Cahaly v. Larosa</u>, 796 F.3d 399, 405 (4th Cir. 2015) (internal citations and quotation marks omitted) (citing <u>Republican Party of Minn. V. White</u>, 536 U.S. 765, 775 (2002) (restriction cannot be overinclusive); <u>Reed</u>, 135 S. Ct. at 2232 (restriction cannot be underinclusive)).

Defendants and Intervenor have not put forward any compelling interest, and in fact did not attempt to defend the Act under a strict scrutiny analysis. (Doc. 115 at 14; Doc. 116 at 22.) While strict scrutiny must not be "strict in theory, but fatal in fact," <u>Adarand Constructors, Inc. v. Pena</u>, 515 U.S. 200, 237 (1995) (citation omitted), where the government posits no compelling interest and does not attempt to show that a law is narrowly tailored, as is its burden, it cannot succeed.

Defendants and Intervenor have not shown that subsection (b)(1) or (b)(2) are narrowly tailored to further a compelling state interest. These provisions are therefore unconstitutional under the First Amendment to the United States Constitution.

### ii. Intermediate Scrutiny

The remaining subsections, (b)(3) and (b)(5), are subject to intermediate scrutiny. Plaintiffs argue that these provisions fail because they are under-inclusive and because intermediate scrutiny requires "actual evidence supporting [the] assertion that a speech restriction does not burden substantially more speech than necessary." (Doc. 114 at 25 (quoting <u>Reynolds v. Middleton</u>,

45

779 F.3d 222, 229 (4th Cir. 2015)).)  They note that both the legislative record as well as Defendants' and Intervenor's briefs are devoid of evidence showing the Act is narrowly tailored. Further still, they argue, the State must prove that it tried unsuccessfully to achieve its stated interest through other methods, such as the enforcement of existing laws, which was not done.  (Id. at 26.)  Finally, Plaintiffs argue there is no scienter requirement connected with the prohibited speech, which is the use of information or a recording.  (Id. at 27.)  Defendants disagree, arguing that the Act's express purpose is to protect property rights, a legitimate interest, and that it is narrowly tailored to further that interest.  In support, they offer two points: first, the inclusion of a scienter requirement, which they argue "substantially limits [the Act's] scope and application;" and second, the contention that the Act "only regulates specific instances of conduct that result in a legally cognizable harm to the property owner."  (Doc. 115 at 15.)  They, and Intervenor, further argue that the Act leaves open ample alternative channels of communication.  (Id.; Doc. 116 at 23.)

Plaintiffs' challenge to subsection (b)(5) is proceeding as-applied.  Although the record is not as robust as in an enforcement action, there is ample evidence in the form of sworn declarations discussing the undercover investigations and associated acts that Plaintiffs would engage in but for fear of liability under the

46

Property Protection Act. (Docs. 100-1, 100-2, 101-1, 101-2, 101-3, 101-4, 101-5, 101-6.) While all Plaintiffs adopt the same arguments, the court will consider each Plaintiff's specific declarations in construing the as-applied challenge. The acts that Plaintiffs PETA and ALDF have disclosed include obtaining employment with various facilities and laboratories and disclosing the lawful and unlawful actions of their employers and co-workers to other entities who release that information. (Docs. 100-1 at 9-10; 100-2 at 8-9.) In construing the as-applied challenge to subsection (b)(5), these are the prohibited "act[s]." As to Plaintiffs ASPCA, CFS, Farm Forward, Farm Sanctuary, FWW, and GAP, they have not alleged any intention to gain access to the nonpublic areas of an employer's premises, but instead have indicated their desire to use the information acquired by PETA and ALDF. The challenge to (b)(5) is proceeding as-applied, but given the declarations of these Plaintiffs, their actions do not fall within the subsection's prohibitions.

Under intermediate scrutiny, the State bears the burden of proving that the law is "narrowly tailored to serve a significant government interest and leave[s] open ample alternative channels of communication." Reynolds, 779 F.3d at 225-26 (quoting Clatterbuck v. City of Charlottesville, 708 F.3d 549, 555 (4th Cir. 2013), abrogated on other grounds by Reed, 135 S. Ct. at 2228-29). A law is narrowly tailored if it "does not 'burden

47

substantially more speech than is necessary to further the government's legitimate interests.'" Id. at 226 (quoting McCullen, 573 U.S. at 486). The law cannot be overinclusive and "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). However, "so long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800. Defendants and Intervenor argue that the purpose of the Property Protection Act is to protect property rights, and they cite to statements made by the Act's sponsors while debating the legislation.[10] (Doc. 121 at 16-17.)

The Supreme Court in McCullen recognized that protecting property rights is a legitimate government interest. 573 U.S. at 486-87 (citation and internal quotation marks omitted) ("We have,

---

[10] Statements from legislators include: "[P]roperty protections [sic] is a serious issue that North Carolina companies of all sizes and all industries face on a daily basis" (Doc. 107-5 at 3); "[C]urrently, North Carolina's weak property protection laws put businesses as well as the privacy of their customers at serious risk" (id.); "North Carolina employers need stronger measures to protect their data and merchandise against corporate espionage, organized retail theft, and internal data breaches" (id.); the Property Protection Act "codifies and strengthens North Carolina trespass law to better protect property owners' rights" (id. at 3-4).

48

moreover, previously recognized the legitimacy of the government's interest[] in . . . protecting property rights . . . ."). And the government need not typically provide evidence of it. <u>Billups</u>, 2020 WL 3088108, at *8. Defendants and Intervenor have therefore satisfied that requirement.

That does not end the inquiry, however. Defendants and Intervenor "must demonstrate the [Act] 'materially advances an important or substantial interest by redressing past harms or preventing future ones.'" <u>Ross</u>, 746 F.3d at 556 (quoting <u>Satellite Broad. & Commc'ns Ass'n v. FCC</u> 275 F.3d 337, 356 (4th Cir. 2001)). While a "panoply of empirical evidence" is not required, Defendants and Intervenor "must nonetheless make some evidentiary showing that the recited harms are real, not merely conjectural, and that the [Act] alleviate[s] these harms in a direct and material way." <u>Id.</u> (internal quotation marks omitted) (quoting <u>Satellite Broad.</u>, 275 F.3d at 356). Further, to demonstrate narrow tailoring, they must present "actual evidence supporting [their] assertion that [the] speech restriction[s] [do] not burden substantially more speech than necessary." <u>Reynolds</u>, 779 F.3d at 228-29. Beyond that, Defendants and Intervenor must "*prove* that [the government] actually *tried* other methods to address the problem." <u>Id.</u> at 231 (emphasis in original). <u>See</u> <u>McCullen</u>, 573 U.S. at 496 ("Given the vital First Amendment interests at stake, it is not enough for [the Government] simply to say that other approaches have not

49

worked."). "[T]he government must *show* [] that it seriously undertook to address the problem with less intrusive tools readily available to it, and must *demonstrate* that [such] alternative measures . . . would fail to achieve the government's interests, not simply that the chosen route is easier." Reynolds, 779 F.3d at 231-32 (emphasis in original) (internal citations and quotation marks omitted).

Defendants and Intervenor point to legislators' floor statements discussing the Act. (Doc. 121 at 16.) They argue that legislators "spoke about the need for the law and their efforts to narrowly tailor it so that it would not burden more speech than necessary." (Id.) Statements made from the floor during the April 22, 2015 debate, and partially cited by Defendants and Intervenor, include the following:

> So first, why is this bill needed? Well, property protections [sic] is a serious issue that North Carolina companies of all sizes and all industries face on a daily basis . . . . North Carolina employers need stronger measures to protect their data and merchandise against corporate espionage, organized retail theft, and internal data breaches. And this act puts greater protection in place to safeguard businesses' property from unlawful access and provide appropriate recourse against individuals that engage in unauthorized activities in non-public areas of business. So what's the bill really do? Well, first of all, it codifies and strengthens North Carolina trespass law to better protect property owners' rights. And it puts teeth into North Carolina trespass law by providing up to $5000 per day penalty for a violation.[11]

---

[11] The Act actually provides $5,000 per day in exemplary damages, not "up to" $5,000. N.C. Gen. Stat. § 99A-2(d)(4).

50

(Doc. 107-5 at 3-4.)

These statements do in fact identify a problem and set forth a solution to curtail it in the future. However, the evidence Defendants and Intervenor cite does not rise to the level dictated by Ross, particularly that the "recited harms are real, not merely conjectural, and that the [Act] alleviate[s] these harms in a direct and material way." 746 F.3d at 556 (citation and internal quotation marks omitted). And while the statements above suggest that the Act strengthens North Carolina trespass law, there is no indication in the record that property protection under North Carolina's existing trespass law was unsuccessful. Without engaging in a review of all North Carolina statutes available to address property protection, obvious candidates are North Carolina General Statute § 99A-1, entitled "Recovery of damages for interference with property rights,"[12] and the North Carolina tort

_____

[12] N.C. Gen. Stat. § 99A-1 provides:

**§ 99A-1. Recovery of damages for interference with property rights.**
    Notwithstanding any other provisions of the General Statutes of North Carolina, when personal property is wrongfully taken and carried away from the owner or person in lawful possession of such property without his consent and with the intent to permanently deprive him of the use, possession and enjoyment of said property, a right of action arises for recovery of actual and punitive damages from any person who has or has had, possession of said property knowing the property to be stolen.
    An agent having possession, actual or constructive, of property lawfully owned by his principal, shall have a right of action in behalf of his principal for any unlawful interference with that possession by a third person.

51

of trespass (upheld in Food Lion, where videotaping was involved)[13] as examples of existing laws that Defendants and Intervenor have not shown to be ineffective in protecting property rights.

While Defendants and Intervenor have identified a legitimate governmental interest in protecting private property, they have failed to demonstrate through evidence that the Property Protection Act is narrowly tailored to further that interest or that existing laws, such as trespass, are insufficient to address the problem. See Billups, 2020 WL 3088108, at *12 (finding city failed to provide evidence before enacting ordinance that it attempted less restrictive means). Because subsections (b)(3) and (b)(5) are not narrowly tailored, the court "need not consider whether the Act leaves open ample alternative channels of communication." McCullen, 573 U.S. at 496 n.9. And because

_____

> In cases of bailments where the possession is in the bailee, a trespass committed during the existence of the bailment shall give a right of action to the bailee for the interference with his special property and a concurrent right of action to the bailor for the interference with his general property.
> Any abuse of, or damage done to, the personal property of another or one who is in possession thereof, unlawfully, is a trespass for which damages may be recovered.

[13] "The elements of trespass to real property are: (1) possession of the property by the plaintiff when the alleged trespass was committed; (2) an unauthorized entry by the defendant; and (3) damage to the plaintiff from the trespass." Keyzer v. Amerlink, Ltd., 618 S.E.2d 768, 772 (N.C. Ct. App. 2005) (citation and internal quotation marks omitted). A trespasser is liable for all damages proximately caused by his or her wrongful entry. Smith v. VonCannon, 197 S.E.2d 524, 528 (N.C. 1973). As held in Food Lion, the making of surreptitious videotapes would not provide a defense under the First Amendment.

52

subsections (b)(1) and (b)(2) suffer from the same lack of showing, were they similarly subject to intermediate scrutiny they would suffer the same fate.

*   *   *

In summary, Defendants and Intervenor have not met their burden under the strict scrutiny analysis as to subsections (b)(1) and (b)(2) of the Act, nor have they met it under the intermediate scrutiny analysis as to any of the challenged subsections. Given the plans of Plaintiffs PETA and ALDF to conduct undercover investigations of potential employers, the prohibitions in subsections (b)(1) and (b)(5) are unconstitutional as applied to the speech they regularly engage in, as detailed in their sworn declarations. As to subsections (b)(2) and (b)(3), these provisions will always target speech, and speech will always be the activity that triggers liability. No set of circumstances changes the fact that these subsections, as written, are unconstitutional under the First Amendment, and as such, are facially invalid. Where a statute is unconstitutional in every scenario, the appropriate remedy is to strike down the law on its face. See Citizens United, 558 U.S. at 331 (finding that the distinction between facial and as-applied challenges informs only the choice of remedy and not what must be alleged in the complaint).

The court therefore finds that subsections (b)(1) and (b)(5)

of the Act are unconstitutional as-applied and subsections (b)(2) and (b)(3) are unconstitutional both facially and as-applied. See Edwards v. Dist. of Columbia, 755 F.3d 996, 1009 (D.C. Cir. 2014) (finding a law that lacked narrow tailoring was not unique to the challengers and invalidating it both facially and as-applied). Because subsections (b)(2) and (b)(3) do not survive a facial challenge, Plaintiffs' remaining challenges are moot and need not be addressed. However, Plaintiffs also raise a facial challenge to subsections (b)(1) and (b)(5) on both overbreadth and Fourteenth Amendment grounds, and those challenges will be addressed below.

### 5. Overbreadth Analysis

Plaintiffs further challenge subsections (b)(1) and (b)(5) facially as unconstitutionally overbroad. They argue that the Act "reaches numerous other First Amendment protected activities in addition to Plaintiffs' undercover investigations," such as the reporting of crimes. (Doc. 114 at 27-29.) They further argue that there is a realistic danger that the Act will compromise the First Amendment rights of parties not before the court and that "[b]alancing the Law's 'legitimate' applications against its unconstitutional ones also tilts decidedly in Plaintiffs' favor." (Id. at 29.) Defendants argue that Plaintiffs fail to identify the alleged variety of First Amendment protected activity that the Act penalizes, but instead "merely offer a couple of extreme hypothetical situations in which they theorize someone could be

54

found liable under the statute." (Doc. 115 at 15-16.) They contend that the Act can be applied in "many ways that are constitutional – including many applications that do not involve protected speech at all." (Id. at 16.) Further, Defendants assert that "Plaintiffs cannot meet their burden of demonstrating 'a substantial number' of unconstitutional applications, both 'in an absolute sense' and 'relative to the statutes plainly legitimate sweep.'" (Id. at 18 (citing United States v. Williams, 553 U.S. 285, 292 (2008)).)

The overbreadth doctrine allows litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973). "[A] plaintiff asserting a facial challenge may . . . prevail if he or she show[s] that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Educ. Media Co., 731 F.3d at 298 n.5 (citation and internal quotation marks omitted). If a plaintiff makes this showing, then the law is "invalid 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" Doe v. Cooper, 842 F.3d

55

833, 845 (4th Cir. 2016) (quoting Virginia v. Hicks, 539 U.S. 113, 118-19 (2003)). "Although substantial overbreadth is not readily reduced to a mathematical formula, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Id. (internal quotation marks omitted) (citing Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800-01 (1984)). "The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" Williams, 553 U.S. at 303 (quoting Taxpayers for Vincent, 466 U.S. at 800).

"Facial challenges are disfavored," Grange, 552 U.S. at 450, and "[d]eclaring a statute unconstitutionally overbroad 'is, manifestly, strong medicine,' and should be 'employed . . . sparingly and only as a last resort.'" Am. Entertainers, LLC v. City of Rocky Mount, 888 F.3d 707, 715 (4th Cir. 2018) (quoting Broadrick, 413 U.S. at 613). Further, "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." Williams, 553 U.S. at 293. The court has found subsections (b)(1) and (b)(5) of the Act unconstitutional as applied to Plaintiffs. Where Plaintiffs "capture" an employer's data through image capture or "use" information they have acquired by engaging in protected speech, the First Amendment is implicated

56

and subsection (b)(1) is unconstitutional as to those acts. And the "substantial[] interfere[nce]" prohibited in subsection (b)(5) does not extend facially to cover the speech in which Plaintiffs engage. Considering the plainly legitimate sweep of subsections (b)(1) and (b)(5), and given where the statute *does not* reach, the court finds that the Act does not cover a substantial amount of protected activity to render it overbroad.

### C. Fourteenth Amendment

Plaintiffs also argue that subsections (b)(1) and (b)(5) are unconstitutionally vague and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. (Doc. 98 at 1-2.) Defendants and Intervenor argue that the Act is not vague and was enacted to protect property rights, not out of animus for any particular group. (Docs. 115 at 18-24; 116 at 24-27.)

### 1. Vagueness Analysis

Plaintiffs argue that subsections (b)(1) and (b)(5) fail to provide a person of ordinary intelligence fair notice of what is prohibited, in violation of the Due Process clause of the Fourteenth Amendment. (Doc. 99 at 18.) As to subsection (b)(1), they argue that "duty of loyalty" has no definition and that North Carolina courts only recognize the duty in fiduciary relationships, not the employer-employee relationship contemplated in the Act. (Id. at 18-19.) To Plaintiffs, "there is no standard for what conduct falls within subsection[] (b)(1) . . ., enabling

57

employers to invoke the provision[] for any covered activity they deem disloyal." (Id. at 19.) As to subsection (b)(5), which covers activities that "substantially interfere with the ownership or possession" of property, Plaintiffs contend that the Act does not define those terms. Moreover, they argue, subsection (b)(5) does not set forth what type of interference falls within its grasp and does not speak to who determines whether that interference is "substantial." (Id.) Defendants and Intervenor argue the Act provides adequate notice of what conduct is prohibited. (Doc. 121 at 19.) They urge that North Carolina courts have given meaning to the phrase "duty of loyalty," but regardless, the applicable test is whether the allegedly vague terms "have an ordinary and common sense meaning." (Id.) To that end, they assert that "'duty of loyalty' simply means that an employee has an obligation not to act in a manner adverse to his employer's interest" and that "'substantially interfere' means to hinder or impede to a great or significant extent." (Id. at 20.)

"The void for vagueness doctrine is rooted in the Due Process Clause of the Fifth and Fourteenth Amendments." Manning v. Caldwell for City of Roanoke, 930 F.3d 264, 272 (4th Cir. 2019) (en banc). Laws that "fail[] to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, or [are] so indefinite that [they] encourage[] arbitrary and erratic [enforcement]" are void under

58

the Due Process Clause of the Fourteenth Amendment.  Colautti v. Franklin, 439 U.S. 379, 390 (1979) (internal citations and quotation marks omitted).  However, "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree."  Nash v. United States, 229 U.S. 373, 377 (1913).  See also Doe, 842 F.3d at 842 ("When applying the constitutional vagueness doctrine, the Supreme Court distinguishes between statutes that 'require[] a person to conform his conduct to an imprecise but comprehensible normative standard' and those that specify 'no standard of conduct.'") (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971)).  Addressing vagueness, the Supreme Court has said "[w]here a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."  Parker v. Levy, 417 U.S. 733, 752 (1974) (quoting Smith v. Goguen, 415 U.S. 566, 573 (1974)).  In addition, while a greater degree of specificity is needed in the First Amendment context, civil statutes require less clarity than those imposing criminal penalties.  Manning, 930 F.3d at 272.  Statutes that impose quasi-criminal penalties, however, are subject to a stricter test for vagueness.  Id. at 273.

Here, the Property Protection Act is a civil statute that provides, in addition to compensatory damages, a $5,000 per-day

penalty for violations as well as an award of attorneys' fees.
Cf. Mobil Oil Corp. v. Att'y Gen. of Va., 940 F.2d 73, 75 (4th
Cir. 1991) (in pre-enforcement challenge to the Virginia Petroleum
Products Franchise Act, noting its "stiff civil remedy" of $2,500
in liquidated damages, actual damages, and attorneys' fees).  The
less demanding test of vagueness ordinarily accorded a civil
statute must therefore take into account the substantial exemplary
damages associated with a violation of the Act.

    As written, subsection (b)(1) prohibits using gathered
information "to breach [one's] duty of loyalty to the employer."
N.C. Gen. Stat. § 99A-2(b)(1).  Defendants argue that duty of
loyalty means "an employee has an obligation not to act in a manner
adverse to his employer's interest." (Doc. 121 at 20.)  They also
suggest that North Carolina courts have "described the concept
generally in several cases." (Doc. 110 at 27.)  In Dalton v. Camp,
the North Carolina Supreme Court intimated that the duty of loyalty
exists in the fiduciary context, stating "[a]s for any claim
asserted . . . for breach of a duty of loyalty (in an employment-
related circumstance) outside the purview of a fiduciary
relationship, we note from the outset that: (1) no case cited by
plaintiff recognizes or supports the existence of such an
independent claim, and (2) no pattern jury instruction exists for
any such separate action." 548 S.E.2d at 708.  In discussing two
cases a litigant relied on, specifically McKnight v. Simpson's

60

Beauty Supply, Inc., 358 S.E.2d 107 (N.C. Ct. App. 1987), and In re Burris, 140 S.E.2d 408 (N.C. 1965) (per curiam), the court stated, "if McKnight and Burris indeed serve to define an employee's duty of loyalty to his employer, the net effect of their respective holdings is limited to providing an employer with a defense to a claim of wrongful termination." Dalton, 548 S.E.2d at 709. While the existence of an independent cause of action for breach of duty of loyalty was not at issue in McKnight and Burris, taken together they may define what the duty of loyalty means in an employment context. See Burris, 140 S.E.2d at 410 (stating "[w]here an employee deliberately acquires an interest adverse to his employer, he is disloyal"); McKnight, 358 S.E.2d at 109 (stating every employee must "serve his employer faithfully and discharge his duties with reasonable diligence, care and attention"). As the breach of such duty has historically been sufficient to serve as a defense to a wrongful termination action, it cannot be said to have an historical basis of vagueness.

Subsection (b)(1) is explicit in what is prohibited. Whether the proper definition stems from the common meaning advanced by Defendants or the synthesized definition from the North Carolina state courts, the "duty of loyalty" is what may not be breached. As stated above, "what renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but

61

rather the indeterminacy of precisely what that fact is."
Williams, 553 U.S. at 306. It is clear what fact creates liability
under the Act, the breach of the duty of loyalty. Any subsequent
difficulties or close calls in deciding whether a breach has in
fact occurred does not amount to a vagueness issue. While
construing the Act to have one defined meaning might add clarity,
"federal courts are without power to adopt a narrowing construction
of a *state* statute unless such a construction is reasonable and
readily apparent." Virginia Soc'y for Human Life, Inc. v.
Caldwell, 152 F.3d 268, 270 (4th Cir. 1988) (emphasis in original)
(citation and internal quotation marks omitted). See also United
States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 369 (1971)
(stating federal courts "lack jurisdiction authoritatively to
construe state legislation"). But the lack of a precise definition
of a prohibited act does not render a law void for vagueness. See
United States v. Shrader, 675 F.3d 300, 310 (4th Cir. 2012)
(internal citations and quotation marks omitted) (describing
vagueness tests to be "practical rather than hypertechnical . . .
and when a statute fails to provide an explicit definition,
[courts] may resort to ordinary meaning and common sense,
considering whether the statute conveys sufficiently definite
warning as to the proscribed conduct when measured by common
understanding and practices.").

As the court has noted, subsection (b)(5) does not facially

target First Amendment-protected activity. Subsection (b)(5)'s prohibition on "substantial" interference is a matter of degree. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." Williams, 553 U.S. at 306. Interference itself is not a term or concept that fails to give fair notice of what is prohibited. Moreover, the subsection requires more - *substantial* interference - with such ownership or possession; mere interference is insufficient. Subsection (b)(5) provides a comprehensive normative standard, regardless of its relative imprecision.

Plaintiffs further argue that the Act does not specify who determines whether the interference is substantial. But this is not an issue of vagueness. The Act establishes a civil remedy against individuals who engage in certain acts that exceed their authority. And while the initial determination of whether there has been substantial interference is made by the owner of the premises (who may decide whether to sue), it is ultimately a factfinder, whether judge or jury, that will determine whether a particular act satisfies the requirements under the law. On balance, the court concludes that subsection (b)(5) is not facially void for vagueness, as a host of trespass activity could fall

63

within its terms.[14]  Further couching the application and aiding in the interpretation of subsection (b)(5) is subsection (a)'s requirement that acts done in excess of one's authority be committed following the *intentional* accessing of the nonpublic areas of another's premises.  This intent requirement will aid Plaintiffs in determining whether their actions fall within the scope of the statute.

In sum, the challenged provisions, subsections (b)(1) and (b)(5), are not impermissibly vague as a facial matter, and Plaintiffs' motion for summary judgment will be denied.

### 2.    Equal Protection Analysis

Plaintiffs challenge the Act on the ground that it violates the Equal Protection Clause of the Fourteenth Amendment.  Relying heavily on United States v. Windsor, 570 U.S. 744 (2013), they argue that the legislative history and veto statement of the Act make it clear that it was enacted to punish animal rights advocacy organizations.  (Doc. 99 at 19.)  In Plaintiffs' view, the Act was not necessary, given the laws on the books, and was designed to target organizations like those of Plaintiffs.  To support their position that the Act was passed out of animus, Plaintiffs highlight certain statements by its sponsors.  Defendants argue

---

[14] Other laws have broad elements of proof, such as North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, which provides for treble damages and attorneys' fees for "unfair" and "deceptive" conduct.

64

that the Act does not violate the Equal Protection Clause because it does not burden a fundamental right, applies equally to all individuals, and is rationally related to a legitimate governmental interest. (Doc. 121 at 20.) In contrast to the statements identified by Plaintiffs, Defendants point to statements by the Act's sponsors indicating a desire to protect private property. (Id. at 20-21.) Finally, Defendants argue the text of the Act does not create classifications but instead applies evenhandedly to every individual.

The Equal Protection Clause of the United States Constitution dictates that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." King v. Rubenstein, 825 F.3d 206, 220 (4th Cir. 2016) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)). The vast majority of Equal Protection challenges are subject to a rational basis review, that is, whether the law is rationally related to some legitimate government interest. Manning v. Caldwell, 900 F.3d 139, 152 (4th Cir. 2018), rev'd en banc, 930 F.3d 264 (4th Cir. 2019) (reversed on other grounds). "Only those laws that implicate a fundamental constitutional right

or employ a suspect classification — typically some immutable characteristic such as race or sex — receive heightened scrutiny." Id. (citing City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.")). However, "[t]he Constitution's guarantee of equality must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot justify disparate treatment of that group." Windsor, 570 U.S. at 770 (citation and internal quotation marks omitted). A law motivated by animus or by a desire to harm a politically unpopular group is reviewed under "a more searching form of rational basis review." Lawrence v. Texas, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring).

Plaintiffs do not suggest they are members of a protected class but instead argue that the Property Protection Act was enacted out of animus toward groups like theirs. But they have failed to show that the Act was passed with animus toward them. Highlighting statements made by the Act's sponsors sheds light on some of the justifications for the Act, but those same sponsors professed other justifications for the Act wholly unrelated to

66

Plaintiffs. And as it relates to voiding a statute that, on its face, creates no unconstitutional classifications, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [the court] to eschew guesswork." United States v. O'Brien, 391 U.S. 367, 383-84 (1968). When considering the legislative record before the court, animus and discrimination are not apparent. Furthermore, Defendants are correct that the text of the law matters. See Romer v. Evans, 517 U.S. 620, 632-33, 635 (1996) (emphasis added) (finding that the text of an amendment to the Constitution of the State of Colorado imposed "a broad and undifferentiated disability on a *single named group*" and was motivated by animus). Plaintiffs support their argument with reference to Windsor, but unlike in Windsor where the Defense of Marriage Act text, and its name, made it clear that a subset of the population was being targeted, the Act before the court creates no category or disfavored subset of the population. In fact, the ratified bill was entitled "An Act to Protect Property Owners from Damages Resulting from Individuals Acting in Excess of the Scope of Permissible Access and Conduct Granted to Them." (Doc. 99-8.) Just as the Act applies to Plaintiffs' animal rights efforts, subsection (b)(1) could apply equally to a corporate executive seeking to steal documents from her employer to sell to a competitor, or subsection (b)(5) to an actor who enters another's

67

property and removes or destroys production equipment. Compare the Property Protection Act with the challenged statute in U. S. Dept. of Agric. v. Moreno, 413 U.S. 528, 533-34 (1973), which distinguished between households of related people and households of unrelated people to prevent hippies from participating in food stamp programs. The statute in Moreno created statutory classifications which were "clearly irrelevant to the stated purposes of the Act." Id. at 534. In contrast, the Property Protection Act applies equally to all people and all organizations and is rationally related to a legitimate governmental interest. Consequently, Plaintiffs have not shown that the alleged animus motivated the passage of the Act.

As to the Equal Protection Clause challenge to subsections (b)(1) and (b)(5) of the Act, therefore, Plaintiffs' motion for summary judgment will be denied and Defendants' and Intervenor's motions for summary judgment will be granted.

**D.  Subsection (c)**

Plaintiffs challenge N.C. Gen. Stat. § 99A-2(c) as it relates to the unconstitutional provisions addressed above. Subsection (c) creates joint liability for any person who "intentionally directs, assists, compensates, or induces another person to violate" the Property Protection Act. Plaintiffs' main arguments are that "direct[ing]" and "induc[ing]" directly involve speech (Doc. 99 at 11), and that subsection (c) should be struck down in

68

connection with subsections (b)(1)-(3) and (5). Each Plaintiff adopts the above arguments, although there is a clear distinction between Plaintiffs who wish to conduct undercover investigations, and those who wish to publish the information collected through those investigations. In response, Intervenors argue that Plaintiffs "provide no authority for the proposition that the First Amendment protects individuals who encourage others to violate generally applicable privacy and trespass laws to gather information." (Doc. 116 at 16.)

"[T]he First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts which the plaintiff (or the prosecution) can establish were undertaken with specific, if not criminal, intent." Rice v. Paladin Enters., Inc., 128 F.3d 233, 248 (4th Cir. 1997). If a person is targeted under the Act for intentionally inducing or directing another to violate a valid provision of subsection (b), the First Amendment would not protect them from liability. However, the court has found that subsections (b)(2) and (b)(3) are facially unconstitutional and subsections (b)(1) and (b)(5) are unconstitutional as-applied to Plaintiffs. Where the underlying act cannot form the basis for civil liability, then liability cannot be imposed for "direct[ing], assist[ing], compensat[ing], or induc[ing]" someone to engage in that act. See Champion Pro Consulting Grp., LLC v. Impact Sports Football, LLC, 116 F. Supp. 3d 644, 652, 664 (M.D.N.C. 2015), aff'd sub

69

nom. <u>Champion Pro Consulting Grp., Inc. v. Impact Sports Football,</u>
<u>LLC</u>, 845 F.3d 104 (4th Cir. 2016) (finding no liability where
defendants allegedly induced another to engage in activity that
was, itself, lawful). <u>See also</u> 54 Causes of Action 2d 603 <u>Cause</u>
<u>of Action for Civil Conspiracy</u>, § 2 (2012). Therefore, subsection
(c) cannot create joint liability for any Plaintiff who encourages
or assists either the prohibited acts in subsections (b)(2) and
(b)(3), or PETA and ALDF's specific acts prohibited in (b)(1) and
(b)(5).

      **E.  Severability**

No party has spoken to the severability of the Act, an issue
necessarily raised by the challenges. When a court finds that
only part of a law is unconstitutional, it may sever the
unconstitutional provisions and leave the valid provisions of the
law in place. <u>Leavitt v. Jane L.</u>, 518 U.S. 137, 139-40 (1996).
This severability analysis is governed by state law. <u>Id.</u> at 139-
40. In North Carolina, the question of severability turns on
whether provisions of a statute are "so interrelated and mutually
dependent" on others that they "cannot be enforced without
reference to another." <u>Fulton Corp. v. Faulkner</u>, 481 S.E.2d 8, 9
(N.C. 1997). The intent of the state legislature also serves a
guiding principle. <u>Pope v. Easley</u>, 556 S.E.2d 265, 268 (N.C.
2001).

While the existence of a severability clause would be a "clear

statement of legislative intent," <u>Appeal of Springmoor, Inc.</u>, 498 S.E.2d 177, 184-85 (N.C. 1998), its presence is not required for this court to find that the Act can be enforced absent its unconstitutional provisions. Subsections (b)(1) through (b)(5) of the Property Protection Act give a complete account of what acts "exceed[] a person's authority to enter the nonpublic areas of another's premises." N.C. Gen. Stat. § 99A-2(b). This disjunctive list of discrete acts indicates that the legislature intended that each separate provision be enforceable on its own, if implicated, regardless of the neighboring provisions. As such, subsections (b)(1), (b)(2), (b)(3), and (b)(5) operate independently and can be enforced without reference to another. The court finds, consistent with North Carolina state law, that the challenged provisions of the Property Protection Act were intended to be severable and they are not mutually dependent on one another. The law is severable, and the facially unconstitutional provisions of subsections (b)(2) and (b)(3) will be severed from the Act.[15]

**III. CONCLUSION**

For the reasons set forth above, the court finds that subsections (b)(1) and (b)(5) of the Property Protection Act are unconstitutional as applied to Plaintiffs and subsections (b)(2) and (b)(3) are unconstitutional both facially and as applied.

---

[15] This conclusion is consistent with the fact that Plaintiffs did not challenge other portions of the Act.

71

IT IS THEREFORE ORDERED that Plaintiffs' motion for summary judgment (Doc. 98) is GRANTED IN PART and DENIED IN PART and Defendants' and Intervenor's motions for summary judgment (Docs. 107, 109) are GRANTED IN PART and DENIED IN PART as follows:

As to N.C. Gen. Stat. §§ 99A-2(b)(1) and (b)(5), Plaintiffs' motion for summary judgment based on their First Amendment challenge (Count I) is GRANTED and the law is declared unconstitutional as applied to them in their exercise of speech. Defendants, as well as their officers, agents, employees, attorneys, and all other persons in active concert or participation with them, are therefore permanently enjoined from attempting to enforce subsections (b)(1) and (b)(5) against Plaintiffs in their stated exercise of speech. Plaintiffs' motion is otherwise DENIED as to these subsections. Defendants' and Intervenor's motion for summary judgment is GRANTED as to any facial challenge to these subsections but is otherwise DENIED.

As to N.C. Gen. Stat. §§ 99A-2(b)(2) and (b)(3), Plaintiffs' motion for summary judgment based on their First Amendment challenge (Count I) is GRANTED and the law is declared unconstitutional both facially and as applied to them in their exercise of speech. Subsections (b)(2) and (b)(3) are therefore struck down as unconstitutional. Defendants, as well as their officers, agents, employees, attorneys, and all other persons in active concert or participation with them, are permanently

enjoined from attempting to enforce subsections (b)(2) and (b)(3) against Plaintiffs. Defendants' and Intervenor's motions for summary judgment on Plaintiffs' facial challenge are DENIED. The parties' remaining challenges are MOOT.

A judgment in conformance with this Memorandum Opinion and Order will be issued.

_____/s/____Thomas D. Schroeder
United States District Judge

June 12, 2020